<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

| | | |
|---|---|---|
| **CARNECIA ROBINSON,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civ. Action No. 07-675(RBW)** |
| | : | |
| **DISTRICT OF COLUMBIA,** | : | |
| | : | |
| **Defendant.** | : | |

<div align="center">

**ADMINISTRATIVE RECORD**

</div>

Attached is an index and the record of the administrative proceedings at issue in this action.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District
 of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

/s/ *Edward P. Taptich*
EDWARD P. TAPTICH (012914)
Chief, Equity Section 2

/s/ *Veronica A. Porter*
VERONICA A. PORTER (412273)
Assistant Attorney General
441 4th St., N.W., Sixth Floor South
Washington, D.C. 20001
(202) 724-6651
(202) 727-3625 (facsimile)
veronica2.porter@dc.gov

**February 29, 2008**

**J.R. v. District of Columbia, Civ. Action No. 07-675**

**Index of Record**

|  |  | **Page** |
|---|---|---|
| 1. | Certification of Record | 1 |
| 2. | Due Process Complaint Notice, 9/28/06 | 2-6 |
| 3. | Scheduling Memorandum, 9/29/06 | 7-10 |
| 4. | Due Process Hearing Notice, 10/24/06 | 11 |
| 5. | Due Process Hearing Notice, 12/4/06 | 12 |
| 6. | Hearing Officer's Decision, 1/12/07 | 13-21 |
| 7. | JR-1 Plaintiff's Disclosure letter, 11/17/06 | 22-24 |
| 8. | JR-2 Notice Compelling DCPS witnesses, 11/17/06 | 25 |
| 9. | JR-3 Due Process Complaint Notice, 9/28/06 | 26-30 |
| 10. | JR-4 Due Process Hearing Notice, 10/24/06 | 31 |
| 11. | JR-5 Student Evaluation Plan, 2/16/06 Includes Consent for Evaluation, 2/16/06- Receipt of Procedures Manual 2/16/06 | 32-34 |
| 12. | JR-6 MDT Meeting Notes, 2/16/06 | 35-37 |
| 13. | JR-7 Student Evaluation Plan, 6/20/06 | 38 |
| 14. | JR-8 MDT Meeting Notes, 6/20/06 | 39-44 |
| 15. | JR-9 MDT Meeting Notes, 8/3/06 | 45-56 |
| 16. | JR-10 Advocate's Meeting Notes, 8/3/06 | 57 |
| 17. | JR-11 MDT Meeting Notes, 9/13/06 | 58-66 |
| 18. | JR-12 Prior to Action Notice, 9/13/06 | 67 |
| 19. | JR-13 Due Process Complaint Disposition, 10/13/06 | 68-71 |

20.  JR-14 Psycho-Educational Evaluation, 5/25/06          72-91

21.  JR-15 ADHD Screening, 8/22/06          92-93

22.  JR-16 Clinical Evaluation, 8/28/06          94-99

23.  JR-17 Letter from Tyrka to W. Walker, 8/30/06          100-102
          Includes Letter of Invitation, 8/30/06

24.  JR-18 Acceptance Letter, Rock Creek Academy, 9/8/06          103

25.  JR-19 Stay-Put Notice, 9/29/06          104-105

26.  JR-20 NCLB-School AYP List for year 2006          106-109

27.  JR-21 NCLB-AYP Status Report for year 2006          110

28.  DCPS Disclosure letter, 11/20/06          111-112

29.  DCPS-1 Due Process Complaint Notice, 9/28/06          113-116

30.  DCPS-2 Title 5, Ch. 30, Special Ed. Policy          117-118

31.  DCPS-3 Prior to Action Notice, 9/13/06          119

32.  DCPS-4 MDT Meeting Notes, 9/13/06          120-128

33.  DCPS-5 ADHD Screening, 8/22/06          129-132

34.  Transcript of Hearing, 1/9/07          133-274

# CERTIFICATION OF RECORD

### INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### *STUDENT HEARING OFFICE*
#### SPECIAL EDUCATION

In the Matter RE:      R██████, J██████ vs. Friendship Southeast ES Academy PCS

Case Information:     Hearing Dates: **01/09/2007**
Held at: **District of Columbia Public Schools Headquarters**
       **825 N. Capitol Street, N.E.**
       **Washington, D.C. 20002**
Student Identification Number:  **9097200**
Student's Date of Birth: ██████/1998
Attending School: **Friendship Southeast ES Academy PCS**
Managing School:
Hearing Request Date(s): **09/29/1996**

## CERTIFICATION OF RECORD

    I, **Shawnta Maddox, Legal Assistant of the Student Hearing Office,**

DO HEREBY CERTIFY that the attached Record of Proceeding is the entire record in

the above entitled matter as of this date, consisting of all letters, pleadings, orders,

exhibits and depositions.

    I FURTHER CERTIFY that the materials forwarded herewith are the true copy

of the original documents submitted in this matter.

EXECUTED this Tuesday, October 30, 2007.

                      **LEGAL ASSISTANT**
                **STUDENT HEARING OFFICE**

1

## DUE PROCESS COMPLAINT NOTICE
### In re J█████ R█████
### September 28, 2006

| | |
|---|---|
| **Petitioner:** | Carnecia Robinson |
| **Student:** | J████ R█████ |
| **DOB:** | ███/98 |
| **Current School:** | Friendship Southeast Elementary Academy ("Friendship") |
| | **NOTE: THIS COMPLAINT IS SOLELY FOR VIOLATIONS BY DCPS.** |
| **Residence:** | 1320 Congress Street, S.E. |
| | Washington, DC 20032 |

**Petitioner's Contact Information for Special Education Purposes:**
Tyrka & Houck, LLP
1726 Connecticut Ave. N.W. Suite 400
Washington, D.C. 20009
Tel: 202-265-4260
Fax: 202-265-4264

**Violations:**

1. Failure to provide an appropriate placement since the start of the 2006-2007 SY.
2. Failure to conduct and review evaluations in all areas of suspected disability.
3. Failure to determine an appropriate disability classification.
4. Failure to develop an appropriate IEP.
5. Failure to provide an appropriate placement.

**Facts:**

1. J█████ has been enrolled at Friendship since the start of the 2005-2006 SY.
2. At an MDT meeting convened on February 16, 2006, the Team:
   a) noted that J█████ "struggles with work and completing task [sic] on 2nd grade level";
   b) discussed J█████ behavioral problems;
   c) developed a student evaluation plan recommending, *inter alia*, completion of a functional behavioral assessment of J█████.
3. A May 25, 2006 psychoeducational evaluation of J█████ reported that her classroom teacher had concerns about her academic performance and behavior.
4. At a June 20, 2006 MDT meeting, the Team recommended, *inter alia*, completion of a clinical evaluation and a functional behavioral assessment.
5. At an August 3, 2006 MDT meeting:
   a) the Team:
      i) determined that J█████ qualifies for special education and related services as a qualified child with a Multiple Disabilities, including a Learning Disability ("LD") and Other Health Impairment ("OHI");

2

    ii) developed an IEP prescribing 25 hours of specialized instruction, 1 hour of occupational therapy services, 1 hour of speech and language therapy, and 30 minutes of counseling per week;

    iii) determined that Friendship was no longer an appropriate placement;

    iv) recommended placement in a full-time setting;

b) the Parent's advocate:

    i) contested the adequacy of J██████ clinical evaluation and her functional behavioral assessment;

    ii) questioned the appropriateness of not including an additional disability classification of Emotionally Disturbed ("ED") on J██████ IEP;

    iii) requested completion of an additional clinical evaluation and a functional behavioral assessment;

    iv) proposed Rock Creek Academy as an appropriate alternative educational placement;

c) the Team:

    i) recommended completion of an additional clinical evaluation;

    ii) agreed to notify DCPS of J██████ need for an alternative placement;

6. An August 28, 2006 ADHD screener diagnosed J██████ with Attention Deficit Hyperactivity Disorder.

7. An August 28, 2006 clinical evaluation of J██████ recommended participation in individual psychotherapy.

8. At a September 13, 2006 MDT meeting:

a) the Team:

    i) recommended a revised disability classification of Multiply Disabled ("MD"), including OHI, Speech and Language Impaired ("SLI"), and LD;

    ii) rejected an additional disability classification of ED;

    iii) recommended a smaller placement for J██████;

b) the Petitioner's advocate:

    i) contested the validity of J██████ current clinical evaluations;

    ii) objected to the rejection of an additional disability classification of ED;

    iii) requested additional clinical testing to confirm a disability classification of ED;

    iv) proposed Rock Creek Academy as an appropriate alternative placement;

    v) reported that J██████ had been accepted for admission into Rock Creek Academy;

c) DCPS:

    i) neglected to participate in the review of J██████ evaluations and in the discussion of her current disability classification and special education needs;

    ii) proposed Prospect Learning Center ("Prospect") as a placement;

    iii) failed to answer questions from the Team about the proposed placement at Prospect Learning Center, including those regarding the student-to-teacher ratio, teacher qualifications, and the age and disability classifications of the other students;

d) the Petitioner's advocate:

    i) objected to DCPS' failure to fully participate in the meeting and to provide all necessary information about the appropriateness of its proposed placement at Prospect;

    ii) reserved a determination on the appropriateness of Prospect;

e) the Team:

3

     i)  agreed to gather additional information for completion of a functional behavioral assessment and development of a behavior intervention plan;

     ii)  did not make any finding or recommendation regarding the appropriateness of Prospect for J██████.

9.  An adequate clinical evaluation of J██████ has never been completed.

10. An adequate functional behavioral assessment and behavior intervention plan have never been completed.

11. DCPS has known of J██████ need for an appropriate alternative placement in a full-time special education program since August 3, 2006.

12. DCPS has never:
    a)  offered an appropriate educational placement for J██████
    b)  issued a prior notice for an appropriate alternative educational placement;
    c)  placed J██████ in an appropriate full-time special educational program.

13. J██████ has been accepted for admission into Rock Creek Academy.

14. J██████ will receive educational benefit at Rock Creek Academy.

**Proposed resolution:**

1.  DCPS to immediately fund and place J██████ at Rock Creek Academy with transportation.

2.  DCPS to immediately fund an independent clinical evaluation and an independent functional behavioral assessment of J██████

3.  DCPS to convene an MDT meeting within thirty (30) days of J██████ enrollment at RCA to:
    a)  review all of her current evaluations,
    b)  revise her IEP, and
    c)  develop an appropriate compensatory education plan to compensate J██████ for its failure to provide an appropriate placement since August 3, 2006.

4.  DCPS to convene an MDT meeting within ten (10) days of receiving J██████ independent clinical evaluation and her independent functional behavioral assessment to:
    a)  review these evaluations,
    b)  revise J██████ IEP, and
    c)  develop an appropriate compensatory education to compensate J██████ for its failure to:
       i)  timely conduct and review an adequate functional behavioral assessment since August 3, 2006;
       ii)  timely conduct and review an adequate clinical evaluation of J██████ since August 3, 2006.

5.  DCPS to pay reasonable attorney fees and costs incurred in bringing and pursuing this case.

**Resolution Meeting:**

1.  The Petitioner contends that the entire IEP Team and a representative of the LEA with authority:
    a.  to immediately fund and place J██████ at Rock Creek Academy with transportation,
    b.  immediately fund an independent clinical evaluation and an independent functional behavioral assessment of J██████,

4

   c.  to convene an MDT meeting within thirty (30) days of J█████ enrollment at RCA, and

   d.  to convene an MDT meeting within ten (10) days of receiving J█████ independent clinical evaluation and independent functional behavioral assessment

are necessary attendees at any resolution meeting.

2. If these individuals are not going to be in attendance, Petitioner requests that DCPS provide counsel with a written notice waiving its right to a resolution session 48 hours prior to any scheduled meeting.

3. The Petitioner contends that any meeting not attended by the identified individuals is not a valid resolution session, but rather an informal settlement discussion.

4. The Petitioner will be accompanied by his or her attorney at any resolution session convened subsequent to the filing of this complaint and will record any resolution session by analog or digital means.

5. Any statements by the Petitioner or his or her representative during any resolution meeting or other settlement discussion incident to the filing of this complaint are for the purposes of compromise only.

Respectfully Submitted,

Douglas Tyrka
Tyrka & Houck, LLP
Attorneys for the Petitioner
1726 Connecticut Ave., NW, Suite 400
Washington, DC  20008
(ph) (202) 265-4260
(f) (202) 265-4264

5

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

**Recipient:** SHO ~OGC

**Fax Number:**

**From:** Douglas Tyrka

**Regarding:** ▆▆▆▆▆ & ▆▆▆▆▆

**# of pages:** 5

**Notes:**

DC PUBLIC SCHOOL SYSTEM    '06 SEP 23 AM 7:54

## CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Associates or their client(s) that is intended solely for the recipient named above. If you are not the intended recipient named above or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Associates expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Associates. Thank you.

STATE EDUCATION AGENCY
DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) | BEFORE A SPECIAL EDUCATION |
| | ) | |
| **R▬▬, J.** Petitioner | ) | |
| | ) | HEARING OFFICER |
| Vs. | ) | |
| | ) | |
| **DCPS** | ) | |
| **Attending Friendship Edison - SE** | ) | DISTRICT OF COLUMBIA |
| | | |
| Respondent | ) | PUBLIC SCHOOLS |

# SCHEDULING MEMORANDUM

1.  A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint <u>within 15 calendar days of receiving notice of the parents' complaint</u>. The meeting shall include a representative of the Local Educational Agency who has decision-making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. **The Student Hearing Office does not schedule or participate in resolution meetings**.

2.  The complaint notice was filed on **September 29, 2006**

3.  The deadline for the resolution meeting is **October 14, 2006** unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

## RESPONSE TO THE COMPLAINT

A.  ***Prior Written Notice Not Issued by the Local Educational Agency***. If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, <u>within 10 days of receiving the complaint</u>, send to the parent a response that shall include:

1.  An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;
2.  A description of other options that the IEP Team considered and the reasons why those options were rejected;
3.  A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and
4.  A description of the factors that is relevant to the agency's proposal or refusal.

Rev'd. 7/6/05

B.     Prior written notice, if not already provided to the parent, must be sent by the Local
       Educational Agency to the complaining party no later than **October 89 2006**.

C.     ***Deficiency Notice***.    A complaint notice shall be deemed sufficient unless the party
       receiving the notice notifies the Student Hearing Office and the complaining party in
       writing, <u>within 15 days of receiving the notice of the complaint</u>, that the complaint does
       not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

D.     The deadline for filing a deficiency notice is **October 14, 2006**.

## DUE PROCESS HEARING

       Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not
resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the
complaint, the due process hearing may occur, and all applicable time lines for scheduling a due
process hearing will commence.  A final hearing officer's decision must be issued within 45 days
from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

       The staff with the Student Hearing Office does not provide legal advice.  The parties
should consult with legal counsel or other representative to answer any legal questions about your
rights, duties, and responsibilities under the law.  The school or the Local Education Agency
responsible for scheduling the meeting will provide information about the time, date, and location
of the resolution meeting.

Rev'd. 7/6/05

8

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556

DISTRICT OF COLUMBIA PUCLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Fax

# Time Sensitive Materials Attached

### Prompt Attention: Attorney:Douglas Tyrka, Esq.
### Parent: Carnecia Robinson

Telephone Number: **(202) 265-4260**          Pages: **3**
Fax Number: **(202) 265-4264**                Date: **September 29, 2006**

---

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: J███████ R████████
School:  **Attending Friendship Edison Elementary Academy**

The Complaint Intake Unit is responsible for providing parties with
information notice that a Due Process Complaint has been filed with the
Student Hearing Office.  If you have questions about the attached Notice,
please contact the Complaint Intake Unit at (202) 724-6556.  Otherwise, if
you have questions about the content of the compliant you should contact
your legal counsel for further advice.

                                        **Thank You**
                                        **Marica Brown**

The document(s) accompanying this telecopy transmission contains confidential information that Is legally
privileged.  The information is intended only for use of the individual or entity named Above, if you are not the
intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in
reliance of the contents of this copied information is Strictly prohibited.  If you receive this telecopy in error, please
immediately notify us by telephone For return of the original document to us.

```
                    ┌─────────────────────────────────────┐
                    │  TRANSMISSION VERIFICATION REPORT     │
                    └─────────────────────────────────────┘

                                    TIME   : 09/29/2006 13:28
                                    NAME   : STATE ENFORCEMENT
                                    FAX    : 2024425253
                                    TEL    :
                                    SER.#  : 000D6J436181

┌──────────────────────────────────────────────────────────────────────┐
│  DATE,TIME              09/29  13:27                                    │
│  FAX NO./NAME           92654264                                       │
│  DURATION               00:00:56                                       │
│  PAGE(S)                03                                             │
│  RESULT                 OK                                             │
│  MODE                   STANDARD                                      │
│                         ECM                                           │
└──────────────────────────────────────────────────────────────────────┘
```

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Fax

## Time Sensitive Materials Attached

**Prompt Attention: Attorney:Douglas Tyrka, Esq.**
**Parent: Carnecia Robinson**

Telephone Number: **(202) 265-4260**          Pages: **3**
Fax Number: **(202) 265-4264**                Date: **September 29, 2006**

---

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: **J███████ R█████████**
School:  **Attending Friendship Edison Elementary Academy**

The Complaint Intake Unit is responsible for providing parties with
information notice that a Due Process Complaint has been filed with the
Student Hearing Office.  If you have questions about the attached Notice,
please contact the Complaint Intake Unit at (202) 724-6556.  Otherwise, if
you have questions about the content of the compliant you should contact
your legal counsel for further advice.

                                        **Thank You**
                                        **Marica Brown**

10

```
┌─────────────────────────────────────────────┐
│        TRANSMISSION VERIFICATION REPORT       │
└─────────────────────────────────────────────┘
```

```
                              TIME  : 10/24/2006 16:55
                              NAME  :
                              FAX   :
                              TEL   :
                              SER.# : BROE6J471573
```

```
┌─────────────────────────────────────────────────────┐
│  DATE,TIME              10/24  16:55                  │
│  FAX NO./NAME           92654264                      │
│  DURATION               00:00:27                      │
│  PAGE(S)                01                            │
│  RESULT                 OK                            │
│  MODE                   STANDARD                      │
│                         ECM                           │
└─────────────────────────────────────────────────────┘
```

2006 OCT 25 AM 11:04    OFFICE OF THE GENERAL COUNSEL

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



HEARING NOTICE

MEMORANDUM VIA: [ ✓ ] FACSIMILE [ ] MAIL [ ] HAND DELIVERY

TO:     Parent (or Representative): _D. TYRKA_          Fax No.: _265 - 4264_

        LEA Legal Counsel: _R. PRIMES_

RE:     R_____, J_____        and (LEA)  DOB: _____ /98
              Student's Name

FROM:   **SHARON NEWSOME**
        Special Education Student Hearing Office Coordinator

DATE SENT: ___10/24/06___

∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙∙

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
_9/29/06_ . Please be advised that the hearing has been scheduled for:

DATE: ___11/28/06___

TIME: ___3:00 Pm___

11

| TRANSMISSION VERIFICATION REPORT |
|---|

```
                                     TIME : 12/04/2006 13:49
                                     NAME :
                                     FAX  :
                                     TEL  :
                                     SER.# : BROE6J471573
```

```
DATE,TIME            12/04  13:48
FAX NO./NAME         92654264
DURATION             00:00:27
PAGE(S)              01
RESULT               OK
MODE                 STANDARD
                     ECM
```

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



X *REVISED COPY*

#### HEARING NOTICE

MEMORANDUM VIA: [✓] FACSIMILE [ ] MAIL [ ] HAND DELIVERY

TO:    Parent (or Representative): D. TYRICA        Fax No.: 265 - 4264

       LEA Legal Counsel: Q. HARRIS - LINDSEY

RE:    R_____ J_____        and (LEA) DOB: _____
              Student's Name

FROM:   SHARON NEWSOME
        Special Education Student Hearing Office Coordinator

DATE SENT: 12/4/06

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
_____. Please be advised that the hearing has been scheduled for:

DATE: 1/9/07                        Con't f

TIME: 1:00 pm or 3:00 pm            11/28/06

12

# District of Columbia Public Schools

## State Enforcement and Investigation Division

**Terry Michael Banks, Due Process Hearing Officer**
825 North Capitol Street, N.E.; Room 8076
Washington, D.C. 20002
(571) 437-7381
Facsimile: (202) 442-5556

## Confidential

| | | |
|---|---|---|
| J_____ R_____, STUDENT | ) | |
| | ) | |
| Date of Birth: _____, 1998 | ) | Hearing Dates: November 28, 2006 |
| | ) | January 9, 2007 |
| Petitioner, | ) | |
| | ) | Complaint Filed: September 28, 2006 |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA | ) | Held at: 825 North Capitol Street, N.E. |
| PUBLIC SCHOOLS | ) | 8th Floor |
| | ) | Washington, D.C. 20002 |
| Respondent. | ) | |
| | ) | |
| Student Attending: | ) | |
| Friendship Southeast Elem. Acad. | ) | |

*(stamp: DC PUBLIC SCHOOL SYSTEM 2007 JAN 12 PM 8· 17)*

## HEARING OFFICER'S DECISION

| | |
|---|---|
| **Parents:** | Ms. Carnecia Robinson, Mother |
| | 1320 Congress Street, S.E. |
| | Washington, D.C. 20032 |
| | |
| **Counsel for Petitioner:** | Douglas Tyrka, Esquire |
| | 1726 Connecticut Avenue, N.W.; Suite 400 |
| | Washington, D.C. 20009 |
| | (202) 265-4260; Fax: (202) 265-4264 |
| | |
| **Counsel for DCPS:** | Quinne Harris-Lindsey, Esquire |
| | Office of the General Counsel, DCPS |
| | 825 North Capitol Street, N.E.; 9th Floor |
| | Washington, D.C. 20002 |

13

An index of names is attached hereto for the benefit of the parties. The index will permit the parties to identify specific witnesses and other relevant persons. The index is designed to be detached before release of this Decision as a public record.

# INDEX OF NAMES

| Child | J█████ R█████ |
|---|---|
| Child's Parent(s) (specific relationship) | Carnecia Robinson, Mother |
| Child/Parent's Representative | Douglas Tyrka, Esquire |
| School System's Representative | Quinne Harris-Lindsey, Esquire |
| Placement Specialist, DCPS | Evan Murray |
| Educational Advocate | Sharon Millis |
| Principal or Designee | Keren Plowden, Executive Director for Student Services, Rock Creek Academy |

**Jurisdiction**

This hearing was conducted in accordance with the rights established under the Individuals With Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. Sections 1400 et seq., Title 34 of the Code of Federal Regulations, Part 300; Title V of the District of Columbia ("District" or "D.C.") Municipal Regulations ("DCMR"), re-promulgated on February 19, 2003; and Title 38 of the D.C. Code, Subtitle VII, Chapter 25.

**Introduction**

Petitioner is an eight year-old student attending Friendship Southeast Elementary Academy ("Friendship"). On September 28, 2006, Petitioner filed a Due Process Complaint Notice ("*Complaint*") alleging that the District of Columbia Public Schools ("DCPS") had failed to (1) provide an appropriate placement, (2) conduct necessary evaluations, (3) determine an appropriate disability classification, and (4) develop an appropriate Individualized Education Program ("IEP"). The due process hearing was convened on January 9, 2007. The parties' Five Day Disclosure Notices were admitted into evidence. Petitioner's counsel moved for a Default Judgment for DCPS' failure to file a response to the *Complaint*. The hearing officer denied the motion because it was not filed in advance of the hearing, thus depriving DCPS of a meaningful opportunity to prepare a response.[1] Petitioner's counsel stipulated that Petitioner's claims are limited to the 2006-2007 school year and that he was not seeking a clinical evaluation.

**Petitioner's Witnesses**

Sharon Millis, Educational Advocate
Keren Plowden, Executive Director for Student Services, Rock Creek Academy

**DCPS' Witnesses**

Evan Murray, Placement Specialist, DCPS

**Findings of Fact**

1. Petitioner is an eight year-old student attending Friendship.[2]

2. On August 3, 2006, Friendship convened a Multidisciplinary Team ("MDT") meeting to determine Petitioner's eligibility for special education services. The MDT determined that Petitioner was eligible and proceeded to develop an IEP for Petitioner.

---

[1] The DCPS Standard Operating Procedures ("SOP") require pre-hearing motions to be filed no later than five business days before the hearing. SOP, §401(C)(4).
[2] *Complaint* at 1.

The MDT classified Petitioner as Learning Disabled ("LD") and prescribed full-time specialized education services, one hour of occupational therapy per week, one hour of speech and language services per week, and 30 minutes of group counseling per week. The MDT determined that Friendship "is no longer appropriate for Petitioner." Petitioner's advocate requested that Petitioner be placed at Rock Creek Academy ("RCA"). The MDT deferred the decision of placement to the State Education Agency, DCPS. DCPS was not represented at the meeting.[3]

3. Friendship convened another MDT meeting on September 13, 2006 "to review evaluations that were completed." The psychologist reported that Petitioner's Attention Deficit Hyperactivity ("ADHD") scores were "elevated in several areas (oppositional, cognitive-inattention, hyperactivity, anxious, shy, and perfectionism. A clinical evaluation was also completed. The clinical included the Rorschach and the Children's Sentence Completion form... [Petitioner] has significant cognitive difficulties that impact her ability to articulate herself and relate with others. Additionally, [Petitioner] experiences a great deal of difficulty and frustration communicating her ideas. Recommendations included therapy and an ADHD screen." The MDT determined that Petitioner had multiple disabilities, LD and other health impaired ("OHI").[4]

4. At the September 13th MDT meeting, Petitioner's advocate again requested a placement at RCA. DCPS recommended Prospect Learning Center ("PLC"). PLC has 13 homeroom teachers certified in special education, five certified specialists, three psychologists, one occupational therapist, and two speech pathologists. Ms. Millis indicated that Petitioner could not accept or reject the placement before visiting PLC.[5]

5. Mr. Murray made the decision to propose PLC as a placement prior to the MDT meeting.[6] Mr. Murray participated in the MDT intermittently and did not participate in the discussion of Petitioner's evaluations and educational needs.[7]

6. Ms. Millis first visited PLC on behalf of Petitioner on November 22, 2006.[8]

7. If Petitioner were to attend PLC, she would be in a class of ten students.[9]

8. Rock Creek Academy ("RCA") accepted Petitioner on September 8, 2006.[10] RCA is a private day school offering full-time special education services. All of its students are funded by DCPS. RCA offers occupational therapy, speech and language services, and psychological counseling by licensed service providers. The student to teacher ratio is 6:1. If Petitioner were to attend RCA, she would be in a class of six

---

[3] Petitioner's Exhibit ("P.Exh.") No. 9.
[4] P.Exh. No. 11 at 1-5.
[5] *Id.* at 6-7.
[6] Testimony of Mr. Murray.
[7] *Id.*; testimony of Ms. Millis.
[8] Testimony of Ms. Millis.
[9] *Id.*
[10] P.Exh. No. 18.

students. All RCA students participate in a point and level behavior modification program that is reinforced daily.[11]

**Conclusions of Law**

1. Petitioner offered no testimonial evidence to refute the appropriateness of the IEP or of the appropriateness of the classification. In fact, Petitioner did not introduce the IEP into evidence. The hearing officer's review of the meeting notes of the MDT meetings on August 3rd and September 13th did not reveal any information that would clearly establish the inappropriateness of Petitioner's classification. The September MDT added OHI as an additional classification and specifically stated that it had not determined that she was emotionally disturbed. At the hearing, Petitioner's counsel stipulated that he was not seeking a clinical evaluation. Thus, there is nothing in the record to contradict the appropriateness of the LD/OHI classification. The hearing officer concludes that Petitioner has failed to meet her burden of proving that her IEP and disability classification are inappropriate.

2. Petitioner's primary objection to the placement at PLC are that (1) Mr. Murray came to the September 13th meeting having already decided to recommend PLC, (2) Mr. Murray did not participate in the MDT's discussion of Petitioner's evaluations and needs, and (3) there was insufficient discussion of PLC's ability to meet Petitioner's needs. Mr. Murray admitted that he predetermined that PLC was the placement he would recommend at the meeting and that he did not participate in the discussion of Petitioner's evaluations and needs. However, Mr. Murray is but one member of the team, and all other members of the team took part in a thorough discussion of Petitioner's needs. Petitioner's mother was invited to propose a placement and she requested RCA. Mr. Murray proposed PLC, and the meeting notes include information provided at the meeting as to PLC's capability to meet the needs of a student with Petitioner's mix of disabilities. According to the meeting notes, Ms. Millis indicated that she could not accept or decline the proposed placement at PLC until visiting the school. However, Ms. Millis did not visit PLC on Petitioner's behalf until November 22nd, more than two months after the MDT meeting.

The September 13th MDT was properly constituted. The IEP team must include the parents of the child, at least one regular education teacher of the child, at least one special education teacher of the child, a representative of the public agency who is qualified to provide or supervise special education services, is knowledgeable about the general curriculum, and is knowledgeable about the availability of resources of the public agency, and an individual who can interpret the instructional implications of evaluation results.[12] The September 13th team met the regulatory requirements.[13]

---

[11] Testimony of Ms. Plowden.
[12] 34 C.F.R. §300.321(a).
[13] P.Exh. No. 11 at 1.

The placement determination must be made "by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options, and … is based on the child's IEP."[14] Petitioner has not shown that the parent did not have a meaningful opportunity to participate in the placement decision. Although Mr. Murray's participation was limited to the determination of the placement location, the primary role of the LEA representative is to be "knowledgeable about the availability of resources of the public agency." Ideally, Mr. Murray would have come to the MDT meeting with more than one placement option and he would have fully participated in the meeting. However, the remaining members of the team were fully aware of Petitioner's evaluation results and educational needs when the discussion turned to placement.

Mr. Murray proposed a placement at a neighborhood school with a staff capable of providing educational benefit, as documented in the September 13th meeting notes. The parent was invited to propose a placement, and she proposed RCA. While the MDT accepted DCPS' proposal to place Petitioner at PLC, the parent neither accepted nor rejected DCPS' placement.[15] Ms. Millis indicated her intention to visit PLC before making a decision to accept or reject the placement. However, she made no effort to visit PLC until more than two months after the MDT meeting, and over nearly two months after the *Complaint* was filed. At the hearing, Ms. Millis offered no explanation for her delay in visiting PLC. However, the date of her visit, November 22nd, was less that one week before the first scheduled hearing date in this proceeding, November 28, 2006. Thus, Petitioner signaled her rejection of the placement by filing the *Complaint* two weeks after the MDT meeting, and that decision preceded Ms. Millis' visit to PLC. Ms. Millis' visit was made to support the allegation in the *Complaint* that PLC is an inappropriate placement for Petitioner rather than as a genuine effort to determine PLC's appropriateness for Petitioner.

The primary difference between DCPS' proposed placement at PLC and Petitioner's proposed placement at RCA appears to be class size. Petitioner would be in a class of ten students at PLC, while the maximum class size at RCA would be six. However, Petitioner offered no compelling evidence that this difference in class size would have a deleterious effect on her academic progress. A class of ten students would provide Petitioner considerable individual attention. While Petitioner would conceivably receive even more attention in the smaller class at RCA, that is not the test. In *Board of Education of the Hendrick Hudson Central School District v. Rowley* ("*Rowley*"),[16] the Supreme Court held that the local education agency ("LEA") is not compelled to optimize a disabled student's educational experience. Rather, the LEA must provide an environment in which the student can derive educational benefit.

---

[14] 34 C.F.R. §300.116(a)(1). Each public agency must ensure that a parent of a child with a disability is a member of any group that makes decisions on the educational placement of the parent's child. 34 C.F.R. §300.501(c)(1).
[15] P.Exh. No. 11 at 7; Ms. Millis' notes at 2.
[16] 458 U.S. 176 (1982).

The District Court and the Court of Appeals thus erred when they held that the Act requires New York to maximize the potential of each handicapped child commensurate with the opportunity provided nonhandicapped children. Desirable though that goal might be, it is not the standard that Congress imposed upon the States which receive funding under the Act...The statutory definition of "free appropriate public education," in addition to requiring that States provide each child with "specifically designed instruction," expressly requires the provision of "such... supportive services... as may be required to assist a handicapped child to *benefit* from special education"...We therefore conclude that the "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.[17]

At PLC, Petitioner would be in a class of ten students, would be taught by a certified special education teacher, and would receive related services from licensed service providers. The hearing officer concludes that Petitioner has failed to meet her burden of proving, by a preponderance of the evidence, that PLC is not an appropriate placement for Petitioner.

## ORDER

Upon consideration of Petitioner's request for a due process hearing, the parties' Five Day Disclosure Notices, the testimony presented at the hearing, and the representations of the parties' counsel at the hearing, this 12th day of January 2007, it is hereby

**ORDERED,** that the Complaint is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED,** that this Order is effective immediately.

**Notice of Right to Appeal Hearing Officer's Decision and Order**

This is the final administrative decision in this matter. Any party aggrieved by the findings and/or decision may bring a civil action in any state court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy within ninety (90) days of the entry of the Hearing Officer's Decision, in accordance with 20 U.S.C. Section 1415(i)(2)(B).

_____
Terry Michael Banks
Hearing Officer

Date:  January 12, 2007                    Issued: _____

_____

[17] *Id.* at 200-01.

7

Copies to:

Douglas Tyrka, Esquire
1726 Connecticut Avenue, N.W.; Suite 400
Washington, D.C. 20009
(202) 265-4260; Fax: (202) 265-4264

Quinne Harris-Lindsey, Esquire
Office of the General Counsel, DCPS
825 North Capitol Street, N.E.; 9th Floor
Washington, D.C. 20002

## ATTENDANCE SHEET

STUDENT'S NAME: J██████ R█████████

SCHOOL OF ATTENDANCE: *Friendship Southeast Elem. Scal.*

D.O.B: ██████████, *1998*

HEARING DATE: *1/9/07*    ROOM: *8151*    TIME: *1:29*  A.M.(P.M.)

| PARTICIPANT NAME: | ON BEHALF OF DCPS OR STUDENT: | TITLE: |
|---|---|---|
| Douglas Tyrka | Student | Counsel for Parent |
| Quinne Harris - Lindsey | DCPS | Attorney Advisor |
| Evan Murray | DCPS | Placement Spec Monitor *via telephone* |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

_____

Impartial Hearing Officer

Revised 10/17/2006

21



# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

**November 17, 2006**

Rhondalyn Primes
Attorney-Advisor
Office of the General Counsel
District of Columbia Public Schools
Washington, DC 20002-4232
By Fax: 202-442-5097/5098

RE:    J███████ R█████████ (D.O.B. ████/98)

Ms. Primes:

A hearing has been scheduled for **3:00 p.m. on November 28, 2006,** to adjudicate a due process complaint filed on behalf of the above-captioned student, J███████ R█████████. In addition to any documents and witnesses disclosed by DCPS, the parent reserves the right to rely on the following witnesses and documents, as well as any other documents previously disclosed or offered into evidence in any other matter concerning this student.

**Documents:**

1. 11/17/06   Disclosure Letter
2. 11/17/06   Notice Compelling DCPS Witness(es)

**Administrative Record**

3. 09/28/06   Due Process Complaint Notice
4. 10/24/06   Hearing Notice

**MDT Meeting Notes, IEPs, etc.**

5. 02/16/06   Student Evaluation Plan
6. 02/16/06   MDT Meeting Notes
7. 06/20/06   Student Evaluation Plan
8. 06/20/06   MDT Meeting Notes
9. 08/03/06   MDT Meeting Notes
10. 08/03/06   Advocate's MDT Meeting Notes
11. 09/13/06   MDT Meeting Notes
12. 09/13/06   Prior to Action Notice
13. 10/13/06   Resolution Meeting Notes

**Evaluations**

**JR1** 22

14. 05/25/06   Psycho-Educational Evaluation
15. 08/22/06   ADHD Screener
16. 08/28/06   Clinical Evaluation

**Correspondence**

17. 08/30/06   Letter, Tyrka & Associates
18. 09/08/06   Acceptance Letter, Rock Creek Academy
19. 09/28/06   Stay-Put Notice

**Other Documents**

20. 11/17/06   No Child Left Behind, School AYP List
21. 11/17/06   No Child Left Behind, AYP Status Report, Prospect Learning Center

**Witnesses:**[1]

1.  Ms. Carnecia Robinson, Parent, 1320 Congress Street, S.E., #2, 202-492-1656
2.  Ms. Sharon Millis, Special Education Advocate & Expert
3.  Mr. Keith Coyle, Associate
4.  Ms. Camille McKenzie, Office Assistant
5.  Mr. Michael Tchorni, Law Clerk

Respectfully submitted,

Douglas Tyrka, #467500
Tyrka & Associates, LLC
1726 Connecticut Ave NW, Suite 400
Washington, DC  20009
(ph) (202) 265-4260
(f) (202) 265-4264

---

[1] Some witnesses may be testifying by telephone and/or use a designee.  The address and phone numbers for all employees or agents of Tyrka & Associates can be found in the letterhead for this correspondence.

```
┌─────────────────────────────────────────┐
│   TRANSMISSION VERIFICATION REPORT        │
└─────────────────────────────────────────┘
                          TIME  : 11/17/2006 17:19
                          NAME  : TYRKA & ASSOCIATES
                          FAX   : 2022654264
                          TEL   : 2022654260
                          SER.# : 000A6J693992
```

| | |
|---|---|
| DATE,TIME | 11/17  16:51 |
| FAX NO./NAME | OGC2 |
| DURATION | 00:27:08 |
| PAGE(S) | 89 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264
                                                                                                    ♦

*Recipient:*      Rhondalyn Primes ~ OGC

*Fax Number:*     202-442-5097/8

*From:*           Douglas Tyrka

*Regarding:*      Ja████R█████████

*# of pages:*     90

*Notes:*          DISCLOSURES

24



# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

November 17, 2006

Rhondalyn Primes
Attorney-Advisor
Office of the General Counsel
District of Columbia Public Schools
Washington, DC 20002-4232

RE:    J██████ R█████████

Ms. Primes:

Pursuant to 34 C.F.R. § 300.509(a)(2) and D.C. Mun. Regs. tit. 5 § 3031.1(b), Petitioner hereby compels the following necessary and material witnesses:

1. Any DCPS employee and/or agent who has drafted notes of any meeting or telephone conversation, which DCPS intends to submit as evidence at this hearing.

Respectfully submitted,

Douglas Tyrka, #467500
Tyrka & Associates, LLC
1726 Connecticut Ave NW, Suite 400
Washington, DC  20009
(ph) (202) 265-4260
(f) (202) 265-4264

3

JR2 25

## DUE PROCESS COMPLAINT NOTICE
### In re J█████ R██████
### September 28, 2006

**Petitioner:**      Carnecia Robinson
**Student:**         J█████ R██████
**DOB:**             █████/98
**Current School:**  Friendship Southeast Elementary Academy ("Friendship")
                     **NOTE: THIS COMPLAINT IS SOLELY FOR VIOLATIONS BY DCPS.**
**Residence:**       1320 Congress Street, S.E.
                     Washington, DC 20032

**Petitioner's Contact Information for Special Education Purposes:**
                     Tyrka & Houck, LLP
                     1726 Connecticut Ave. N.W. Suite 400
                     Washington, D.C. 20009
                     Tel: 202-265-4260
                     Fax: 202-265-4264

**Violations:**

1. Failure to provide an appropriate placement since the start of the 2006-2007 SY.
2. Failure to conduct and review evaluations in all areas of suspected disability.
3. Failure to determine an appropriate disability classification.
4. Failure to develop an appropriate IEP.
5. Failure to provide an appropriate placement.

**Facts:**

1. J█████ has been enrolled at Friendship since the start of the 2005-2006 SY.
2. At an MDT meeting convened on February 16, 2006, the Team:
   a) noted that J█████ "struggles with work and completing task [sic] on 2nd grade level";
   b) discussed J█████ behavioral problems;
   c) developed a student evaluation plan recommending, *inter alia*, completion of a functional behavioral assessment of J█████.
3. A May 25, 2006 psychoeducational evaluation of J█████ reported that her classroom teacher had concerns about her academic performance and behavior.
4. At a June 20, 2006 MDT meeting, the Team recommended, *inter alia*, completion of a clinical evaluation and a functional behavioral assessment.
5. At an August 3, 2006 MDT meeting:
   a) the Team:
      i) determined that J█████ qualifies for special education and related services as a qualified child with a Multiple Disabilities, including a Learning Disability ("LD") and Other Health Impairment ("OHI");

**JR3**  26

    ii) developed an IEP prescribing 25 hours of specialized instruction, 1 hour of occupational therapy services, 1 hour of speech and language therapy, and 30 minutes of counseling per week;

    iii) determined that Friendship was no longer an appropriate placement;

    iv) recommended placement in a full-time setting;

  b) the Parent's advocate:

    i) contested the adequacy of J██████ clinical evaluation and her functional behavioral assessment;

    ii) questioned the appropriateness of not including an additional disability classification of Emotionally Disturbed ("ED") on J██████ IEP;

    iii) requested completion of an additional clinical evaluation and a functional behavioral assessment;

    iv) proposed Rock Creek Academy as an appropriate alternative educational placement;

  c) the Team:

    i) recommended completion of an additional clinical evaluation;

    ii) agreed to notify DCPS of J██████ need for an alternative placement;

6. An August 28, 2006 ADHD screener diagnosed J█████ with Attention Deficit Hyperactivity Disorder.

7. An August 28, 2006 clinical evaluation of J█████ recommended participation in individual psychotherapy.

8. At a September 13, 2006 MDT meeting:

  a) the Team:

    i) recommended a revised disability classification of Multiply Disabled ("MD"), including OHI, Speech and Language Impaired ("SLI"), and LD;

    ii) rejected an additional disability classification of ED;

    iii) recommended a smaller placement for J█████;

  b) the Petitioner's advocate:

    i) contested the validity of J██████ current clinical evaluations;

    ii) objected to the rejection of an additional disability classification of ED;

    iii) requested additional clinical testing to confirm a disability classification of ED;

    iv) proposed Rock Creek Academy as an appropriate alternative placement;

    v) reported that J█████ had been accepted for admission into Rock Creek Academy;

  c) DCPS:

    i) neglected to participate in the review of J██████ evaluations and in the discussion of her current disability classification and special education needs;

    ii) proposed Prospect Learning Center ("Prospect") as a placement;

    iii) failed to answer questions from the Team about the proposed placement at Prospect Learning Center, including those regarding the student-to-teacher ratio, teacher qualifications, and the age and disability classifications of the other students;

  d) the Petitioner's advocate:

    i) objected to DCPS' failure to fully participate in the meeting and to provide all necessary information about the appropriateness of its proposed placement at Prospect;

    ii) reserved a determination on the appropriateness of Prospect;

  e) the Team:

      i)  agreed to gather additional information for completion of a functional behavioral assessment and development of a behavior intervention plan;
      ii)  did not make any finding or recommendation regarding the appropriateness of Prospect for J██████.

9. An adequate clinical evaluation of J██████ has never been completed.
10. An adequate functional behavioral assessment and behavior intervention plan have never been completed.
11. DCPS has known of J██████ need for an appropriate alternative placement in a full-time special education program since August 3, 2006.
12. DCPS has never:
    a)  offered an appropriate educational placement for J██████;
    b)  issued a prior notice for an appropriate alternative educational placement;
    c)  placed J██████ in an appropriate full-time special educational program.
13. J██████ has been accepted for admission into Rock Creek Academy.
14. J██████ will receive educational benefit at Rock Creek Academy.

**Proposed resolution:**

1. DCPS to immediately fund and place J██████ at Rock Creek Academy with transportation.
2. DCPS to immediately fund an independent clinical evaluation and an independent functional behavioral assessment of J██████.
3. DCPS to convene an MDT meeting within thirty (30) days of J██████ enrollment at RCA to:
    a)  review all of her current evaluations,
    b)  revise her IEP, and
    c)  develop an appropriate compensatory education plan to compensate J██████ for its failure to provide an appropriate placement since August 3, 2006.
4. DCPS to convene an MDT meeting within ten (10) days of receiving J██████ independent clinical evaluation and her independent functional behavioral assessment to:
    a)  review these evaluations,
    b)  revise J██████ IEP, and
    c)  develop an appropriate compensatory education to compensate J██████ for its failure to:
      i)  timely conduct and review an adequate functional behavioral assessment since August 3, 2006;
      ii)  timely conduct and review an adequate clinical evaluation of J██████ since August 3, 2006.
5. DCPS to pay reasonable attorney fees and costs incurred in bringing and pursuing this case.

**Resolution Meeting:**

1. The Petitioner contends that the entire IEP Team and a representative of the LEA with authority:
    a.  to immediately fund and place J██████ at Rock Creek Academy with transportation,
    b.  immediately fund an independent clinical evaluation and an independent functional behavioral assessment of J██████.

    c.  to convene an MDT meeting within thirty (30) days of J████ enrollment at RCA, and

    d.  to convene an MDT meeting within ten (10) days of receiving J████ independent clinical evaluation and independent functional behavioral assessment

are necessary attendees at any resolution meeting.

2. If these individuals are not going to be in attendance, Petitioner requests that DCPS provide counsel with a written notice waiving its right to a resolution session 48 hours prior to any scheduled meeting.

3. The Petitioner contends that any meeting not attended by the identified individuals is not a valid resolution session, but rather an informal settlement discussion.

4. The Petitioner will be accompanied by his or her attorney at any resolution session convened subsequent to the filing of this complaint and will record any resolution session by analog or digital means.

5. Any statements by the Petitioner or his or her representative during any resolution meeting or other settlement discussion incident to the filing of this complaint are for the purposes of compromise only.

Respectfully Submitted,

Douglas Tyrka
Tyrka & Houck, LLP
Attorneys for the Petitioner
1726 Connecticut Ave., NW, Suite 400
Washington, DC 20008
(ph) (202) 265-4260
(f) (202) 265-4264

29

```
                  TRANSMISSION VERIFICATION REPORT

                                      TIME : 09/28/2006 17:27
                                      NAME : TYRKA & ASSOCIATES
                                      FAX  : 2022654264
                                      TEL  : 2022654260
                                      SER.# : 000A6J693992


   DATE,TIME              09/28  17:25
   FAX NO./NAME           SHO
   DURATION               00:01:32
   PAGE(S)                05
   RESULT                 OK
   MODE                   STANDARD
                          ECM
```

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

**Recipient:** SHO ⚹OGC

**Fax Number:**

**From:** Douglas Tyrka

**Regarding:** ▬▬▬ ▬▬▬▬

**# of pages:** 5

**Notes:**

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
## STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



HEARING NOTICE

| MEMORANDUM VIA: [√] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:   Parent (or Representative): *D. TYRKA*        Fax No.: *265 - 4264*

LEA Legal Counsel: *R. PRIMES*

RE:   R██████, ████████        and (LEA) DOB: ██████/98
           Student's Name

FROM:   **SHARON NEWSOME**
           Special Education Student Hearing Office Coordinator

DATE SENT:   *10/24/06*

▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on *9/29/06*. Please be advised that the hearing has been scheduled for:

DATE:   *11/28/06*

TIME:   *3:00 pm*

AT:   825 North Capitol Street, NE, Washington, DC
         8th Floor

ASSIGNED HEARING OFFICER: _____

[ ] THIS IS A FINAL NOTICE OF HEARING: If you wish to request a continuance of this hearing, you must submit your request in *writing on the attached form* to the Special Education Student Hearing Office at the above address, or by fax at 202 442-5556. All decisions regarding continuances are made *exclusively* by the Hearing Officer, and cannot be made by SHO administrative staff. Unless you receive notice that the Hearing Officer has granted your request for a continuance, you must appear for the hearing as scheduled above.

[X] THIS IS A PROVISIONAL NOTICE OF HEARING: The SHO was unable to accommodate any of your proposed dates. If you are unavailable for the above date, you must inform the SHO in writing (letter or fax) that the date is unavailable and specify times during the next four business days when you are either available or unavailable for a teleconference with the Hearing Officer. If the SHO does not receive a response from you within three business days of your receiving this provisional notice, the notice becomes a final notice of hearing that may be modified with only a request for a continuance.

Failure to appear for a properly scheduled hearing may result in dismissal of the case or a default judgment against you. Disclosure of evidence and witnesses to the opposing party is required at least **five business days** prior to the hearing with copies to the Special Education Student Hearing Office.

JR4

District of Columbia Public Schools
Division of Special Education
Washington, D.C.

Multidisciplinary Team
(MDT)
Student Evaluation Plan
(SEP)

MDT REFERRAL DATE: _____    MEETING DATE: 2/16/06

STUDENT: ~~Je___ R___~~  OB: ~~___~~ 98 AGE: 8  GRADE: 2  SCHOOL FSEA

STUDENT IDENTIFICATION NUMBER: _____    TEACHER/HOMEROOM: _____

ADDRESS: 1320 Congress St. SE # 2            Washington, DC 20032
　　　　　　Street #　　Street Name　　Quadrant　　Apartment #　　City　　State　Zip Code

PARENT(S)/GUARDIAN: Ms. Carnecia Robinson TELEPHONE (H): 2562-1626 (W): 2/889-3600

Summarize Area(s) of Concern:

The areas of concern are: long and short-term memory
reading comprehension / processing
behavior - off-task

Team Recommendations:

The MDT team recommends the following
- Psycho-educational to include VMI / Bender
- Speech/Language to include TAPS

EVALUATION(S) IN AREA(S) OF LEARNING CONCERNS(S)

| ASSESSMENT | ASSESSOR | TEST INSTRUMENT | TIMELINE ASSIGNED | DUE DATE |
|---|---|---|---|---|
| ☑ Psychological | | to include VMI / Bender | | |
| ☑ Speech/Language | | to include: TAPS | | |
| ☐ Social History | | | | |
| ☐ Audiological | | | | |
| ☐ Vision Screening | | | | |
| ☐ Medical | | | | |
| ☑ Educational | | | | |
| ☐ Hearing Screening | | | | |
| ☑ Other: FBA | | Classroom Observation over | | |
| ☑ Visual / Motor | | a week period of time after lunch | | |

| TEAM MEMBERS: | NAME | POSITION | TEAM MEMBERS: | NAME | POSITION |
|---|---|---|---|---|---|
| | Adrienne Johnson | Gen. Ed Teacher | | ~~_____~~ | SpEd |
| | ~~Eva Estes~~ | School Psychologist | | Carnecia Robinson | Parent |
| | ~~_____~~ MSW/SP | Speech Pathologist | | J. ~~_____~~ | PSEC |
| | Kim ~~_____~~ | School Psych Intern | | | |

The MDT meeting to discuss the evaluation results is scheduled on _____ at _____ in room _____

**JR5** 32

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

CONSENT FOR EVALUATION – INITIAL OR REEVALUATION
(*CHECK ONE ONLY – INITIAL OR REEVALUATION)

**I.    INITIAL EVALUATION CONSENT ☑**

As a result of the review of the screening information at the MDT meeting on _2/16/06_ it was determined in
a MDT meeting that your child, ███████████████ is in need of a full and individual evaluation to
assist us in developing the most appropriate educational program. You have been provided a copy of the "Procedural
Safeguards – Parental Rights" booklet. We would like to remind you at this time that:
- granting consent for this evaluation is a voluntary action on your part;
- this consent may be revoked at any time although the school district is required to take all necessary action to
  provide an appropriate program and may be required to initiate due process procedures to obtain consent; and
- by granting consent in writing, you are agreeing to the evaluation(s) in Section III.

**II.    REEVALUATION ☐**

The MDT received the following request for a reevaluation for _____ by/for a:
            ☐ parent request        ☐ teacher request        ☐ 3 year reevaluation
The MDT will collect supportive documentation in the area of the disability to determine the need for continued
special education and related services. The school is required to only evaluate in those areas of documented need or
consensus of the MDT (parent is a member of team). Parents have the right to request assessments to determine if the
child continues to be a child with a disability. DCPS may reevaluate your child, without your consent, if the school
district can demonstrate that it has taken reasonable steps to get parental consent and the parent has not responded.
- Granting consent for this evaluation is a voluntary action on your part;
- This consent may be revoked at any time although the school district is required to take all necessary action
  to provide a Free Appropriate Public Education program and may be required to initiate due process
  procedures to obtain consent; and
- By granting consent in writing, you are agreeing to the evaluation(s) on the student evaluation plan (SEP).

**III.**    I give permission for District of Columbia Public Schools to proceed with the evaluation(s) based on the
Student Evaluation Plan (attached) for my child, ███████████████ .

Within a reasonable period of time days after completion of the evaluation, we will hold another MDT meeting (to
which you will be invited) to determine if your child is eligible for special education and related services. The written
reports of all procedures administered will be provided to you at that meeting, along with explanations and
interpretations. We will use this information to determine an appropriate program for your child. If records are to be
obtained/released as part of this evaluation, the "Consent for Release of Records" form is completed and attached.
If you have questions or concerns at any time during the evaluation process, feel free to contact me at
_202-562-1980_ (telephone number).

                    * ☑ INITIAL EVALUATION              * ☐ REEVALUATION

☑ I agree to the proposed evaluation(s)                    ☐ I do NOT agree to the proposed evaluation(s)

_Cesecia Pelier_                                            _2/16-06_
Parent/Guardian Signature                                   Date

33

STATE EDUCATION AGENCY
SPECIAL EDUCATION
DISTRICT OF COLUMBIA PUBLIC SCHOOLS AND CHARTER SCHOOLS
825 North Capitol Street, N.E.
Washington, D.C. 20002-4232


Caring for Our Students with Disabilities
A Procedural Manual for Parents

RECEIPT


I, _Careeia Robinson_____, received a copy of *A Procedural*
(Parent/Guardian Name)

*Manual for Parents* from _Sonja Djossou_____ /Title _Special Education Coordinator_
(Person Issuing Document)

at _Friendship Southeast Elementary Academy_
(School)

2 / 16 / 06 .
(Date)


_Careeia Robinson_
Parent/Guardian Signature


(This receipt is to remain in a designated file in the school.)

Friendship Public Charter Schools
_Southeast_____ Campus

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT REFERRAL DATE: _____          MEETING DATE: 2/16/06

STUDENT: ~~J████ R████~~          SCHOOL: FSEA

| PARTICIPANTS: (PRINT NAME) | PARTICIPANTS: (SIGN NAME) | POSITION |
|---|---|---|
| Adrienne Johnson | _[signature]_ | Gen. Ed. Teacher |
| Kya Mathews | Kya E. Mathews | School Psychologist |
| Beth Wilkinson mscc&p | _[signature]_ mscc&p | Speech Pathologist |
| Kimberly Williams | Kimberly Hill | School Psychology Intern |
| _[signature]_ | _[signature]_ | SPED Advocate |
| Carnecia Robinson | _[signature]_ | Parent |
| Sonja Djossou | Sonja Djossou | SEC |

Procedural Safeguards were read and explained and a receipt was signed for.

Purpose: The purpose of this meeting is to develop a student evaluation plan with the parent,
_Carnecia Robinson_____  who came in and requested that his/her child be evaluated for
Special Education.

The purpose of this meeting is to develop a Student Evaluation Plan. The MDT team made introductions during this meeting. The parent was given the Procedural safeguards and explained her rights. A receipt was given and signed by the parent.

Teacher → Ms. Johnson - J████ enjoys participating in class. J████ may have difficulty seeing things on the board. Ms. Johnson has moved her desk to the ~~front~~ of the class. J████ writing can be slanted or she may miss a few letters. J████ has difficulties with attending to tasks and simple directions. J████ composes letters and words differently from how it is written on the board or dittos. Mathematics is J████ strength. Academically, Ms. Johnson biggest concern is ████ language arts and reading (comprehension). Ms. Robinson assist J████ with homework. She struggles with work and completing task on 2nd grade level.

**JR6** 35

Friendship Public Charter Schools
_Southeast_____ Campus

MULTIDISCIPLINARY TEAM (MDT)                    page: _2_ of _2_
CONTINUATION MEETING NOTES
MEETING TYPE: _SEP_____

STUDENT: J_____ R_____          DATE OF BIRTH ____/__/88

SCHOOL: _FSEA_____             DATE: _2/16/06_

Teacher → Ms. Johnson → J_____ may have behavior problems at times in class. She struggles with telling the truth and communicating with her peers. Adult supervision is mandatory at all times.

Mother → Ms. Robinson → She sought out an advocate to get J_____ evaluated due to problems she experienced last year. J_____ had vision screening during physical last year. Ms. Robinson agrees with Ms. Johnson, the teacher regarding J_____ academically and behaviorally this school year.

The MDT team agrees and makes the following recommendations:
- psycho-educational to include VMI/Bender
- speech/language to include TAPS

_____ R_____ SEP 2/16/06

Difficulty focusing, following 2 step
directions, working independently, can't
copy (words/letters) information correctly
Gets aggressive, demands harder

Team determined a Psychoeducational, FBA
and Sp/Lang evaluation was warranted

**Friendship Public Charter School**
906 Pennsylvania Avenue SE
Washington, DC 20003
(202) 543-8395

MULTIDISCIPLINARY TEAM
(MDT)
STUDENT EVALUATION PLAN
(SEP)

| MDT |
|-----|
| SEP |

MDT REFERRAL DATE: _____                                    MEETING DATE: ___06/20/06___

STUDENT: J_____ R_____     DOB: __/__/98    AGE: 8   GRADE: 2   SCHOOL: FPCS-Southeast Elementary Acade

STUDENT IDENTIFICATION NUMBER: ___900501000132___     TEACHER / HOMEROOM: _____

ADDRESS: 1320 Congress Street, SE _____ Washington, DC 20032
          Street #          Street Name,          Quadrant      Apartment #       City,              State,       Zip Code

PARENT(S)/GUARDIAN: Carnecia Robinson _____     TELEPHONE (H): (202) 562-1626   (W): (202) 889-3600

**Summarize Area(s) of Concern:**

The areas of concerns are : In order to make a determination as to the services that J_____ will need as part of her educational program futher assessments are needed

**Team Recommendations:**

The MDT team recommends the following
  -- Functional Behavior Assessment/Behavior Intervention Plan
     Occupational Theapy Assessment
     Clinical Evaluation
     An Adaptive to rule out Mental Retardation
     CTONI

### EVALUATION(S) IN AREA(S) OF LEARNING CONCERN(S)

| ASSESSMENT | ASSESSOR | TEST INSTRUMENT | TIMELINE ASSIGNED | DUE DATE |
|---|---|---|---|---|
| ☑ Psychological | CTONI | _____ | _____ | _____ |
| ☐ Speech/Language | _____ | _____ | _____ | _____ |
| ☐ Social History | _____ | _____ | _____ | _____ |
| ☐ Audiological | _____ | _____ | _____ | _____ |
| ☐ Vision Screening | _____ | _____ | _____ | _____ |
| ☐ Medical | _____ | _____ | _____ | _____ |
| ☐ Educational | _____ | _____ | _____ | _____ |
| ☐ Hearing Screening | _____ | _____ | _____ | _____ |
| ☑ Other | Other: FBA    TBD | Other: Classroom observation over 2 week | _____ | _____ |
| OT/ Clinical/Adaptive | | | | |

| TEAM MEMBERS: NAME | POSITION | TEAM MEMBERS: NAME | POSITION |
|---|---|---|---|
| Adrienne Johnson | Gen. Ed. Teacher | Charlene Glymph | Director of Special Education |
| Bronwen Millet | School Psych. | Mr. Themba Masimini | School Counselor |
| Madelynn Angelin | Speech Pathologist CCC-SLP | | Advocate |
| Carnecia Robinson | Parent | | |

The MDT meeting to discuss the evaluation results is scheduled on ___TBD___ at ___TBD___ in room ___TBD___

Place completed form in MDT folder.
DISTRICT OF COLUMBIA PUBLIC SCHOOLS     07-02-2001     DIVISION OF SPECIAL EDUCATION     MDT - SEP     APPENDIX -

JR 38

Friendship Public Charter Schools

*Southeast Ele.* Campus
*Academy*

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT REFERRAL DATE: _____

MEETING DATE: 4/20/06

STUDENT: ~~J█████ R█████~~

SCHOOL: *Friendship Southeast Ele. Academy*

| PARTICIPANTS; (PRINT NAME) | PARTICIPANTS; (SIGN NAME) | POSITION |
|---|---|---|
| | | *parent* |
| Madlynn Anglin, CCC-SLP | *Madlynn Anglin, CCC-SLP* | *Speech Path.* |
| Bronwen L. Millet Ph.D. | *Bronwen L. Millet Ph.D.* | *Psychologist* |
| Themba Masimini | | *Counselor* |
| Corenne Johnson | | *Gen. Ed. Teacher* |
| Sharon Mills | | *SPED Advocate* |

The team has introductions were made. Educational advocate signed the receipt. The parent was not present at the meeting. The purpose of the meeting is to determine eligibility for special education services for

~~J█████ R█████~~


<u>Parent</u>: (Was not in attendance)

JR89

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES          page: _02_ of ____
MEETING TYPE: _____

STUDENT: ~~J_____ R_____~~     DATE OF BIRTH _____/ /98

SCHOOL: _Friendship Southeast_     DATE: _6/20/06_

---

_Gen. Ed. Teacher:_ ~~J_____~~ was suspended for defiance and disrespect. There has been no change in ~~f_____~~ behavior and academic performance in classroom: She yells out and threatens students in class. She has experienced some success in class. She has been recommended for summer school. She has done well in non-core subjects in Science and Social Studies. Her final grades in Math and Reading are D's

_Special Ed:_ Please review the summary and recommendation

---

Friendship Public Charter Schools
———————————————
Campus

MULTIDISCIPLINARY TEAM (MDT)                    page: 03 of _____
CONTINUATION MEETING NOTES
MEETING TYPE: _____

STUDENT: ███████████████          DATE OF BIRTH ___/__/98

SCHOOL: Friendship Southern DATE: 6/20/06
Ele. Academy

Psychologist: Evaluation was completed
in May. She was given the WISC IV, WIAT, and
the VMI. There were no prior evaluations
available. Please review the evaluation for
detail summary of the results. ████████
scores were all in the low average to extremely low
average range. Ms. Johnson, ████████ teacher
reported that her grades were a 0 in reading
and language, a F in social studies, a B/A in
science and a F/D in Mathematics. ████████ was
also given the VMI where she received a standard
score of 78. Although on the Visual Perception
area she obtained a standard score of 59 which is
in the very low range. A language, occupational
and C-TONI (NON-verbal) assessments were
recommended to obtain her current functioning
and to determine her specific disability.

41

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)    page: 4 of ___
CONTINUATION MEETING NOTES
MEETING TYPE: _____

STUDENT: ████ ██████    DATE OF BIRTH ████ / ██ / 98

SCHOOL: Friendship Southeast    DATE: 6/20/06
Ele. Academy

Advocate: (Present) Concerned about having further assessments to determine the appropriate classification.

Speech Pathologist (MACS) Madelin Anglin:
████ demonstrated speech sound production, fluency, phonological awareness and memory skills within normal limits, but hoarse voice quality and language delay characterized by: mild to moderate expressive and receptive language delays, moderate to severe expressive and receptive vocabulary delays. ████ should be referred to an ENT to R/O physical etiologies of the hoarseness. Results of the TAPS-3, when considered with other tests, revealed auditory processing and memory skills within normal limits. This suggests that ████ communication issues are more in line with a language delay than memory problems. 42

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)                    page: 05 of 6
CONTINUATION MEETING NOTES
MEETING TYPE: _____

STUDENT: ███████████                    DATE OF BIRTH: ██████ / /98

SCHOOL: Friendship Public                    DATE: 6/20/06
Charter Schools S.E. Academy

Team Recommendations: In order to determine
J███████ disability category that a CBCR,
Vineland adaption be completed to rule
out a Mental Retardation and an OI
Assessment to determine if services are warrented.
Recommend that an OI report be brought to the
table at the time the MDT Reconvenes.
Clinical evaluation. FBA and BIP.


Summary:

    The team will develop a Student
Evaluation Plan to address the recommendation.
the team will reconvene to determine
the appropriate category and educational
services.

43

J██████ R█████ MDT 6/20/06

A Vineland was recommended but not done to confirm a disability classification of MR.

FBA provided at meeting. No direct assessments or documentation to support the findings

There is no social/emotional component to the Psychoed and the evaluator appears to not have gathered any information regarding her behavior

A C-TONI was recommended as was an OT evaluation

Advocate also requested a Clinical to r/o emotional concerns as the FBA indicated

Disciplinary reports were requested since she had been suspended several times

No IEP was able to be written until the remaining evaluations have been completed

44

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT REFERRAL DATE: _____

STUDENT: ████████████

PARTICIPANTS: (PRINT NAME)

MEETING DATE: 8/3/06

SCHOOL: Friendship Southeast Academy

PARTICIPANTS: (SIGN NAME)          POSITION

| PARTICIPANTS: (PRINT NAME) | PARTICIPANTS: (SIGN NAME) | POSITION |
|---|---|---|
| Willie Walker | Willie Walker | SEC-Southeast Academy. |
| Wanda S. Perez | Wanda S. Perez | Academy Director |
| _____ | _____ | _____ Director of Special |
| Charlene C. Glymph | Charlene Glymph | A___ Mohlst |
| Sharon Kner | Sharon Kner | Speech Pathologist |
| Beth Wilkinson, MSW/SSW | _____ MSW/SSW | Occup. Therapist |
| Kristin S. Conaboy | _____ OTR/L | |

The team has convened this meeting to develop an I.E.P. for ████ R████ who qualifies for special education services as a Learning Disabled student

Specialized Instruction: In the area of Reading, Writing, Math — 25 min. hours

OI Services: 1x60/week. Goals were developed, shared and agreed up by Mom + Team. See IEP

PI Services: None needed

SLL Servies: 2x 30 min. 1 hour per week

Counseling: 1x 30 min. per week group counseling

JR9
45

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)          page: 2 of 3
CONTINUATION MEETING NOTES
MEETING TYPE: *I.E.P. Meeting*

STUDENT: ████████████          DATE OF BIRTH: ██████ '88

SCHOOL: *F.S.E.A*          DATE: *August 3, 2006*

---

Parent is in agreement with a full time
I.E.P. for ████████ if that is what she needs
and if it would benefit her


The team has determined that a full time
setting would benefit ████████ based on
her achievement scores (educational; cognitive)

   Because ████████ scored on the kindergarten
level with the exception of math numeration (2.2)
She would gain no educational benefit in an inclusion or
general ~~education~~ education setting.



          *Advocate*
Parent ~~Academy~~ is recommending Rock Creek Academy.
S.E.A → (D.C.P.S.): Upon receiving the packet then
the S.E.A. will make a recommendations for placement

46

Friendship Public Charter Schools

_____ Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES        page: 3 of 3

MEETING TYPE: _I.E.P. Meeting_____

STUDENT: ~~J████ R█████~~           DATE OF BIRTH: ██/██/98/06

SCHOOL: _ISE Academy_____          DATE: _8/03/06___

Given that this placement is no longer appropriate for ~~J█████~~ ISE will complete the Clinical before the next placement ~~meeting tests~~ We will complete projectives and the Connors.

**Friendship Public Charter School**
906 Pennsylvania Avenue SE
Washington, DC 20003
(202) 543-8395

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**MEETING NOTES**

MDT
08/03/06

MDT REFERRAL DATE: _____

MEETING DATE: 02/13/06

STUDENT: J~~_____~~    SCHOOL: FPCS-Southeast Elementary Academy

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Willie Walker | Willie Walker | SEC Southeast Academy Parent |
| Mr. Anthony Ray | (via phone) | Gen. Ed Teacher |
| Tonina Fleming | Tonina Fleming | Sp. Ed Teacher / Attorney |
| Sharon Piner | Sharon Piner | Psychologist |
| Beth Wilkinson, MSCCP | Beth Wilkinson MSCCP | Speech Pathologist |
| Kristin S. Conaboy | Kristin S. Conaboy | Occupational Therapist |
| Wanda S. Perez | Wanda S. Perez | Academy Director |
| Laura Dios | Laura Dios | AH |
| Sharon Miller | Sharon Miller | SE Advocate |

Procedural Safe Guards were given to the parent at 2/16/06 Meeting. Introductions were made. The purpose of this meeting is to determine eligibility.

Parent: sees many of the behaviors at home that were indicated in the Clinical Evaluation.

THE PARENT ☐ IS PRESENT  ☒ IS NOT PRESENT  AT THE MEETING  *Participating via phone*

AFTER A REVIEW OF THE ASSESSMENTS, IT IS DETERMINED THAT J~~_____~~ R~~_____~~

☐ CONTINUES TO BE ELIGIBLE FOR SPECIAL EDUCATION

☐ IS TO BE EXITED FROM SPECIAL EDUCATION

▷ Charlene C. Glymph    Charlene C. Glymph    Director. Of Sp. Ed FPCS

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES                    page: 2 of 11
MEETING TYPE: _Eligibility_____

STUDENT: ██████ R ██████ DATE OF BIRTH ██████ / /98

SCHOOL: _Southeast Ele. Academy_ DATE: _Aug 3, 2006_

Occupational Therapist (Ms Conaboy):
Ms. Conaboy reviewed the Occupational
Therapy evaluation completed by Conaboy &
Assoc Inc. The evaluator's name was
Patrice Brown, MSA OTR/L. The evaluation
was conducted on 7/13/06. Ms. Conaboy
shared that ██████ was a pleasure to test
██████ presents with minimal tactic
processing concerns. She tolerates all
movement input. Difficulties processing
auditory information was noted. ██████
had difficulty following 2-3 step directions.
Difficulties were noted with visual
processing. Ms. Robinson shared that a
vision screening was completed in 02/06
and reportedly within normal limits.
The team requested a copy for records.
Gross motor skills are adequate for the
school environment. Stiffness & an awkward
quality was noted. Bilateral coordination
is below average. Fine motor skills fall within
the low range. ██████ displayed difficulty
with tasks requiring coordination of her
finger, hand, + eye movement. ██████ had
difficulty when using a writing tool to
produce written output (ie copying, tracing,
writing). ██████ struggled to manipulate
small objects accurately + effectively.
██████ handwriting is below average in
terms of legibility, letter formation, alignment

(con't)

49

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES          page 3 of 11
MEETING TYPE: Eligibility

STUDENT: J____ R_____          DATE OF BIRTH ____/98

SCHOOL: Southeast Elem. Academy   DATE: 08/03/06

---

dictation and copying. J_____ is said
to avoid these tasks. Mom agrees
with these findings & reports similar
difficulties at home. Visual motor
integration was previously evaluated.
Visual motor integration is found to
be within the low range and is
consistent with related testing items
and Mom's report. Visual perception
was also assessed and all areas
were found to be well below average
range and can impact things such
as reading, math, and spelling.
Due to observations, test scores, word
review, consultation J_____ is
recommended to receive Occupational
Therapy. The mom agrees with
findings of the evaluation reports.

Summary: Decreased tactile, visual,
          auditory processing
  • BEO: low range.
  • Handwriting: below average
  • VMI: overall low range
  • TVPS: well below average
  • Services: Recommended 1x60/wk.

50

Friendship Public Charter Schools

_____ Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES          page: 4 of 11
MEETING TYPE: _Eligibility_

STUDENT: ~~J_____ R_____~~          DATE OF BIRTH ~~_____~~ .98

SCHOOL: _Southeast Ele Academy_ DATE: 08·03·06

---

School Psychologist (Ms. Sharon Piner):

Clinical — According to the the clinical evaluation, (Behavior Rating) J_____ scores are as follow: Externalizing Composite (T=53), Internalizing Composite (T=46) and Adaptive Skills (T=45). Parent Rating scale yielded the following scores: externalizing Composite (T=56), Internalizing (T=54) and Adaptive Composite (T=47). At this time the evaluator does not recommend psycho social intervention; however, the MDT would like to recommend counseling and the implementation of a B.I.P.

Adaptive: Mrs. Piner

Ms. Robinson and Ms. Lay completed an Adaptive Behavior Inventory which yielded the following scores: Adaptive Full Scale — 98 (Parent Rating) and Adaptive Full Scale — 92 (Teacher Rating), which is clearly an indicator that J_____ does not qualify as a student with an MR disability code.

~~Alt T~~ CTONI — J_____ Nonverbal IQ yielded a score in the Deficient Range (SS=68).

Review the Behavior Intervention Plan after it has been in place 45-60 days after implementation

51

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES

page: _____ of _____

MEETING TYPE: _____

STUDENT: _____    DATE OF BIRTH_____

SCHOOL: _____    DATE: _____

The evaluator These The clinical evaluations were completed by the mother and Mr. Lay (teacher); however the evaluator was under the impression that Mr. Lay had the assistance of Ms. Johnson (former teacher) to complete complete the BASC questionnaire. Therefore the advocate is requesting another clinical eval. The MDT agrees.

Finally, the evaluator is recommending an LD classification code.

Shawn Knox

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)                    page: 6 of 11
CONTINUATION MEETING NOTES
MEETING TYPE: _Multidisciplinary Eligibility_

STUDENT: ▓▓▓▓▓▓▓▓▓▓▓     DATE OF BIRTH: ▓▓▓▓▓ 98

SCHOOL: _Friendship Southeast_ DATE: 08/03/06
_Academy_

Advocate (Ms. Millis): Is not in agreement with the Clinical, adaptive, or Functional Behavior Assessment. She wants the previous gen. ed teacher to complete the assessment instead of the summer school gen ed. teacher. The previous gen. ed. teacher Ms. Johnson has been released from Friendship Schools and is unavailable. Ms. Millis wants a clinical that complete assessment will include more than one assessment. The advocate has some concerns about ruling out MR diagnosis based on the assessments. She scores on every assessment except the adaptive.

53

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES                    page: 7 of 11
MEETING TYPE: _____

STUDENT: O████████ R████████    DATE OF BIRTH ████ / 98
SCHOOL: Griendship Southeast DATE: 08/23/06
Academy

Speech and Language: The speech-language
Pathologist reported that J████ presents with
mild delays in receptive & expressive language (according
to her May 2006 assessment results). Furthermore,
J████ receptive & expressive vocabulary skills are
moderately delayed. It is likely that her moderately-
delayed vocabulary skills are impacting her overall
IQ to some extent. J████ language skills are
not consistent with a Mental Retardation
diagnosis.

54

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES          page: 8 of 11

MEETING TYPE: _____

STUDENT: ████████ ████████ DATE OF BIRTH ████████/98

SCHOOL: *Friendship Souther* / DATE: 08/03/06
*Academy*

Gen. Ed. Teacher (Mr. Ray) participated by phone.

Summary: The team has ruled out the classification of MR based on the CTONI Psycho-Ed, ~~the~~ Adaptive and speech and Language does not support the diagnosis of MR. Based on the speech and Language evaluation the team has decided that ████ does not qualify for special education services as a student with a speech and language impairment

55

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)    page: 9 of 11
CONTINUATION MEETING NOTES
MEETING TYPE: _____

STUDENT: ████████ R█████    DATE OF BIRTH: ████████ /90

SCHOOL: Friendship Southeast    DATE: 08/03/06

The team has noted discrepancies with
J████████ achievement scores that will has
supported a diagnosis of Learning Disabled.

Recommendations
  • Clinical assessment that
    will address distractibility
    peer relations and a
    need to redirect.
  • After 45 days determine the
    effectiveness of the B.I.P.
The team will reconvene at the
end of the first quarter to review
(45 days) 45 days ~~first quarter~~
the B.I.P. and review clinical and
progress. The team will reconvene at the
end of ~~the~~ October
Before making ~~the~~ a diagnosis of Emotional
Disturbance. The team feels that it is best
practice to implement the B.I.P. and then
review if the student makes progress.

56

Parent/Advocate requested a Comprehensive Clinical and stated she would be happy to provide a list of assessments that comprize a comprehensive clinical. Friendship Edison stated "No Thanks." Edison is going to classify her as LD write an IEP provide services, do additional testing that should have been done months ago and receive after school states. Since the student is in need of services. The Advocate has serious concerns about this entire process but realizes the student has to have some intervention and this is the only way Edison will provide it. Goals/objectives do not address the level of her disability.
Goals in Spell Lang are not measurable. Goals in Soc Emot are not measurable.
Services provider refused to make cha Spll Lang provider disagreed with Ediso evaluator regarding the time of servi Provison which was 2x45 Time on IEP will be 2x30 which the Advocate disagrees with.
Edison only has inclusion no resource room Parent/Advocate has requested a full tim setting. I am against DCPS assess ass Parent/Advocate also requesting Rock Creek Academy as a placement. DCPS had no placement recommendation

JR1(
57

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT REFERRAL DATE: _____

MEETING DATE: 9-13-06

STUDENT: J_____ R_____

SCHOOL: Friendship Southeast Elementary

| PARTICIPANTS; (PRINT NAME) | PARTICIPANTS; (SIGN NAME) | POSITION |
|---|---|---|
| Carnecia Robinson | Carnecia Robinson | Parent Leader |
| Willie Walker | Willie Walker | Gen. Ed. Teacher |
| Sharon Millis | | Sp. Ed. Teacher |
| Charlene Glymph | Charlene G. | Psychologist |
| Bronwen L. Miller | Bronwen L. Miller | Exec. Director of S.| psychologist |
| Paul S. Dalton | Paul Dalton | Attorney F.P.C.S. |
| Evan Murray | by phone | DCPS Placement Specialist |

Introductions were made. Procedural safeguards
were given to parent 2/16/06 and made
available this meeting. Purpose of this meeting
is to review evaluations for that were completed.

Parent: Did not want to add anything to
the notes. (See advocates) comment.

JR11  58

Friendship Public Charter Schools

_Southeast Ele._ Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES
page 2 of 7

MEETING TYPE: _Placement Mtg._

STUDENT: J___ R___     DATE OF BIRTH ___-98

SCHOOL: _Friendship Southeast_     DATE: 09·13·06
_Elementary Academy_

(Ms. Wallace)

Gen. Ed. Teacher: She tends to mind the other students business. J___ tries to comply with the token economy system. She accepts redirections quickly. She does not had any time outs. Teacher will provide us w/ behavior logs for J___. Botel/Morrison n Call scored 1.5. Currently in lowest reading groups. Has difficulty answering questions. Has difficulty with Higher Order Thinking. Has difficulty writing.

Special Ed Teacher:

59

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES                    page: 3 of 7
MEETING TYPE: _Placement Mtg._

STUDENT: ▓▓▓▓▓▓▓▓▓▓▓▓▓        DATE OF BIRTH ▓▓▓▓▓▓-98

SCHOOL: _FPCS. Southeast Academy_ DATE: _09·13·06_

_Psychologist: (Dr. Bronwen Millet)_.

Dr. Millet reviewed the A.D.H.D. instrument, completed by Sharon Pines. Ms. Masimini completed the teacher portion. ▓▓▓▓▓▓ scores were elevated in several areas (oppositional, emotional lability, hyperactivity, restless-impulsive, inattentive. Ms. Robinson (mother) completed the parent portion ▓▓▓▓▓ scores were elevated in several areas (oppositional, cognitive-inattentive, hyperactivity, Anxious Shy and Perfectionism. A clinical evaluation was also completed. The clinical included the Rorschach and the Children's Sentence Completion form - while her protocol was not scorable valuable information was able to be ascertained. ▓▓▓ has significant cognitive difficulties but meant her ability to articulate herself and relate with others. Additionally ▓▓ experiences a great deal of difficulty and frustration communicating her ideas, Recommendations included therapy and an A.D.H.D. screen.

Her cognitive difficulties is what impedes ▓▓ ability to progress.

60

Friendship Public Charter Schools
_____
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)    page: 4 of 7
CONTINUATION MEETING NOTES
MEETING TYPE: _____

STUDENT: ████████ ██████    DATE OF BIRTH __/__/98

SCHOOL: FPCS-Southeast    DATE: 09-13-06
         Academy

_Educational Advocate:_ Ms. Millis wanted it
noted that Mr. Massimini the Student Support
Manager (Counselor) was not ████████ teacher.
████████ teacher was released from contract
before the request for evaluations were made.
Mr. Massimini's interaction with ████████ was
on a frequent basis. He covered the students
class every day for lunch and dealt with
behavior when she was not following class
expectations. Ms. Millis agrees with the
diagnosis of ADHD however she did not agree with
the assessments being completed. Ms. Millis
objected to Mr. Murray's having to not participate
in the entire review of evaluations and was
~~unable to complete~~ would be available for
placement. Mr. Murray had to leave the meeting
via phone to attend another meeting. Ms. Millis
feels that the clinical is not appropriate.

61

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)        page: 5 of 7
CONTINUATION MEETING NOTES
MEETING TYPE: _____

STUDENT: J_____ R_____        DATE OF BIRTH _____ 98

SCHOOL: FPCS Soul                    DATE: 09.13.06

<u>Team Recommendations</u>

The team has concluded that at this time
that the reports completed for J_____ are
valid and a current measure of her
ability. The team did recommend a
smaller placement for J_____

The team has concluded that J_____
continues to qualify for services as a
multiple disabled setting students
that qualifies as learning disabled and
Other Health Impairment. The team has
not concluded that J_____ is not a student with
an emotional disturbance. The

62

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)          page: 6 of 7
CONTINUATION MEETING NOTES
MEETING TYPE: _____

STUDENT: ███████████████          DATE OF BIRTH ████████ 98

SCHOOL: FPCS-Southeast          DATE: 09-13-06
              Academy

Ms. Murray the SEA Rep. asked the parent attorney what placement are they proposing

Parent Advocates response:
Rock Creek Academy is the recommended school by parents advocate. ████████ has been accepted and a letter will be provided.


L.C.P.S. is recommending Prospect Learning Center
LD, SL, and OHI (ADD and ADHD) 7:45-2:15
(13) homeroom teachers (certified in Sp Ed.
(5) certified specials  (1) OT
(2) resource teachers
(1) special Ed. Coor.
(3) Psychologist
(2) Speech Pathologist

63

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)          page: 7 of 7
CONTINUATION MEETING NOTES
MEETING TYPE: _____

STUDENT: _____    DATE OF BIRTH ████ 98

SCHOOL: *FPCS Southeast Ele.*    DATE: *09·13·06*
*Academy.*

Dr. Peterson principal has received the
file and reviewed the folder and J████
R████ has been accepted. Dr. Peterson could
answer some questions however not extensive
questions. ~~The call was~~ terminated the call.


Parent advocate can not accept or reject the
placement until the parent has the opportunity
to go see the school.

64

J██████ R██████    MDT    9/13/06

Reg ed teacher available by phone, no
progress report or documentation
provided.
Parent/Advocate feel student is ED
Inadequate testing in this area in order
to make this determination has been
done. Parent/Advocate request additional
testing FF SA states they will not do
any other testing. This testing is crucial
to student being placed in full time
therapeutic setting. Parent/Advocate
are requesting DCT
Team determined that student qualified
for OHI classification.
DCPS representative did not participate
in the entire meeting since he was not
physically at the meeting and there were
phone problems
Team determined that while she
is FF SA information will be gathered
for an FBA, so a BIP can be constructed.
Parent/Advocate do not agree with Sed and
goals/objectives and do not think they
address her disability.
Team feels she needs a small classroom
of 5-6 students
DCPS
Questions asked the DCPS representative
were not able to be answered and

65

at Prospect to answer all questions
regarding placement. Team called
DCPS person who was unable to
speak to the team. Parent/Advocate
to answer more than a "couple of
questions", he was busy with testimony
Parent/Advocate was unable to
accept/reject DCPS placement due
to lack of any information other
than the number of teachers
service providers and therapists
which were told to the team
as well as which disability
classifications the school serves

Requests to the team to clarify the votes
and add parent concerns were
refused, so full parent participation
in this meeting was not possible

66

09/13/2006  15:39  FAX  2024425517      DCPS SPECIAL EDUCATION     ☎ 003

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**

**MULTIDISCIPLINARY TEAM (MDT)**

**Prior to Action Notice**

Check Purpose:
- ☐ Initial Evaluation
- ☐ Initial Placement
- ☐ Reevaluation
  - ☐ Change in Category Exit
  - ☐ Related Service Add
  - ☐ Related Service
  - ☑ Change in Placement
  - ☐ Annual
  - ☐ Other _____

Date  *9/13/06*

Student  *S_____ R_____*  DOB _____

School  *FESA PCS*

Current Disability Category

Setting  *Outside the educational setting*

Dear  *Ms. Robinson*

State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program.

Therefore, you are being notified of the following proposed changes:
- ☐ Proposes to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- ☐ Refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- ☐ Other _____

A multidisciplinary team (MDT), of which you were an invited member, has made the following decisions about your child: (check all that apply)

- ☐ Your child is not eligible for special education service(s).
- ☐ Your child is eligible or continues to be eligible to receive special education services as a student with _____
- ☐ Your child will begin receiving _____ as a related service(s).
- ☐ Your child will no longer receive _____ as a related service(s).
- ☐ Your child's category of disability is being changed from _____ to _____
- ☑ Your child's alternative placement on continuum (next setting) is being changed.
  - from  *Combine  Educational  Setting*  to  *Outside of General Education Setting*
- ☐ Your child is no longer eligible and will be exited from the special education program.
- ☐ Other: _____

Location of Services  *Prospect LC  Dr. Eve Byford Peterson  920 F St. NE WDC 20002*
*2-698-3800*

**Description and Explanation of agency action proposed or refused.**

*The student has been appropriately placed in a educational Setting*

**Description of Other Options Considered and reasons for rejection of each option**

*General Education Setting — rejected*
*Combined Education Setting  rejected*
*Outside the general Educational Setting  accepted*

Other relevant factors to the decision-

MDT Members:
- ☐ Principal or Designee
- ☑ Parent
- ☐ Student
- ☐ Social Worker
- ☑ General Education Teacher
- ☑ Special Education Teacher
- ☐ Speech and Language
- ☑ *LEA & Interpreter ("may be one)
- ☑ Psychologist
- ☑ Other: *DCPS*

Parents may bring individuals to participate in the MDT meeting. These participants should have knowledge or special expertise regarding the child. The following individuals invited by parent:  *Sharon  Millis*

Any questions you may have concerning your child's program may be directed to the principal.
You are protected under the Procedural Safeguards for parents, which are enclosed for your information.
If I can be of assistance to you, or have questions regarding the Procedural Safeguards

please contact  *Evan Murry*  at  *442-5144*  (school telephone number).

See attachments for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

MDT Prior to Action Notice
07-02-2001

**JR12 67**

*State Education Agency for the District of Columbia*
*State Enforcement and Investigation Division (SEID) Special Education*
*Programs*



# *Due Process Complaint Disposition*

- This form should be used by the parties to notify the Student Hearing Office about important information concerning the outcome of the resolution meeting.
- Please return to the Student Hearing Office of the District of Columbia Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002, Fax number 202/442-5556.

## A.  STUDENT AND CASE INFORMATION:

Student Name: J▮▮▮▮    R▮▮▮▮    Birth Date: ▮▮▮98

First       MI       Last

SHO Case Number: [          ]       (if applicable)

## B.  PARENT / GUARDIAN:

Name: Carnecia                    Robinson

First                          Last

Complete Address: 1322 Congress Street, SE
Washington, DC  20032

Phone: [          ]  [          ]  [          ]

Home       Work or alternative phone no.       Fax No. if applicable

## C.  LOCAL EDUCATION AGENCY REPRESENTATIVE:

Full Name: Kymberly   Grafton       Title: LEA, CRS

Address:

825 North Capitol Street, NE 6th Floor
Washington, DC  20002

Phone: (202) 442-4800    (202) 442-5517

Office       Fax

1

SEID DRN Rev'd. 6/14/05

_____ The complaint has been resolved and the parties have reached agreement to the satisfaction of the parent / guardian. The due process complaint notice and the request for a due process hearing should be dismissed and withdrawn. The parties are aware that the agreement may be voided by any party within 3 business days of the date the agreement is signed. The parties have agreed to wait at least 3 business days before filing this form with the Student Hearing Office.

___X___ The resolution session was unsuccessful. The case should proceed to a due process hearing.

_____ The resolution session was unsuccessful. The parties have agreed to try mediation.

_____ The parties mutually agree to waive the resolution session and request mediation and the assignment of a mediator to this case.

_____ The parties mutually agree to waive the resolution session and request that this case proceed to a due process hearing on the merits.

_____ The parent has failed to participate in a resolution meeting as required under the law. A due process hearing should not be scheduled until further notice

**J.** **Signature and Affirmation:**

I affirm that the information provided on this form is true and correct. I also affirm my receipt of the Procedural Safeguards Manual or I have waived my right to receive the Procedural Safeguards Manual.

_____          10/13/06
Signature of Parent/Guardian                    Date

_____   10-13-06
Local Educational Agency Representative      Date

**Mail, fax or deliver this form to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC 20002**
**Fax number: 202/442-5556**

2

SEID DRN Rev'd. 6/14/05

69

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

__ PUBLIC        ___DCPS CHARTER        __ LEA CHARTER        __ NONPUBLIC        __ PRIVATE/RELIGIOUS

## RESOLUTION MEETING NOTES

Meeting Confirmation Date: [        ]        Meeting Held: 10-13-06

Student: J███████ R████████        DOB: ████-98        Friendship SE PCS

| PARTICIPANTS: (Print Name) | PARTICIPANTS (Sign Name) | POSITION |
|---|---|---|
| Kymberly Grafton | *Kymberly Drafton* | LEA/CRS |
| Carnecia Robinson | *signature* | Mother (via phone) |
| Sharon Millis | *signature* | Advocate |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

[  ] Resolved        [X] Unresolved

The meeting began with introductions.  The parent's complaint is DCPS failed to provide an appropriate placement for school year 2006-2007, failed to develop an appropriate IEP, failed to establish an appropriate disability and failed to complete and review assessments in all areas of suspected disability on the student and failed to provide an appropriate placement.

DCPS agrees to complete a clinical and Functional Behavior Assessment.  Upon completion of the assessments, DCPS agrees to convene an MDT in which these assessments are reviewed, student's IEP is revised as necessary, placement and comp ed are discussed and a new prior notice and/or comp ed plan are developed if necessary within 60 school days.

The parent is unwilling to accept DCPS' offer and will proceed to due process.  This case is unresolved.  The parent will cooperate with DCPS in the evaluation and meeting process scheduled through parent's counsel.

70

R███████ RS  10/13/06

CTS states that they will complete
Clinica and FBA. Hold an IEP
address IEP, disability and
placement within 60 days
they will not fund and place at PCA,
and independent clinical/FBA or
assess. However CTS.
Parent does not give up his right
to DRC but will cooperate with
CTS.



**Friendship Edison**
**Public Charter School**
Community Vision ... World Class Education

## Psycho-Educational Evaluation

| | | | |
|---|---|---|---|
| EXAMINEE: | J█████ R█████ | REPORT DATE: | 5/25/2006 |
| AGE: | 8 years 3 months | GRADE: | 2nd |
| DATE OF BIRTH: | ████1998 | ETHNICITY: | African/African American |
| EXAMINEE ID: | Not Specified | EXAMINER: | Richard L. Griffith |
| GENDER: | Female | | |

Tests Administered: WISC-IV (5/24/2006)
WIAT-II (5/17/2006)

Age at Testing: WISC-IV (8 years 3 months)
WIAT-II (8 years 3 months)

Is this a retest?     No

### SCORES SUMMARY

| WISC-IV COMPOSITE | SCORE | WIAT-II COMPOSITE | SCORE |
|---|---|---|---|
| Verbal Comprehension Index (VCI) | 53 | Reading | 71 |
| Perceptual Reasoning Index (PRI) | 59 | Mathematics | 74 |
| Working Memory Index (WMI) | 68 | Written Language | 80 |
| Processing Speed Index (PSI) | 80 | Oral Language | 65 |
| Full Scale IQ (FSIQ) | 56 | | |

### Reason for Referral

The Multidisciplinary Team recommended a psycho educational evaluation based on emerging concerns about J█████ academic performance and observed behaviors in the classroom.

### Background

According to Ms. Carnecia Robinson, J█████ biological mother, J█████ and her 4 siblings (3 boys and one girl who Ms. Robinson adopted) live with her in a 3-bedroom house in South East Washington DC. According to Ms. Robinson J█████ shares a room with her adopted sister and her three brothers share another room. Reportedly, J█████ often starts verbal and physical altercations with her siblings. However, Ms. Robinson is not aware of J█████ motivation behind these altercations. J█████ mother is a 30-year-old woman working full-time as nursing assistant. J█████ father is 30-years-old and does not reside in the household with her biological mother. According to Ms. Robinson, J█████ father is employed as a mail sorter. Ms. Robinson also indicates that J█████ sees her father daily as he visits the household regularly despite him not living there.

JR14
72

06/08/2006 02:36 FAX    FRIENDSHIP SCHOOL    ☒006/024

2

### Developmental Milestones and Early Childhood

Ms. Robinson reports that J██████ was born full-term and weighed 6 pounds and 9 ounces. She reported that there were no complications with J██████ birth and that she was a healthy baby. According to Ms. Robinson she did not use alcohol or drugs during her pregnancy with J██████. Ms. Robinson reports that J██████ began to walk when she was 10 months old, began talking at 1-year-old, and was fully potty-trained by 3-years-old.

### Medical History

According to Ms. Robinson J██████ does not currently have any serious medical conditions and has never been hospitalized for any major illness. In addition, Ms. Robinson indicated that J██████ is not currently taking any medication for any illness or psychiatric conditions.

### Academic History

J██████ has attended the following schools: New Image Daycare (Pre-K to K) Friendship Southeast Elementary Academy (1st Grade – 2nd Grade).

J██████ grades over four marking periods in 1st Grade are as follows, three "F's" in Mathematics, a "D" in History for the 3rd marking period, two "B's" and a "C" in Music over three marking periods, two "A's" in Health and Fitness, and an "F" in Language Arts. Based on her Stanford Achievement Test-9th Edition scores in 1st Grade, J██████ exhibited below average performance in the following major test areas, Word Study Skills, Mathematics: Problem Solving, and Mathematics: Procedures.

J██████ is presently in the 2nd Grade at Friendship Southeast Elementary Academy. J██████ grades for the 1st and 2nd quarters of the current school year are as follows: "C" & "D" in Reading, "B" & "C" in World Language, two "A's" and a "C" in Physical Fitness, a "B" in Art for the 2nd quarter, "B" & "A" in Social Studies, two "C's" in Mathematics, and two "A's" in Science.

### Teacher Observation

Ms. Johnson, J██████ 2nd grade teacher indicates that J██████ has difficulties attending to tasks and following simple directions. Ms. Johnson stated that J██████ consistently is unable to carry out the sequence of the morning routine (i.e. hanging coat, organizing materials for class etc.). Reportedly, J██████ also has difficulty forming letters and words and was observed to produce slanted writing and to omit certain letters from the words she writes. Ms. Johnson has also indicated that J██████ has difficulty reading and understanding what she has read. According to Ms. Johnson, J██████ struggles with her 2nd grade assignments and has trouble completing these tasks. With regard to her behavior, Ms. Robinson reports that J██████ has difficulty communicating with peers, and often gets into disagreements with peers.

73

Classroom Observation                                                                   3

At the time of her in class observation, J████ appeared to isolate herself from the
majority of her classmates who, despite their involvement in various tasks, still interacted
with each other. In fact, she was the least active of the 23 students in her class during the
class's designated free time following recess; however this may have been a result of her
being involved in a drawing activity.

J████ actively participated in the in class assignment, and raised her hand to both ask
and answer questions. However, J████ frequently provided incorrect answers to the
questions asked her answers reflected her failure to grasp the concept of the questions
asked of her. J████ appeared very concerned about the examiner's presence in the
classroom during the observation, which may have influenced the observed behavior.
J████ was observed to keep to herself and only interacted with other children when
approached by them.

Behavior Observation during Testing

J████ presented to the examiner as shy and soft-spoken. Most notable to the examiner
was J████ blank affect, which made it difficult to determine her mood. It was
difficult for the examiner to tell whether J████ was excited or apprehensive about the
possibility of her being subject to testing. She seemed neither enthusiastic nor
apprehensive about being tested. However, J████ was very cooperative with the
examiner throughout the entirety of the assessment battery. When J████ became
frustrated with tasks that she had difficulty with, she became silent and placed her head
on the table and limited any further attempts to answer questions. J████ did not
attempt to solve any items that she did not know as she gave up easily when the test items
increased in difficulty. Due to J████ non-investment in the assessment (as evidenced
by her giving up when tasks increased in difficulty), the examiner believes that the results
may not be an accurate measure of her current cognitive functioning.

Previous Psychological Evaluations

None

Test Administered:

-   Wechsler Intelligence Scale for Children – 4th Ed. (WISC-IV)
-   Wechsler Individual Achievement Test – 2nd Ed. (WIAT-II)
-   Beery-Buktenica Developmental Test of Visual-Motor Integration (VMI)-4th Ed.

Interpretation of WISC-IV Results

J████ was administered fourteen subtests of the Wechsler Intelligence Scale for
Children – Fourth Edition (WISC-IV) from which her composite scores are derived. The
Full Scale IQ (FSIQ) is derived from a combination of ten subtest scores and is
considered the most representative estimate of global intellectual functioning. J████
general cognitive ability is within the Extremely Low range of intellectual functioning, as

906 Pennsylvania Avenue, Southeast • Washington, DC 20003
TELE:(202) 543-8248 • FAX:(202) 543-8246

4

measured by the FSIQ. Her overall thinking and reasoning abilities exceed those of approximately 0.2% of children her age (FSIQ = 56; 95% confidence interval = 52-62). [redacted] may experience great difficulty in keeping up with her peers in a wide variety of situations that require age-appropriate thinking and reasoning abilities. Her ability to think with words is comparable to her ability to reason without the use of words. Both [redacted] verbal and nonverbal reasoning abilities are in the Extremely Low range. She performed slightly better on nonverbal than on verbal reasoning tasks, but there is no significant meaningful difference between [redacted] ability to reason with and without the use of words.

[redacted] verbal reasoning abilities as measured by the Verbal Comprehension Index are in the Extremely Low range and above those of only 0.1% of her peers (VCI = 53; 95% confidence interval = 49-63). The Verbal Comprehension Index is designed to measure verbal reasoning and concept formation. [redacted] performance on the verbal subtests contributing to the VCI is somewhat variable although it is not especially unusual. Examination of [redacted] performance on individual subtests provides additional information regarding her specific verbal abilities.

[redacted] nonverbal reasoning abilities as measured by the Perceptual Reasoning Index are in the Extremely Low range and above those of only 0.3% of her peers (PRI = 59; 95% confidence interval = 55-70). The Perceptual Reasoning Index is designed to measure fluid reasoning in the perceptual domain with tasks that primarily assess nonverbal fluid reasoning and perceptual organization abilities. [redacted] performance on the perceptual reasoning subtests contributing to the PRI is somewhat variable, although the magnitude of this difference in performance is not unusual among children her age. Examination of [redacted] performance on individual subtests provides additional information regarding her specific nonverbal abilities.

[redacted] ability to sustain attention, concentrate, and exert mental control is in the Extremely Low range. She performed better than approximately 2% of her age-mates in this area (Working Memory Index = 68; 95% confidence interval 63-78).

[redacted] had difficulty with the two tasks that demand mental control, that is, attending and holding information in short-term memory while performing some operation or manipulation with it and then correctly producing the transformed information. (Digit Span scaled score = 7; Letter-Number Sequencing scaled score = 2). [redacted] difficulty recalling long spans of digits backwards (Longest Digit Span Backwards = 2) is further evidence of weak mental control. This general weakness in attention, concentration, mental control, and short-term auditory memory may impede [redacted] performance in a variety of academic areas but especially on tasks that require her to solve numerical problems mentally (i.e., without using pencil and paper).

[redacted] ability in processing simple or routine visual material without making errors is in the Low Average range when compared to her peers. She performed better than approximately 9% of her peers on the processing speed tasks (Processing Speed Index = 80; 95% confidence interval 73-91). Processing visual material quickly is an ability that [redacted] performs well as compared to her verbal and nonverbal reasoning ability. Processing speed is an indication of the rapidity with which [redacted] can mentally process

906 Pennsylvania Avenue, Southeast · Washington, DC 20003
TELE:(202) 543-8248 · FAX:(202) 543-8246

75

5

simple or routine information without making errors. Students with very low reasoning abilities often tend to do somewhat better on these processing speed tasks. This may have practical implications for vocational programs in which successful adjustment depends upon quick and relatively error-free performance of simple tasks.

**Personal Strengths and Weakness**

J▬▬ achieved her best performance among the nonverbal reasoning tasks on the Matrix Reasoning subtest and lowest score on the Block Design subtest. Her performance across these areas differs significantly, suggesting that these are the areas of most pronounced strength and weakness, respectively, in J▬▬ profile of nonverbal reasoning abilities. Although better developed than her other nonverbal reasoning abilities, J▬▬ ability on the Matrix Reasoning subtest was still below that of most children her age. Her weak performance on the Block Design subtest was far below that of most children her age. The Matrix Reasoning subtest required J▬▬ to look at an incomplete matrix and select the missing portion from five response options. This subtest assesses fluid visual information processing and abstract reasoning skills; (Matrix Reasoning scale score = 5). The Block Design subtest required J▬▬ to use two-color cubes to construct replicas of two-dimensional, geometric patterns. This subtest assesses nonverbal fluid reasoning and the ability to mentally organize visual information. More specifically, this subtest assesses her ability to analyze part-whole relationships when information is presented spatially. Performance on this task also may be influenced by visual-spatial perception and visual perception-fine motor coordination, as well as planning ability; (Block Design scaled score = 1).

**Interpretation of WIAT-II Results**

**Reading**

J▬▬ presents a diverse set of skills on different aspects of reading. She performed much better on tasks that assessed her capability to correctly apply phonetic decoding rules when reading a series of nonsense words (Pseudoword Decoding standard score = 83) and name alphabet letters, identify and generate letter sounds and rhyming words, and match and read a series of printed words (Word Reading standard score = 78) than on tasks that required her to read sentences and paragraphs and answer questions about what was read (Reading Comprehension standard score = 60). A strength in decoding words and reading words in isolation relative to comprehending words in text may indicate that J▬▬ is not actively reading for meaning. She may not be utilizing context clues to facilitate her understanding of text. Given the disparity in subtest performance, the Reading Composite standard score (71) may not be the most accurate manner in which to summarize her reading skills.

**Mathematics**

J▬▬ skills in mathematics are diverse and may not be adequately summarized by a single number. She performed much higher on tasks that evaluated her ability to add and subtract numbers up to three digits (Numerical Operations standard score = 91) than on tasks that required her to understand basic number concepts, including unit and geometric

measurement, and solve one-step word problems (Math Reasoning standard score = 60). Because of this variability in her performance, the Mathematics Composite standard score (74) may not be the best summary of her overall skills in mathematics. J‎████ skills in Math Reasoning are within the Extremely Low range and better than those of only approximately 0.4% of children her age. Her Numerical Operations subtest score is above that of approximately 27% of her peers, placing these skills in the Average range.

## Oral Language

J‎████ performed in the Extremely Low range in overall language skills, as indicated by her standard score on the Oral Language Composite (65). Her skills in this area exceed those of only approximately 1% of students her age. J‎████ performed comparably on tasks that required her to identify the picture that best represents an orally presented descriptor or generate a word that matches the picture (Listening Comprehension standard score = 73) and repeat sentences, generate words within a category, describe scenes, and give directions (Oral Expression standard score = 66).

## Written Language

J‎████ skills in written language are diverse and may not be adequately summarized by a single number. She performed much higher on tasks that evaluated her ability to correctly spell verbally presented words (Spelling standard score = 91) than on tasks that required her to write the alphabet from memory, generate words within a category, generate sentences to describe visual cues, and combine sentences (Written Expression standard score = 72). Because of this variability in her performance, the Written Language Composite standard score (80) may not be the best summary of her overall skills in writing. J‎████ skills in Written Expression are within the Borderline range and better than those of only approximately 3% of children her age. Her Spelling subtest score is above that of approximately 27% of her peers, placing these skills in the Average range.

## Strengths And Weaknesses

Compared to J‎████ mean score for all WIAT-II subtests, her performance is significantly better in Numerical Operations, indicating that this is an area of relative strength for her. Compared to those of other children her age, however, her skills in this area are in the Average range.

Spelling and Pseudoword Decoding are areas of relative strength for J‎████. She performed significantly higher than her mean WIAT-II score on each of these subtests. Compared to those of other children her age, however, her skills Spelling are in the Average range and her Pseudoword Decoding skills fall in the Low Average range.

Reading Comprehension and Math Reasoning are notable weaknesses for J‎████. Her scores on these subtests are significantly less than her mean score for all WIAT-II

7

subtests, indicating that these are areas of lower performance relative to her other skills. She performed better than only approximately 0.4% and 0.4% of her peers on Reading Comprehension and Math Reasoning, respectively. Thus, J██████ may experience great difficulty keeping up with other students when these skills are needed.

**Ability-Achievement Discrepancy Analysis Predicted Method**

J██████ scores on the WIAT-II were compared to the levels of achievement predicted for a student with her general cognitive ability, as indicated by her Full Scale IQ score of 56 on the WISC IV administered 5/24/2006. Significant differences between actual and predicted achievement scores are reported in this section.

J██████ achieved better than anticipated in reading. Her Reading Composite score (71) is much higher than anticipated for a child with her general cognitive ability (predicted score = 66). The difference is significant, suggesting that this is an area of considerable strength for J██████. Although higher than expected, J██████ performance in this area is still in the Borderline range. She performed particularly well on tasks that required her to correctly apply phonetic decoding rules when reading a series of nonsense words as well as on tasks that assessed her ability to name alphabet letters, identify and generate letter sounds and rhyming words, and match and read a series of printed words. J██████ achieved a much higher score on the Pseudoword Decoding subtest (actual score = 83) than expected, based on her overall cognitive ability (predicted score = 73). Similarly, she obtained a higher score on Word Reading subtest (actual score = 78) than anticipated (predicted score = 67). These significant differences indicate specific strengths in these skill areas relative to her general cognitive ability. J██████ performance in Pseudoword Decoding and Word Reading, however, is only in the Low Average range and Borderline range, respectively, compared to that of her peers.

She performed particularly well on tasks involving Numerical Operations. J██████ achieved a much higher score on this subtest (actual score = 91) than expected, based on her overall cognitive ability (predicted score = 70). This significant difference indicates a specific strength in tasks that required her to add and subtract numbers up to three digits.

J██████ achieved better than anticipated in writing. Her Written Language Composite score (80) is much higher than anticipated for a child with her general cognitive ability (predicted score = 67). The difference is significant suggesting that this is an area of considerable strength for J██████. Although higher than expected, J██████ performance in this area is still in the Low Average range. She performed particularly well on tasks involving Spelling. J██████ achieved a much higher score on this subtest (actual score = 91) than expected, based on her overall cognitive ability (predicted score = 68). This significant difference indicates a specific strength in tasks that required her to correctly spell verbally presented words.

Reading Comprehension is a particular area of difficulty for J██████. Specifically, there is a noteworthy difference between her Reading Comprehension subtest score (60) and the level of achievement anticipated for a student with her cognitive ability (predicted score = 67). This significant difference indicates a specific weakness on tasks that required her to read sentences and paragraphs and answer questions about what was read.

---

906 Pennsylvania Avenue, Southeast • Washington, DC 20003
TELP.:(202) 543-8248 • FAX:(202) 543-8246

8

## Interpretation of Beery-Buktenica VMI Results

The Beery-Buktenica Visual-Motor Integration (VMI) was designed to identify deficits in visual perception, fine motor skills, and hand-eye coordination. It may be used to diagnose cognitive development disorders in young children using the measure's analysis of visual construction skills. It can be administered to individuals from age two through young adulthood and can also be used to test adults of all ages (i.e. individuals who have been disabled by stroke, injury, or Alzheimer's disease).

J█████ performed in the Low range on the Beery VMI as she obtained a standard score of 78 on the test. Her performance on this test was only better than 7% of children her age who have provided normative data on the measure. J█████ obtained a standard score of 59 on the Visual Perception component of the test that places her in the Very Low range. Her performance on the Visual Perception component was only better than 0.7% of children in her age group who have provided normative data on the measure.

The discrepancy between J█████ scores on the VMI and Visual Perception components indicate that her ability to visually recognize and reproduce designs are slightly more developed than her ability to distinguish subtle differences in designs.

The examiner allowed J█████ to attempt all 30 items on the VMI despite her meeting criteria for discontinuation of the test on item 20. The results illustrated J█████ difficulty in determining the placement of shapes, line orientation, inability to reproduce figures with overlapping lines, distortion of shapes, and perseveration.

J█████ replication of item 16 (Open Square and Circle) showed significant distortion. Interestingly, her reproduction of the Open Square was produced as though she was writing the number 4. J█████ may have found it difficult to inhibit herself from writing the number four as her method of creating the shape resembled the same initial motor movements involved in writing the number for. In addition, the circle may have reinforced this behavior, as her reproduction resembles the number forty. Her reproduction of item 16 was comparable to those produced by 5-year-old children.

On item 19 (Two-Dimensional Rings) J█████ was only able to overlap two of the three circles. Her attempt on this item did not evidence any use of strategy to reproduce the shape. Moreover, the placement of her first reproduced circle did not allow for the accurate placement of the remaining circles. As a result, J█████ did not connect the two remaining circles, which she did manage to overlap. In fact, J█████ attempt to reproduce item 27 (Three-Dimensional Rings) was more accurate for item 19 which indicates that J█████ is capable of creating and orienting the complexity of the design. Consequently, her inability to reproduce item 19 may be more linked to a poor strategy of spatial orientation.

J█████ was also observed to have consistent difficulty producing angled lines to create diamond shapes. Her reproductions of items 21, 22, and 26 show significant distortion which indicates that J█████ has not developed the appropriate skills necessary to produce angled lines to form these shapes. Most notable is her performance on item 21

79

9

(Circle and Tilted Square) as she did attempt to tilt the square to create the design. J████ reproduction of item 21 resembled those created by 5-year-old children.

J████ also exhibited perseveration, where she created more small circles than were necessary to create item 24 (Eight-Dot Circle).

In summary, J████ ability to integrate, and coordinate her visual-perceptual (finger and hand movement) abilities is below that which is age appropriate. As a result, J████ may experience difficulty in age appropriate tasks requiring her to uses these faculties.

80

## Assessment Results

On the Wechsler Intelligence Scale for Children, J█████ achieved a Verbal Comprehension Index of 53 Extremely Low, a Perceptual Reasoning Index of 53 Extremely Low, Working Memory Index 68 Extremely Low and a Processing Speed Index of 80 Low Average. J█████ earned a Full Scale IQ of 56, which indicated that her overall level of cognitive functioning is within the Extremely Low Range.

On the Wechsler Individual Achievement Test – 2nd Edition, J█████ achieved a Reading score of 71, a Mathematics score of 74, Written Language score of 80, and an Oral Language score of 65.

J█████ performed in the Low range on the Beery VMI, she achieved a standard score of 78. On Visual Perception J█████ obtained a standard score of 59 which is in the Very Low range.

### Summary

J█████ is an 8-year-old child who completed the WISC-IV and the WIAT-II. Her general cognitive ability, as estimated by the WISC-IV, is in the Extremely Low range. J█████ verbal comprehension and perceptual reasoning abilities were also both in the Extremely Low range (VCI = 53, PRI = 59).

J█████ demonstrated personal strengths in Numerical Operations, Pseudoword Decoding, Spelling, and Word Reading on the WIAT-II. However, her skills in Pseudoword Decoding and Word Reading are still less than expected for her age. She demonstrated relatively weak skills in Reading Comprehension on the WIAT-II.

Because J█████ tended to give up on items that she was unsure about during testing, it is likely that the results of the cognitive and educational testing are an underestimate of her abilities. Her overall cognitive functioning was Extremely Low. J█████ reading skills are an area of weakness, her overall math skills were within the Extremely Low range and her writing skills varied from the Borderline to Average range.

J█████ ability to integrate, and coordinate her visual-perceptual (finger and hand movement) abilities is below that which is age appropriate. As a result, J█████ may experience difficulty in age appropriate tasks requiring her to uses these faculties.

### Recommendations

1. J█████ may benefit from more concrete strategies of problem solving and reasoning (i.e, finger counting, etc.) given that she has more difficultly than most children her age performing these skills.

2. Assignments or tasks requiring J█████ to perform a number of steps or sequences should be broken down into individual and more manageable steps, as she has problems remembering all the parts of a sequence in addition to organizing the steps necessary to perform the task.

906 Pennsylvania Avenue, Southeast • Washington, DC 20003
TELE:(202) 543-8248 • FAX:(202) 543-8246

10

3. J█████ ma benefit from an increased focus on phonetics as the effort she exerts on focusing on the formation of words may override her ability to understand what she has read.

4. A test of nonverbal intelligence should be administered in attempt to gain further information regarding J██████ cognitive ability.

5. A Vineland Assessment should be administered in an attempt to secure the most appropriate classification.

6. An Occupation therapist should be invited to the MDT meeting to explore the need for service.

_Richard Griffith_

Richard Griffith, M.S. Clinical Psychology Extern

6/7/06
Date

_Bronwen L. Millet_

Dr. Bronwen Millet, Director of Clinical Services

6/7/06
Date

06/08/2006 02:39 FAX

12

# APPENDIX

**Composite Score Summary**

| Scale | Sum of Scaled Scores | Composite Score | Percentile Rank | Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|
| Verbal Comprehension (VCI) | 6 | 53 | 0.1 | 49-63 | Extremely Low |
| Perceptual Reasoning (PRI) | 10 | 59 | 0.3 | 55-70 | Extremely Low |
| Working Memory (WMI) | 9 | 68 | 2 | 63-78 | Extremely Low |
| Processing Speed (PSI) | 13 | 80 | 9 | 73-91 | Low Average |
| Full Scale (FSIQ) | 38 | 56 | 0.2 | 52-62 | Extremely Low |

## WISC-IV Composite Scores

### Composite Score Profile



Vertical bar represents the Standard Error of Measurement.

| Composite | Score | SEM | Composite | Score | SEM |
|-----------|-------|------|-----------|-------|------|
| VCI | 53 | 4.24 | PSI | 80 | 5.2 |
| PRI | 59 | 3.97 | FSIQ | 56 | 2.6 |
| WMI | 68 | 4.5 | | | |

906 Pennsylvania Avenue, Southeast · Washington, DC 20003
TELE:(202) 543-8248 · FAX:(202) 543-8246

84

14

## Verbal Comprehension Subtest Scores Summary

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Similarities | 0 | 1 | <6:2 | 0.1 |
| Vocabulary | 10 | 4 | <6:2 | 2 |
| Comprehension | 3 | 1 | <6:2 | 0.1 |
| (Information) | 9 | 5 | <6:2 | 5 |
| (Word Reasoning) | 5 | 4 | <6:2 | 2 |

## Perceptual Reasoning Subtest Scores Summary

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Block Design | 0 | 1 | <6:2 | 0.1 |
| Picture Concepts | 6 | 4 | <6:2 | 2 |
| Matrix Reasoning | 8 | 5 | <6:2 | 5 |
| (Picture Completion) | 3 | 1 | <6:2 | 0.1 |

## Working Memory Subtest Scores Summary

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Digit Span | 11 | 7 | 6:2 | 16 |
| Letter-Number Sequencing | 3 | 2 | <6:2 | 0.4 |
| (Arithmetic) | 13 | 7 | 6:10 | 16 |

## Processing Speed Subtest Scores Summary

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Coding | 27 | 8 | <8:2 | 25 |
| Symbol Search | 5 | 5 | <8:2 | 5 |

85

15

## WISC-IV Subtest Scaled Score Profile



| | Verbal Comprehension | | | | Perceptual Reasoning | | | | Working Memory | | | Processing Speed | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SI | VC | CO | IN | WR | BD | PCn | MR | PCm | DS | LN | AR | CD | SS | CA |

Vertical bar represents the Standard Error of Measurement.

| Subtest | Score | SEM | Subtest | Score | SEM |
|---|---|---|---|---|---|
| Similarities (SI) | 1 | 1.12 | Picture Completion (PCm) | 1 | 1.2 |
| Vocabulary (VC) | 4 | 1.12 | Digit Span (DS) | 7 | 1.2 |
| Comprehension (CO) | 1 | 1.41 | Letter-Number Sequencing (LN) | 2 | 0.95 |
| Information (IN) | 5 | 1.24 | Arithmetic (AR) | 7 | 1.16 |
| Word Reasoning (WR) | 4 | 1.24 | Coding (CD) | 8 | 1.24 |
| Block Design (BD) | 1 | 1.12 | Symbol Search (SS) | 5 | 1.27 |
| Picture Concept (PCn) | 4 | 1.31 | Cancellation (CA) | | |
| Matrix Reasoning (MR) | 5 | 0.85 | | | |

906 Pennsylvania Avenue, Southeast • Washington, DC 20003
TELE:(202) 543-8248 • FAX:(202) 543-8246

86

16

**Composite Score Differences**

| Discrepancy Comparisons | Scaled Score 1 | Scaled Score 2 | Diff. | Critical Value | Sig. Diff. Y/N | Base Rate |
|---|---|---|---|---|---|---|
| VCI - PRI | 53 | 59 | -6 | 11.38 | N | 34.6% |
| VCI - WMI | 53 | 68 | -15 | 12.12 | Y | 14.9% |
| VCI - PSI | 53 | 80 | -27 | 13.15 | Y | 5.4% |
| PRI - WMI | 59 | 68 | -9 | 11.76 | N | 26.3% |
| PRI - PSI | 59 | 80 | -21 | 12.82 | Y | 8.5% |
| WMI - PSI | 68 | 80 | -12 | 13.48 | N | 26% |

Base Rate by Overall Sample
Statistical Significance (Critical Values) at the .05 level

**Subtest Score Differences**

| Discrepancy Comparisons | Scaled Score 1 | Scaled Score 2 | Diff. | Critical Value | Sig. Diff. Y/N | Base Rate |
|---|---|---|---|---|---|---|
| Digit Span - Letter-Number Sequencing | 7 | 2 | 5 | 2.83 | Y | 7.2% |
| Coding - Symbol Search | 8 | 5 | 3 | 3.55 | N | 17.3% |
| Similarities - Picture Concepts | 1 | 4 | -3 | 3.36 | N | 20.7% |
| Digit Span - Arithmetic | 7 | 7 | 0 | 2.94 | N | |
| Letter-Number Sequencing - Arithmetic | 2 | 7 | -5 | 2.80 | Y | 6.3% |

Statistical Significance (Critical Values) at the .05 level

**Differences between Subtest and Mean of Subtest Scores**

| Subtest | Subtest Scaled Score | Mean Scaled Score | Diff. from Mean | Critical Value | S/W | Base Rate |
|---|---|---|---|---|---|---|
| Block Design | 1 | 3.8 | -2.80 | 3.01 | | 10-25% |
| Similarities | 1 | 3.8 | -2.80 | 3.01 | | 10-25% |
| Digit Span | 7 | 3.8 | 3.20 | 2.87 | S | 10-25% |
| Picture Concepts | 4 | 3.8 | 0.20 | 3.39 | | >25% |
| Coding | 8 | 3.8 | 4.20 | 3.17 | S | 5-10% |
| Vocabulary | 4 | 3.8 | 0.20 | 2.70 | | >25% |
| Letter-Number Sequencing | 2 | 3.8 | -1.80 | 2.63 | | >25% |
| Matrix Reasoning | 5 | 3.8 | 1.20 | 2.68 | | 10-25% |
| Comprehension | 1 | 3.8 | -2.80 | 3.44 | | 10-25% |
| Symbol Search | 5 | 3.8 | 1.20 | 3.56 | | >25% |

Overall: Mean = 3.8, Scatter = 7, Base Rate = 53.9%
Statistical Significance (Critical Values) at the .05 level

906 Pennsylvania Avenue, Southeast • Washington, DC 20003
TELE:(202) 543-8248 • FAX:(202) 543-8246

| ...ICY Analysis | Raw Score | Scaled Score |
| --- | --- | --- |
| | 1 | 1 |
| | | 7 |
| | | 8 |

17

## Process Summary and Discrepancy Analysis

| Process Score | Raw Score | Scaled Score |
|---|---|---|
| Block Design No Time Bonus | 1 | 1 |
| Digit Span Forward | 6 | 7 |
| Digit Span Backward | 5 | 8 |

| Process Score | Raw Score | Base Rate |
|---|---|---|
| Longest Digit Span Forward (LDSF) | 5 | 75.5% |
| Longest Digit Span Backward (LDSB) | 2 | 99% |

## Process Discrepancy Comparisons

| Process Score | Raw Score 1 | Raw Score 2 | Difference | Base Rate |
|---|---|---|---|---|
| LDSF – LDSB | 5 | 2 | 3 | 31.4% |

Base Rate by All Ages

| Subtest/Process Score | Scaled Score 1 | Scaled Score 2 | Diff. | Critical Value | Sig. Diff. Y/N | Base Rate |
|---|---|---|---|---|---|---|
| Block Design – Block Design No Time Bonus | 1 | 1 | 0.00 | 3.26 | N | |
| Digit Span Forward  Digit Span Backward | 7 | 8 | -1.00 | 3.62 | N | 45.4% |

Statistical Significance (Critical Values) at the .05 level

906 Pennsylvania Avenue, Southeast • Washington, DC 20003
TELE:(202) 543-8248 • FAX:(202) 543-8246

18

### WISC-IV Total Raw Scores

| Subtest | | Score Range | Raw Score |
|---|---|---|---|
| Block Design | | 0 to 68 | 0 |
| Similarities | | 0 to 44 | 0 |
| Digit Span | | 0 to 32 | 11 |
| Picture Concepts | | 0 to 28 | 6 |
| Coding | | 0 to 119 | 27 |
| Vocabulary | | 0 to 68 | 10 |
| Letter-Number Sequencing | | 0 to 30 | 3 |
| Matrix Reasoning | | 0 to 35 | 8 |
| Comprehension | | 0 to 42 | 3 |
| Symbol Search | | 0 to 60 | 5 |
| Picture Completion | | 0 to 38 | 3 |
| Cancellation | | 0 to 136 | |
| Information | | 0 to 33 | 9 |
| Arithmetic | | 0 to 34 | 13 |
| Word Reasoning | | 0 to 24 | 5 |
| Process Score | | Score Range | Raw Score |
| Block Design No Time Bonus | | 0 to 50 | 1 |
| Digit Span Forward | | 0 to 16 | 6 |
| Digit Span Backward | | 0 to 16 | 5 |
| Cancellation Random | | 0 to 68 | |
| Cancellation Structured | | 0 to 68 | |
| Longest Digit Span Forward | | 0,2 to 9 | 5 |
| Longest Digit Span Backward | | 0,2 to 8 | 2 |

20

## Ability-Achievement Discrepancy Analysis
Date of Ability Testing: 5/24/2006
Ability Score Type: FSIQ
Ability Score: 56

### Predicted-Difference Method

|  | Predicted Score | Actual Score | Expected Diff. | Critical Value | Sig. Diff. Y/N | Base Rate |
|---|---|---|---|---|---|---|
| **WIAT-II SUBTEST** |  |  |  |  |  |  |
| Word Reading | 67 | 78 | -11 | 4.78 | Y |  |
| Reading Comprehension | 67 | 60 | 7 | 6.33 | Y | 25% |
| Pseudoword Decoding | 73 | 83 | -10 | 5.22 | Y |  |
| Numerical Operations | 70 | 91 | -21 | 11.92 | Y |  |
| Math Reasoning | 65 | 60 | 5 | 8.76 | N | >25% |
| Spelling | 68 | 91 | -23 | 8.18 | Y |  |
| Written Expression | 69 | 72 | -3 | 11.15 | N |  |
| Listening Comprehension | 66 | 73 | -7 | 12.71 | N |  |
| Oral Expression | 76 | 66 | 10 | 10.13 | N | 20-25% |
| **COMPOSITES** |  |  |  |  |  |  |
| Reading | 66 | 71 | -5 | 4.86 | Y |  |
| Mathematics | 66 | 74 | -8 | 8.73 | N |  |
| Written Language | 67 | 80 | -13 | 8.18 | Y |  |
| Oral Language | 67 | 65 | 2 | 9.57 | N | >25% |
| Total | 62 | 70 | -8 | 6.08 | Y |  |

Statistical Significance (Critical Values) at the .05 level
Base Rates are not reported when the achievement score equals or exceeds the ability score.



**Friendship Edison**
**Public Charter School**
Community Vision ... World Class Education

# ADHD SCREENING

| | |
|---|---|
| **STUDENT:** | J█████ R██████ |
| **DOB:** | ████/1998 |
| **AGE:** | 8 Years, 6 months |
| **SCHOOL:** | Friendship Southeast Elementary Academy |
| **GRADE:** | 3rd |
| **EXAMINER:** | Sharon Piner, School Psychologist |
| | D.C. Licensed |
| **DATE OF REPORT:** | 08/22/2006 |
| **TEST ADMINISTERED:** | Conner's Teacher Rating Scale – 08/17/2006 |
| | Conner's Parent Rating Scale – 08/21/2006 |

## Interpretation of the Conner's Rating Scale

The Connors' Rating Scales-Revised (CRS-R) is primarily used in the assessment of ADHD; although additional subscales for the assessment of oppositional behavior, cognitive difficulties, perfectionism, social and emotional functioning, anxiety, and psychosomatic complaints are also assessed. Ms. Robinson completed the Conners' Parent Rating Scale-Revised: Long Version (CPRS-R:L), and Mr. Masimini completed the Conners' Teacher Rating Scale-Revised: Long Version (CTRS-R:L). The average scaled T score is 65, which means any score above 65 is an area of concern.

## Teacher Rating Scale Results and Interpretation

Mr. Masimini's responses on the CTRS-R:L yield an elevated profile. Most of his subscale and index scores exceed the cut-off point for clinical significance (i.e. $T$-score greater than 65), which is indicative of global problematic functioning. His standard scores on Oppositional Index ($T$=90), Emotional Lability ($T$=86), and Conner's Global Index-Total (T=80) fall in the Markedly Atypical range, indicating significant problems with breaking rules, problems with authority, and being more prone to more emotional responses such as crying, anger, etc. than is typical. Likewise, his standard scores on the Cognitive Problems/Inattention (T=73), Hyperactivity (T = 70), Social Problems ($T$ = 68), Conners' ADHD Index (T=68), Restless-Impulsive (T=72), Inattentive (T=75), and the DSM-IV-Total (T=71) subscales fall in the Mildly Atypical range. Children who score in this range on the Cognitive/Inattention, Hyperactivity, Restless-Impulsive,

2

Inattentive subscales tend to have difficulty sitting still, feel more restless and impulsive than most children their age, and have the urge to always be "on the go."

In comparison, Ms. Robinson's responses on the CPRS-R:L yield a more Mildly Atypical elevated profile. Her subscale score for Social Problems (T=85) is Marked y Atypical which suggests that J██████ is likely perceived to have few friends, low self esteem and low self confidence. Her standard scores on the Oppositional (T=75), Cognitive-Inattention (T=78), Hyperactivity (T=75), Anxious-Shy (T=65), Perfection sm (T=69), Psychomatic (T=64), Conners ADHD Index (T=69), Restless Impulsive (T 70), Emotinal Lability (T=68), Conners' Global Index (T=70), Inattentive (T=7 ), Hyperactive-Impulsive (T=75), and DSM-IV Total (T=75) scales fall in the Mildly Atypical range and indicates J██████ may have problems in these areas. Th ere are minimal discrepancies between the two raters thus both raters yielded two very similar profiles.

**Summary:**

After reviewing the results of the CPRS:L and the CTRS:L, J██████ yielde l markedly A-Typical Scores in most of the indexes indicating an ADHD diagnosis is wa ranted at this time.

**Recommendation:**

The following recommendations are offered for consideration by the multic isciplinary team (MDT) based on the information obtained in this evaluation. Final de :isions about eligibility determination, special education services, and interventions shot d be made at the MDT meeting in conjunction with results from any other evaluations cc nducted along with input from the parent and other members of the MDT.

1. To help J██████ develop appropriate interpersonal relationships and social behaviors at home and school, family and teachers are encouraged t share behavior-management strategies so that limits are well defined and consistently applied.

2. After reviewing, the Conners' Rating Scale, J██████ Behavior Int rvention Plan continues to be warranted at this time and may need to be revised to meet her ADHD diagnosis.

3. J██████ should receive counseling one time a week for 30 minutes o address her atypical behavioral concerns.

4. J██████ should receive an evaluation by her pediatrician to evaluat the need for medication to treat this ADHD diagnosis.

Sharon Piner, School Psychologist
D.C. Licensed

8/22/06
Date

906 Pennsylvania Avenue, Southeast • Washington, DC 20003
TELE:(202) 543-8248 • FAX:(202) 543-8246

93



**Friendship Edison**
**Public Charter School**
Community Vision ... World Class Education

## Clinical Evaluation

| | | |
|---|---|---|
| EXAMINEE: | J_____ R_____ | REPORT DATE: 8/28/2006 |
| AGE: | 8 years 6 months | GRADE: Completed 2nd |
| DATE OF BIRTH: | ____/1998 | ETHNICITY: African/African American |
| EXAMINEE ID: | Not Specified | EXAMINER: Chanda C. Graves, M.Ed. |
| GENDER: | Female | Clinical Psychology Intern |

### Reason for Referral

J_____ was referred for a psychological evaluation by the Multidisciplinary Team to determine whether social-emotional factors are contributing to a recent decline in her academic performance. The results of this evaluation will be utilized to facilitate treatment planning and instructional programming.

### Background

J_____ is an 8 year old African American female who recently completed the 2nd grade at Friendship Public Charter School – Southeast Campus in Washington, DC. She currently resides with her mother, Carmecia Robinson (30yrs), her brothers Earl (14 yrs) and James (12 yrs), and her sister Ashante (4 yrs). Ms. Robinson reported that J_____ gets along with all of her siblings. Her father, Mr. Anderson, has been incarcerated for the past 9 months. According to Ms. Robinson, J_____ has a close relationship with her father and saw him often prior to his incarceration.

Ms. Robinson stated that J_____ has not experienced any traumatic events and did not exhibit suicidal or homicidal ideation. According to Ms. Robinson, J_____ is very active and experiences some problems with attention. Although J_____ is generally obedient, she has some aggressive behaviors (i.e. fighting) and engages in temper tantrums. Moreover, she often daydreams and sometimes experiences changes in her mood. Ms. Robinson reported being concerned about recent enuresis problem (occurring for the last two years). She stated that she was examined by a physician who indicated that there was no medical cause for J_____ bedwetting.

There appears to be some inconsistency between this examiner's interview with Ms. Robinson and the interview conducted by Richard Griffith, MS on 5/25/2006. According to J_____ psycho-educational report (completed by Richard Griffith, MS on 5/25/2006), Ms. Robinson indicated that J_____ has three rather than two brothers (which she indicated in her interview with this examiner). Moreover, Ms. Robinson stated that J_____ often started both physical and verbal altercation with her siblings during her interview with Mr. Griffith, but stated that she gets along with her siblings

JR16
94

2

during her interview with this examiner. Therefore, there is some degree on uncertainty concerning J████ family composition and her relationship with siblings.

## Developmental Milestones and Early Childhood

J████ was a 6 lbs. 7oz (18 inches) product of a full-term uncomplicated pregnancy with a vaginal delivery. There were no concerns reported regarding her early development. She met developmental milestones within normal limits (walked at 11 months, first words at 24 months, and potty training at 18 months). Ms. Robinson stated that she did not use drugs or alcohol during her pregnancy with J████.

## Medical History

According to Ms. Robinson, J████ does not currently have any serious medical conditions and has never been hospitalized for any major illness. In addition, Ms. Robinson indicated that J████ is not currently taking any medication for any illness or psychiatric conditions. However, Ms. Robinson mentioned that J████ as asthma. She stated that she has not had any recent attacks and believes that J████ may be growing out of her asthma.

## Academic History

J████ attended Martin Luther King Elementary School in Washington, DC from pre K-Kindergarten and Friendship Public Charter School – Southeast Campus in Washington, DC for grades 1-2. Ms. Robinson reported that she was concerned about █████ math and reading abilities. She reported that J████ often gets distracted by others students and socializes with peers. She stated that she was suspended from school three times for fighting, running the halls, and disrupting class.

## Social History

Ms. Robinson described J████ as being creative and outgoing. She reported that she has some difficulty making friends because she becomes upset when she does not get her way. She reported that she often has temper tantrums, slams doors, and storms away when she is not getting her way. According to Ms. Robinson she enjoys reading, writing, eating out, cheerleading and going to the boys and girls club. J████ stated that she enjoys basketball, jump rope and dining out.

J████ reported that she wants to be a nurse or a doctor when she grows up. She stated that her three wishes were to have fun, be happy, and be good. She denied physical, sexual, or emotional abuse and suicidal or homicidal ideation.

## Teacher & Classroom Observation

This examiner was unable to conduct a classroom observation. J████ was tested over the summer vacation and was not enrolled in classes when examined. Likewise, her classroom teachers were unavailable to comment on her academic performance and behavior as they were not available due to the summer vacation.

3

## Behavioral Observation during Testing

J██████presented as a cooperative young girl, who appeared her stated age. She reported being unaware of the reason for her interview and subsequent testing. She was casually dressed, appropriately groomed and walked with an appropriate gait. There were no indicators of any significant difficulties with gross or fine motor movements.

J██████ remained focused for the duration of this evaluation. She was able to establish rapport with the examiner quickly and was personable during the interview. She responded to all questions asked and remained cooperative during the testing. Her mood was normal and her affect was congruent with her mood. J██████was alert and oriented to person, place, situation and time. Her voice volume and speech rate were normal and word pronunciation difficulties were not noted. Her conversation was logical and she adhered to the subject matter at hand.

J██████approached the social-emotional tests in a focused manner. She put forth effort and attention in completing tasks. She required little redirection and few breaks to remain focused. However, she seemed to have difficulty articulating her ideas during the examination. She appeared to become extremely frustrated and attempted to give multiple examples to explain herself. However, in spite of her frustration, she gave a consistent effort throughout the examination period. She responded well to praise, support, and redirection and was motivated by positive reinforcement. Given her positive attitude and motivation to complete the testing, the results of this evaluation are considered a valid and reliable assessment of J██████current social emotional functioning.

## Previous Psychological Evaluations

J██████received a Psycho-Educational Evaluation completed by Richard Griffith, MS on May 25, 2006. The following were her Wechsler Intelligence Scale for Children – Fourth Edition (WISC-IV) scores: Full Scale - 56, Verbal Comprehension - 53, Perceptual Reasoning - 59, Working Memory - 68, Processing Speed – 80. Results indicate that J██████overall functioning was in the Extremely Low range. Her scores on the Wechsler Individual Achievement Test (WIAT-II) were as follows: Reading – 71, Mathematics - 74, Written Language – 80, Oral Language – 65. Results suggest that J██████ academic functioning ranges between the Low Average and Extremely Low range. Non-verbal intelligence and adaptive behavior tests were recommended to confirm the results of her psycho-educational evaluation.

On June 14, 2006, Sharon Piner gave J██████ the Comprehensive Test of Nonverbal Intelligence (C-TONI). The following were J██████ C-TONI scores: Pictorial Nonverbal IQ – 70, Geometric Nonverbal IQ – 70, Non-verbal IQ – 68. Results suggest that J██████ nonverbal intelligence is in the Deficient to Borderline range.

On July 25, 2006 Ms. Piner administered the Adaptive Behavior Inventory and the Behavior Assessment System for Children, 2nd Edition (BASC-2). J██████s Adaptive Behavior Full Scale (ABI=92) was in the average range. Her scores on the subtests comprising the ABI Full Scale ranged between the Low Average to Average range (Self Care Skills=110, Communication Skills=85, Social Skills=90, Academic Skills=90,

4

Occupational Skills=95). Ms. Piner indicated that J██████ did not fall with in the clinically significant range on any scales measured by the BASC-2. She co ncluded that J██████ did not have any behavioral problems that impacted her academic performance.

**Test Administered**
- Rorschach
- Children's Sentence Completion Form

## Interpretation of Social Emotional Testing

Based on J██████ responses to the Clinical Interview, the Rorschach, a nd the Sentence Completion test, it appears that J██████ may have significant cognitive difficulties that impact her ability to articulate herself and relate with others. J██████ seemed to experience a great deal of frustration and difficulty communicating her i leas. While she seemed to understand how to perform requested tasks, she experienced more difficulty answering questions and responding appropriately to questions asked. The following sections will provide a clearer and descriptive interpretation of J██████ social-emotional functioning.

## Projective measures

J██████ was administered the Rorschach Inkblot Test. The Rorshach is a projective test of personality in which a person's interpretations of ten standard abstract designs are analyzed as a measure of emotional and intellectual functioning and integ ration. J██████ had extreme difficulty completing the Rorschach. While she was able to i dentify objects in the inkblots, she had difficulty explaining where she saw the objects at d what aspects of the inkblot made the drawing appear to be the object that she identifie . J██████ also had great difficulty articulating herself. It appeared that she understood the question, but could not explain herself to the examiner. She made multiple attempts an I used various examples to try to make her point, but became increasingly frustrated try ng to articulate her ideas. As she became frustrated she held her hand on her head and be gan repeating previous answers. Despite this examiner's attempts to re-phrase the ques ions, J██████ was unable to explain her ideas.

J██████ difficulty with articulation was also noted on the WISC-IV an I WIAT-II (completed by Richard Griffith, MS on May 25, 2006). Her scores on the Verbal Comprehension Index and the Oral Expression subtests were in the Extr mely Low range and suggest that she may experience difficulty verbally articulating her i leas. Both J██████ cognitive and verbal deficiencies were noted by this examiner throughout the testing process; particularly during the interview. J██████ stated that she would be a dog if she could be an animal of her choice. However, when asked why she chose to be a dog, she stated that "dogs have ears, a neck, legs, and a tail". In her attempts o answer the question she could only identify physical characteristics of a dog. She did not seem to understand that the question was pulling for a personality characteristic of a dog.

As a result of J██████ cognitive and verbal difficulties, this examiner could not score J██████ Rorschach. According to the Exner Scoring System, the exam iner must be able to identify the parts of the picture the examinee is using to perceive the object identified

5

and what aspect of the picture makes the inkblot look like the identified object. Despite multiple attempts, J▓▓▓▓ was unable to provide this information.

J▓▓▓▓ identified both common and uncommon themes on the Rorschach. On several pictures she identified a butterfly or a face which were generally more common responses. However, she identified some objects that were uncommon. For example, on Card II she stated that she saw a boat going in the air. She could not identify the part of the picture that looked like a boat and often resorted to identifying an animal when she became frustrated. She seemed to use shape and color to identify most objects; however, she was not able to clearly articulate how she identified the objects.

J▓▓▓▓ completed the Children's Sentence Completion Form. The Sentence Completion task provides J▓▓▓▓ with the beginning of a sentence and asks her to complete the sentence. On this test J▓▓▓▓ completed several sentences in which she complimented her family members [i.e.: "My mother is garte" (great), "my father and have fun" (and I have fun), "my sister is nice", and "my brother is have fun" (and I have fun)]. She mentioned several times that she wanted to be "good". However, she stated that she worries about school. J▓▓▓▓ also seemed to be aware that she had difficulty answering the questions asked. Overall themes suggest that J▓▓▓▓ likes to play and socialize with others, wants to perceived as "good" and worries about school.

In a former clinical evaluation completed by Sharon Piner, School Psychologist, (7/17/2006) Ms. Robinson and summer school teacher (Mr. Ray) completed the BASC-2 parent and teacher scales for J▓▓▓▓. Ms. Piner concluded that the J▓▓▓▓ did not have significant behavior problems that are impacting her academic performance and success. However, this examiner noted that J▓▓▓▓ academic problems may be impacting her social-emotional functioning. For example, Ms. Robinson stated that J▓▓▓▓ often has temper tantrums and no longer wants to associate with peers when she does not get her way. It is possible that J▓▓▓▓ may not be able to articulate her feelings appropriately with others due to problems with verbal and oral expression. As a result, ▓▓▓▓ may not be able to articulate her feelings and/or needs to others and may use other means (temper tantrum, slamming doors, storming off) to communicate her feelings/needs. Therefore, it is extremely important that J▓▓▓▓ develop her ability to articulate herself to prevent her from developing maladaptive ways of communicating her feelings or needs.

Moreover, BASC-2 results suggest that Ms. Robinson rated J▓▓▓▓ in the "At Risk" range on the following scales: Externalizing, Internalizing, and Behavioral Symptoms. J▓▓▓▓ teachers (Mr. Ray and Ms. Robinson) rated her in the "At Risk" range on the following scales: Externalizing, Aggression, Conduct Problems, School Problems, Attention Problems, and Learning Problems, Depression, Withdrawal, Functional Communication. This suggests that J▓▓▓▓ may already be developing maladaptive behaviors. Scales falling in the "At Risk" range signify a developing problem that may not warrant the need for formal treatment. However, given J▓▓▓▓ cognitive difficulty and the impact maladaptive behaviors may have in the classroom, J▓▓▓▓ may benefit from intervention to prevent maladaptive behaviors from developing into a clinical disorder in addition to noted cognitive difficulties. It appears that J▓▓▓▓ adaptive skills are in the average range (Clinical Evaluation, Ms. Piner, 7/17/2005).

906 Pennsylvania Avenue, Southeast • Washington, DC 20003
TELE:(202) 543-8248 • FAX:(202) 543-8246

## Summary

J██████ was referred for a psychological evaluation to assess her current social-emotional functioning. She presented as being cooperative and affable throughout the examination. She demonstrated a consistent effort in completing test items and appeared motivated to do well. However, this examiner noted difficulties in her cognitive abilities. Specifically, her ability to articulate herself and respond appropriately to interview questions asked.

It is this examiner's clinical impression that J██████ cognitive difficulties may be impacting her social-emotional functioning. Difficulty expressing feelings and needs in children can often lead to inappropriate behaviors that help to express unarticulated needs and emotions. J██████ may be developing behavioral problems as a result of her unexpressed emotions and needs. While these behavioral problems may not be clinically significant, intervention is warranted to avoid the progression into more severe behavioral problems. Moreover, J██████ may benefit from additional academic assistance to improve her ability to communication needs and feelings to others.

Despite J██████ socio-emotional challenges there are a number of positive prognostic indicators, which can facilitate intervention and treatment. First, J██████ is an outgoing young lady who has demonstrated the ability to develop appropriate peers relationships. She has been able to form a healthy attachment with her mother and some teachers in the school environment. In addition, she has the potential for engaging in meaningful dialogue, reciprocity, and appropriate disclosure. She has the potential do well if she receives more positive and consistent support from her environment.

## Recommendations

In light of the evaluative data, the following recommendations are offered:

1.  Participation in individual psychotherapy is recommended to assist J██████ in developing expressing her feeling and needs in an appropriate manner. Specific intervention should address her difficulties articulating feelings, bedwetting problems, and acting out behaviors (temper tantrums, fighting, slamming doors, and disrupting class). These issues should be immediately addressed to avoid the progression into a more serious clinical disorder.

2.  Given reports of attention problems from Ms. Robinson and J██████ teachers, it is recommended that J██████ be evaluated by to determine whether an attention or hyperactivity problem exists.

Chanda C. Graves, M.Ed. Clinical Psychology Extern          Date

_Bronwen Millet_

8/28/06

Dr. Bronwen Millet, Director of Clinical Services          Date
Supervising Psychologist of Intern Program

906 Pennsylvania Avenue, Southeast • Washington, DC 20003
TELE:(202) 543-8248 • FAX:(202) 543-8246

**TYRKA & HOUCK, LLP**
1726 Connecticut Ave., NW, Suite 400
Washington, DC  20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

**August 30, 2006**

By Fax:  202-562-0726

Mr. William Walker
IEP Coordinator
Friendship Southeast Elementary Academy
645 Milwaukee Place, SE
Washington, DC 20032

**RE:**    J██████ R████████ (D.O.B.████98)

Mr. Walker:

We represent Carnecia Robinson, the mother of J██████ R████████.  I am writing to you regarding your most recent MDT meeting invitation and your ongoing discussions with Sharon Millis, Ms. Robinson's educational advocate.

As Ms. Millis has reported to you, the current clinical evaluation of J█████ is not adequate.  Certain measures necessary to determine her special education needs are missing.  She has requested that the appropriate clinical personnel at your school be contacted to determine what additional measures are necessary.  You have reported that these members have been contacted, and that an update on the outstanding clinical measures will be forthcoming.

Due to the ongoing nature of this case, Ms. Millis is accepting your MDT meeting invitation at this time for September 13, 2006 at 10:00 a.m.

However, we must emphasize that Ms. Robinson expects all necessary clinical personnel to be prepared for this meeting, and their attendance is expected.  Any further delays in this matter will only cause additional harm to J█████, a child who desperately needs an appropriate determination as to the special education and related services she requires.

Sincerely,

Keith J. Coyle, Associate
Tyrka & Houck, LLP
Attorneys for the Petitioner
1726 Connecticut Avenue N.W., Suite 400

JR17
100

**Friendship Public Charter School**
906 Pennsylvania Avenue SE
Washington, DC 20003
(202) 543-8395

MULTIDISCIPLINARY TEAM
(MDT)
Meeting Notice

MDT Referral Date: _____                                    Date ___08/30/06___

Letter of Invitation                    Re : J█████ R█████

Dear  Camecia Robinson

A multidisciplinary team (MDT) meeting is scheduled to discuss the status of your child's education needs. Your participation is essential, and we look forward to your valuable input. The purpose and details of the meeting are printed below. You and the school may have additional individuals attend the meeting who have knowledge or special expertise regarding your child. Other invited participants are listed under MDT members.

Place/Location:

| FPCS-Southeast Elementary Academy |
| 645 Milwaukee Ave. SE |
| Washington, DC 20032 |

Please check one date for confirmation:

☐ Date:   09/06/06      Time:  11:00am  ; or
☑ Date:   09/11/06      Time:  11:00am  ; or
☐ Date:   09/13/06      Time:  10:00AM

If a suggested meeting time is inconvenient, please call the counselor and/or special education coordinator for a mutual time to address the concerns. Participation by teleconference may be requested if other arrangements prove to be unsuccessful.

**\*The purpose of this meeting is to:**

☐ \*\*develop/review IEP (including consideration of extended school year (ESY) services        ☐ \*\*discuss CompEd
☑ \*\*review evaluation or reevaluation information        ☑ discuss placement        ☐ \*consider transition services needs
☐    develop the student evaluation plan (SEP)        ☐ determine manifestation        ☐ discuss quarterly review
☑ discuss documented levels of service        ☑ discuss eligibility        ☐ behavior plan review
☐ \*\*review records to support the completion of services as follows:

☐ Graduated    ☐ Completed Services    ☐ Aged Out    ☐ Transferred Out of District    ☐ Dropped Out
☐ Other:

**\*\*Placement will be discussed.**

MDT Members:    ☑ Principal or Designee        ☑ General Education Teacher        ☑ Psychologist
                ☑ Parent        ☑ Special Education Teacher        ☐ Other:  DCPS Placement Specialist
                ☑ LEA Representative        ☑ Speech and Language        Attorney-PARENT
                ☐ Student        ☐ Social Worker        Attorney-FPCS

Any questions you may have concerning your child's program will be discussed at the above meeting. A copy of the Procedural Safeguards for parents is enclosed for your information. If the school can be of assistance to you, please contact

_____Mr. Willie Walker_____  at  ___(202) 562-1980___  (school telephone number).

If the purpose of the meeting includes consideration of a transition plan, your child is invited to attend and a representative of the following agency(ies) may be invited, if appropriate

See attachments, when appropriate, for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

**\*After the third attempt to contact the parent, the meeting will be held without further notice.**

**Please sign below and return this page to the school.**

Parent/Guardian/Surrogate Signature _____    Date _____

I acknowledge receipt of the Procedural Safeguards for parents (due process procedures).    ☐ Yes    ☐ No

District of Columbia Public Schools        07-02-2001        Division of Special Education        MDT Letter of Invitation to the Parent - Page 1 of 3

101

```
                    ┌─────────────────────────────────────┐
                    │  TRANSMISSION VERIFICATION REPORT     │
                    └─────────────────────────────────────┘

                                              TIME  : 08/30/2006 15:02
                                              NAME  : TYRKA HOUCK LLP
                                              FAX   : 2022654264
                                              TEL   :
                                              SER.# : 000A6J693992
```

| | |
|---|---|
| DATE,TIME | 08/30  15:01 |
| FAX NO./NAME | 2025620726 |
| DURATION | 00:01:00 |
| PAGE(S) | 04 |
| RESULT | OK |
| MODE | STANDARD |
| | ECM |

## TYRKA & HOUCK, LLP
1726 Connecticut Ave., NW, Suite 400
Washington, DC  20009
(202) 265-4260 (ph)
(202) 265-4264 (fax)

### CONFIDENTIALITY NOTICE

This facsimile contains confidential information belonging to Tyrka & Houck or their client(s) that is intended solely for the recipient named below. If you are not the intended recipient named below or the agent or employee thereof, this transmission was sent to you in error, and your review, use, reproduction, publication, or distribution of this transmission or the contents thereof is strictly prohibited. Tyrka & Houck expressly preserves and asserts all privileges applicable to this transmission. If you have received this transmission in error, please read no further than this Confidentiality Notice and call the telephone number above to arrange for the return of this transmission at the cost of Tyrka & Houck. Thank you.

Recipient: William Walker

Fax number: 562 - 0726

From: Keith Coyle

Regarding: J██████ R█████████

Number of pages: 4   (including cover sheet)

Notes:

102

09/08/2006 14:37 FAX 202 237 7369      E C I



Challenging Minds. Building Character.

Rock Creek Academy, Inc.
4401 Connecticut Ave., NW
Washington, DC 20008
202.378.1400

September 8, 2006

Doug Tyrka
Tyrka & Associates
1726 Connecticut Avenue NW Suite 400
Washington, D.C. 20009

Re: J█████ R██████
DOB: ███98

Dear Mr. Tyrka,

Thank you for referring J█████ R██████ to Rock Creek Academy(RCAI). We have reviewed this information and feel that Rock Creek Academy can provide the required and appropriate services for J█████. Ms. Robinson is familiar with our program and services as her son currently attends RCAI and has therefore declined the follow up tour. Currently we have space available within our program and can enroll J█████ upon receipt of funding. Funding may be secured through parent payment, a DCPS Notice of Placement, or the results of a due process hearing or court order.

A copy of this referral packet has been forwarded to the office of Ruth Blake, Executive Director of the Non-Public Unit at DCPS.

If you have any questions or concerns regarding this referral, please contact me at the above listed number. Thank you for considering Rock Creek Academy as a possible placement for your client.

Sincerely,

Keren Plowden, MA
Executive Director of Student Services

Cc:    Ruth Blake, Director, Non Public, Charter, Interagency Programs



# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

**September 29, 2006**

Paul Dalton
Dalton, Dalton & Houston P.C.
Attorneys at Law
1008 Pendleton Street
Alexandria, VA 22314
By Fax:  703-739-2323

RE:    J████ R██████ (D.O.B. ███/98)
       **Stay-Put Notice**

Mr. Dalton:

We represent Carnecia Robinson, the mother of J█████ R██████. J█████is currently attending Friendship Southeast Elementary Academy.

Please be advised that Ms. Robinson has filed a due process complaint against DCPS challenging its proposed placement at Prospect Learning Center, and requesting authorization and funding for J█████ immediate placement at Rock Creek Academy.

Ms. Robinson expects Friendship Southeast Elementary Academy to honor its obligation under the IDEA's stay-put provision by maintaining J█████current placement during the pendency of these proceedings. 20 U.S.C. § 1415(j).

We appreciate all your efforts to ensure that Jamecia continues to receive a free appropriate public education.

Sincerely,

Keith J. Coyle, Associate
PA Bar No. 201128
Tyrka & Houck, LLC
Attorneys for the Petitioner
1726 Connecticut Avenue N.W., Suite 400
Washington, D.C. 20009
p. (202) 265-4260
f. (202) 265-4264

```
TRANSMISSION VERIFICATION REPORT
```

```
                              TIME  : 09/29/2006 14:27
                              NAME  : TYRKA & ASSOCIATES
                              FAX   : 2022654264
                              TEL   : 2022654260
                              SER.# : 000A6J693992
```

| DATE,TIME | 09/29  14:25 |
|---|---|
| FAX NO./NAME | 17037392323 |
| DURATION | 00:01:55 |
| PAGE(S) | 07 |
| RESULT | OK |
| MODE | STANDARD |
|  | ECM |

# TYRKA &
## ASSOCIATES, LLC
1726 Connecticut Ave., NW ♦ Suite 400 ♦ Washington DC 20009 ♦ Phone: (202)265-4260 ♦ Fax: (202)265-4264

**Recipient:**     Paul Dalton

**Fax Number:**     703-739-2323

**From:**     Keith Coyle

**Regarding:**     J████ R█████ (D.O.B. 2/13/98)

**# of pages:**     7

**Notes:**     Stay-put notice

105



# NCLB – NO CHILD LEFT BEHIND DATA REPORTS

**District of Columbia Public and Charter Schools**

Home | School Lists | Summary Report Cards | Summary

## SCHOOL AYP LISTS

If you want to get a report, please first select the school group and then the report type from the options below:

**Year:** 2006

**School Group:**
- [ ] STATE REPORTS
- [x] DCPS Schools
- [ ] Public Charter Schools
- [ ] BOE Charter Schools

Improvement Status By School

AYP Status List By School

Percent Proficient List

Average Daily Attendance

Alternate Assessment

Truancy Report

### IMPROVEMENT STATUS BY SCHOOL (1)

Year : 2006
Group : DCPS
Category : ELEMENTARY (Click fo

| SCHOOL | School Code | READING | MATH | ATT |
|---|---|---|---|---|
| 1. ADAMS ES | 201 | - | - | |
| 2. AITON ES | 202 | - | - | |
| 3. AMIDON ES | 203 | - | I | |
| 4. BANCROFT ES | 204 | C | - | |
| 5. BARNARD ES | 205 | - | - | |
| 6. BEERS ES | 206 | I | - | |
| 7. BENNING ES | 207 | I | C | |
| 8. BIRNEY ES | 208 | - | - | |
| 9. BOWEN ES | 211 | C | C | |
| 10. BRENT ES | 212 | - | - | |
| 11. BRIGHTWOOD ES | 213 | I | - | |
| 12. BROOKLAND ES | 346 | - | - | |
| 13. BRUCE-MONROE ES | 296 | I | - | |
| 14. BUNKER HILL ES | 219 | - | - | |
| 15. BURROUGHS ES | 220 | - | - | |
| 16. BURRVILLE ES | 221 | - | - | |
| 17. CLARK ES | 223 | - | - | |
| 18. CLEVELAND ES | 224 | - | - | |
| 19. COOK JF ES | 226 | I | I | |
| 20. COOKE HD ES | 227 | C | - | |
| 21. DAVIS ES | 229 | - | - | |
| 22. DRAPER ES | 230 | - | - | |
| 23. DREW ES | 231 | - | - | |
| 24. EATON ES | 232 | - | - | |
| 25. EMERY ES | 235 | I | I | |
| 26. FEREBEE-HOPE ES | 343 | I | - | |
| 27. FLETCHER-JOHNSON EC | 348 | R | I | |
| 28. GAGE-ECKINGTON ES | 281 | I | - | |
| 29. GARFIELD ES | 238 | C | C | |

| | | | |
|---|---|---|---|
| 30. GARRISON ES | 239 | I | I |
| 31. GIBBS ES | 240 | I | I |
| 32. GREEN ES | 244 | R | C |
| 33. HAMILTON CENTER | 567 | C | C |
| 34. HARRIS PR EC | 352 | C | C |
| 35. HARRIS, C.W. ES | 247 | - | - |
| 36. HEARST ES | 258 | - | - |
| 37. HENDLEY ES | 249 | I | I |
| 38. HOUSTON ES | 251 | C | I |
| 39. HYDE ES | 252 | - | - |
| 40. JANNEY ES | 254 | - | - |
| 41. KENILWORTH ES | 256 | C | C |
| 42. KETCHAM ES | 257 | I | - |
| 43. KEY ES | 272 | - | - |
| 44. KIMBALL ES | 259 | C | - |
| 45. KING M L ES | 344 | I | - |
| 46. LAFAYETTE ES | 261 | - | - |
| 47. LANGDON ES | 262 | - | - |
| 48. LASALLE ES | 264 | - | - |
| 49. LECKIE ES | 266 | - | - |
| 50. LUDLOW-TAYLOR ES | 271 | I | I |
| 51. MALCOLM X ES | 308 | - | - |
| 52. MAMIE D. LEE SCHOOL | 265 | - | - |
| 53. MANN ES | 273 | - | - |
| 54. MAURY ES | 274 | - | - |
| 55. MCGOGNEY ES | 275 | R | I |
| 56. MERRITT ES | 277 | I | I |
| 57. MEYER ES | 278 | I | I |
| 58. MINER ES | 280 | R | I |
| 59. MONTGOMERY ES | 282 | - | - |
| 60. MOTEN CENTER | 241 | C | C |
| 61. MOTEN ES | 285 | I | R |
| 62. MURCH ES | 287 | - | - |
| 63. NALLE ES | 288 | - | - |
| 64. NOYES ES | 290 | - | - |
| 65. ORR ES | 291 | - | - |
| 66. OYSTER ES | 292 | - | - |
| 67. PARK VIEW ES | 293 | - | - |

107

| | | | |
|---|---|---|---|
| 68. PATTERSON ES | 294 | - | - |
| 69. PAUL ROBESON SCHOOL | 725 | - | - |
| 70. PAYNE ES | 295 | - | - |
| 71. PLUMMER ES | 299 | I | I |
| 72. POWELL ES | 300 | C | C |
| 73. PROSPECT LC | 486 | C | C |
| 74. RANDLE-HIGHLANDS ES | 316 | - | - |
| 75. RAYMOND ES | 302 | C | - |
| 76. REED LC | 284 | I | - |
| 77. RIVER TERRACE ES | 304 | - | - |
| 78. ROSE SCHOOL | 726 | - | - |
| 79. ROSS ES | 305 | - | - |
| 80. RUDOLPH ES | 306 | - | - |
| 81. SAVOY ES | 307 | I | - |
| 82. SEATON ES | 309 | - | - |
| 83. SHADD ES | 310 | C | - |
| 84. SHAED ES | 311 | - | I |
| 85. SHARPE HEALTH SCHOOL | 312 | C | C |
| 86. SHEPHERD ES | 313 | - | - |
| 87. SIMON ES | 315 | - | I |
| 88. SLOWE ES | 342 | C | I |
| 89. SMOTHERS ES | 322 | - | - |
| 90. STANTON ES | 319 | R | I |
| 91. STEVENS ES | 320 | - | - |
| 92. STODDERT ES | 321 | - | - |
| 93. TAKOMA ES | 324 | - | - |
| 94. TERRELL MC ES | 353 | I | I |
| 95. THOMAS ES | 325 | I | - |
| 96. THOMSON ES | 326 | - | - |
| 97. THURGOOD MARSHALL ES | 351 | - | - |
| 98. TRUESDELL ES | 327 | R | - |
| 99. TUBMAN ES | 328 | C | I |
| 100. TURNER ES | 329 | - | - |
| 101. TYLER ES | 330 | C | C |
| 102. VAN NESS ES | 331 | I | I C |
| 103. WALKER-JONES ES | 332 | C | C |
| 104. WATKINS ES | 333 | - | - |
| 105. WEBB ES | 335 | R | I |

http://webb.k12.dc.us/NCLB/schoolsSummaryReports.asp

| | | | |
|---|---|---|---|
| 106. WEST ES | 336 | - | - |
| 107. WHEATLEY ES | 337 | - | - |
| 108. WHITTIER ES | 338 | - | - |
| 109. WILKINSON ES | 354 | I | - |
| 110. WILSON JO ES | 339 | - | - |
| 111. WINSTON EC | 355 | I | I |
| 112. YOUNG ES | 341 | - | - |

| | | |
|---|---|---|
| Number Not In Improvement Status | 61 | 75 |
| Number In Need of Improvement | 25 | 23 |
| Number In Corrective Action | 19 | 13 |
| Number In Restructuring | 7 | 1 |

\*    No data are displayed for groups with less than 40 students.

(1)  - = School is not in improvement status,
   **I - In Need of Improvement** = The school failed to make AYP in this area for 2 consecutive ye

   **C - Corrective Action** = The school failed to make AYP in this area for 3 consecutive years,
   **R - Restructuring** = The school failed to make AYP in this area for 4 consecutive years

## NUMBER OF SCHOOLS IN VARIOUS READING AND MATH IMPROVEMENT CATEGORIES

| READING | MATH | | | |
|---|---|---|---|---|
| | Not In Improvement | In Need of Improvement | Corrective Action | Restructuring |
| Not In Improvement | 58 | 3 | 0 | 0 |
| In Need of Improvement | 11 | 12 | 1 | 1 |
| Corrective Action | 5 | 3 | 11 | 0 |
| Restructuring | 1 | 5 | 1 | 0 |
| **TOTAL** | **75** | **23** | **13** | **1** |

For best site experience, use Netscape 6.0+ or IE 5.0+, screen resolution of 800x600 (min). District of Columbia Public Sch
Office of Information Technology | Enterprise Information Services | NCLB 2004 | Designed and Developed by Fernando J (



# NCLB – NO CHILD LEFT BEHIND DATA REPORTS

**District of Columbia Public and Charter Schools**

Home | School Lists | Summary Report Cards | Summary

## SCHOOL REPORTS

Please select from the options below:

**YEAR:**
2006

**Report type:**
AYP STATUS REPORT

**School Group:**
DCPS Schools

**School Level:**
Elementary Schools

**School:**
PROSPECT LC

**Subject:**
Select Subject

Get Report

## AYP STATUS REPORT

? He

AYP STATUS REPORT
**PROSPECT LC**

Year : 2006
Group : DCPS SCHOOLS
Category : ELEMENTARY

Problem Ar
READING - Correc
MATH - Corrective

| CATEGORY | ETHNICITY | | | | | | DISAB. | LEP / NEP | ECON. DISADV. | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | Asian / Pacific Islander | Black, non-Hispanic | Hispanic | American Indian / Alaskan Native | White, non-Hispanic | | | | |
| **READING** | | | | | | | | | | |
| 2003 | -* | - | No** | - | - | - | No | - | No | No |
| 2004 | - | - | No | - | - | - | No | - | No | No |
| 2005 | - | - | - | - | - | - | - | - | - | - |
| 2006 | - | - | No | - | - | - | No | - | No | No |
| **MATH** | | | | | | | | | | |
| 2003 | - | - | No | - | - | - | No | - | No | No |
| 2004 | - | - | No | - | - | - | No | - | No | No |
| 2005 | - | - | - | - | - | - | - | - | - | - |
| 2006 | - | - | No | - | - | - | No | - | No | No |
| **ATTENDANCE** | | | | | | | | | | |
| 2003 | - | - | - | - | - | - | - | - | - | No |
| 2004 | - | - | - | - | - | - | - | - | - | - |
| 2005 | - | - | - | - | - | - | - | - | - | - |
| 2006 | - | - | - | - | - | - | - | - | - | Yes |

\*    No data are displayed for groups with less than 40 students.

\*\*   Yes means group made AYP. No means group did not make AYP.

(1)  Group membership is not known.

For best site experience, use Netscape 6.0+ or IE 5.0+, screen resolution of 800x600 (min). District of Columbia Public Sch
Office of Information Technology | Enterprise Information Services | NCLB 2004 | Designed and Developed by Fernando J (

**JR21**

DISTRICT OF COLUMBIA
PUBLIC SCHOOLS

**Office of the Superintendent**
Office of the General Counsel
825 North Capitol Street, N.E., 9ᵗʰ Floor
Washington, D.C. 20002-4232
202-442-5000        Fax: 202-442-5098
www.k12.dc.us

November 20, 2006

Douglas Tyrka, Esquire
Tyrka & Houck, LLP
1726 Connecticut Avenue, N.W.
Suite 400
Washington, D.C. 20009

**DISCLOSURE STATEMENT**

**VIA facsimile (202) 265-4264**

**Subject: Due Process Hearing for J███████ R█████████,**
**DOB:    █████/1998**

Dear Mr. Tyrka:

At the upcoming due process hearing in the above-referenced matter, scheduled for Tuesday, November 28, 2006, at 3:00 p.m., and pursuant to 34 C.F.R. 300.509(a)(3), in addition to any documents and witnesses disclosed by the parent, DCPS may rely upon any of the following witnesses/documents[1]:

### Witnesses

Marla Oakes, Executive Director, Office of Special Education, DCPS and/or designee(s) – **825 North Capitol Street, N.E., Washington, D.C. 20002; (202) 442-4800 –** *same for all Central Office staff*
Evan Murray, Placement Specialist Monitor – Charter Schools, DCPS and/or designee(s);
Dr. Eve Byford-Peterson or successor, Principal, Prospect LC and/or designee(s) – **920 F. Street, NE, Washington, D.C. 20002; (202) 698-3800 –** *same for all Prospect LC staff*

**Pursuant to 34 C.F.R. 300.509(a)(2) and 5 DCMR 3031.1(b), DCPS hereby compels the attendance of the below named individual as a necessary and material witness(es):**

**Carnecia Robinson, mother**

### Documents

| | | |
|---|---|---|
| DCPS-01 | Due Process Complaint Notice | Date: 09/28/2006 |
| DCPS-02 | CDCR 5-3019 | |
| DCPS-03 | MDT Prior to Action Notice | Date: 09/13/2006 |
| DCPS-04 | MDT Meeting Notes | Date: 09/13/2006 |
| DCPS-05 | ADHD Screening | Date: 08/22/2006 |

---

[1] Witnesses may testify by telephone.

111

DCPS Office of the General Counsel
Page 2 of 2

DCPS reserves the right to examine any witness called or identified as a potential witness by the representative(s) J██████ R████████, as if such witness was called by DCPS. Also, DCPS reserves the right to rely upon and/or use any documents/witnesses presented and/or disclosed by the parent that DCPS deems relevant in this case. Lastly, DCPS reserves the right to call rebuttal witnesses in this matter.

If you wish to discuss any aspect of this case further, or have questions, please contact me at (202) 442-5604.

Sincerely,

Quinne Harris-Lindsey
Acting Supervisory Attorney Advisor

cc:    Student Hearing Office

112

09/28/2006  17:25    2022654264         TYRKA & ASSOCIATES                PAGE   02/05

## DUE PROCESS COMPLAINT NOTICE
### In re J█████ R████████
### September 28, 2006

| | |
|---|---|
| **Petitioner:** | Carnecia Robinson |
| **Student:** | J██████ R██████████ |
| **DOB:** | ████/98 |
| **Current School:** | Friendship Southeast Elementary Academy ("Friendship")  **NOTE: THIS COMPLAINT IS SOLELY FOR VIOLATIONS BY DCPS.** |
| **Residence:** | 1320 Congress Street, S.E.  Washington, DC 20032 |

**Petitioner's Contact Information for Special Education Purposes:**

> Tyrka & Houck, LLP
> 1726 Connecticut Ave. N.W. Suite 400
> Washington, D.C. 20009
> Tel: 202-265-4260
> Fax: 202-265-4264

**Violations:**

1. Failure to provide an appropriate placement since the start of the 2006-2007 SY.
2. Failure to conduct and review evaluations in all areas of suspected disability.
3. Failure to determine an appropriate disability classification.
4. Failure to develop an appropriate IEP.
5. Failure to provide an appropriate placement.

**Facts:**

1. J█████ has been enrolled at Friendship since the start of the 2005-2006 SY.
2. At an MDT meeting convened on February 16, 2006, the Team:
   a) noted that J██████ "struggles with work and completing task [sic] on 2nd grade level";
   b) discussed J██████ behavioral problems;
   c) developed a student evaluation plan recommending, *inter alia*, completion of a functional behavioral assessment of J██████.
3. A May 25, 2006 psychoeducational evaluation of J██████ reported that her classroom teacher had concerns about her academic performance and behavior.
4. At a June 20, 2006 MDT meeting, the Team recommended, *inter alia*, completion of a clinical evaluation and a functional behavioral assessment.
5. At an August 3, 2006 MDT meeting:
   a) the Team:
      i) determined that J██████ qualifies for special education and related services as a qualified child with a Multiple Disabilities, including a Learning Disability ("LD") and Other Health Impairment ("OHI");

113

DCPS – 01

      ii) developed an IEP prescribing 25 hours of specialized instruction, 1 hour of occupational therapy services, 1 hour of speech and language therapy, and 30 minutes of counseling per week;

      iii) determined that Friendship was no longer an appropriate placement;

      iv) recommended placement in a full-time setting;

  b) the Parent's advocate:

      i) contested the adequacy of J███████ clinical evaluation and her functional behavioral assessment;

      ii) questioned the appropriateness of not including an additional disability classification of Emotionally Disturbed ("ED") on J███████ IEP;

      iii) requested completion of an additional clinical evaluation and a functional behavioral assessment;

      iv) proposed Rock Creek Academy as an appropriate alternative educational placement;

  c) the Team:

      i) recommended completion of an additional clinical evaluation;

      ii) agreed to notify DCPS of J███████ need for an alternative placement;

6. An August 28, 2006 ADHD screener diagnosed J██████ with Attention Deficit Hyperactivity Disorder.

7. An August 28, 2006 clinical evaluation of J██████ recommended participation in individual psychotherapy.

8. At a September 13, 2006 MDT meeting:

  a) the Team:

      i) recommended a revised disability classification of Multiply Disabled ("MD"), including OHI, Speech and Language Impaired ("SLI"), and LD;

      ii) rejected an additional disability classification of ED;

      iii) recommended a smaller placement for J██████;

  b) the Petitioner's advocate:

      i) contested the validity of J███████ current clinical evaluations;

      ii) objected to the rejection of an additional disability classification of ED;

      iii) requested additional clinical testing to confirm a disability classification of ED;

      iv) proposed Rock Creek Academy as an appropriate alternative placement;

      v) reported that J██████ had been accepted for admission into Rock Creek Academy;

  c) DCPS:

      i) neglected to participate in the review of J███████ evaluations and in the discussion of her current disability classification and special education needs;

      ii) proposed Prospect Learning Center ("Prospect") as a placement;

      iii) failed to answer questions from the Team about the proposed placement at Prospect Learning Center, including those regarding the student-to-teacher ratio, teacher qualifications, and the age and disability classifications of the other students;

  d) the Petitioner's advocate:

      i) objected to DCPS' failure to fully participate in the meeting and to provide all necessary information about the appropriateness of its proposed placement at Prospect;

      ii) reserved a determination on the appropriateness of Prospect;

  e) the Team:

114

      i) agreed to gather additional information for completion of a functional behavioral assessment and development of a behavior intervention plan;

      ii) did not make any finding or recommendation regarding the appropriateness of Prospect for J█████

9. An adequate clinical evaluation of J█████ has never been completed.

10. An adequate functional behavioral assessment and behavior intervention plan have never been completed.

11. DCPS has known of J█████'s need for an appropriate alternative placement in a full-time special education program since August 3, 2006.

12. DCPS has never:

    a) offered an appropriate educational placement for J█████;

    b) issued a prior notice for an appropriate alternative educational placement;

    c) placed J█████ in an appropriate full-time special educational program.

13. J█████ has been accepted for admission into Rock Creek Academy.

14. J█████ will receive educational benefit at Rock Creek Academy.

**Proposed resolution:**

1. DCPS to immediately fund and place J█████ at Rock Creek Academy with transportation.

2. DCPS to immediately fund an independent clinical evaluation and an independent functional behavioral assessment of J█████.

3. DCPS to convene an MDT meeting within thirty (30) days of J█████ enrollment at RCA to:

    a) review all of her current evaluations,

    b) revise her IEP, and

    c) develop an appropriate compensatory education plan to compensate J█████ for its failure to provide an appropriate placement since August 3, 2006.

4. DCPS to convene an MDT meeting within ten (10) days of receiving J█████'s independent clinical evaluation and her independent functional behavioral assessment to:

    a) review these evaluations,

    b) revise J█████ IEP, and

    c) develop an appropriate compensatory education to compensate J█████ for its failure to:

      i) timely conduct and review an adequate functional behavioral assessment since August 3, 2006;

      ii) timely conduct and review an adequate clinical evaluation of J█████ since August 3, 2006.

5. DCPS to pay reasonable attorney fees and costs incurred in bringing and pursuing this case.

**Resolution Meeting:**

1. The Petitioner contends that the entire IEP Team and a representative of the LEA with authority:

    a. to immediately fund and place J█████ at Rock Creek Academy with transportation,

    b. immediately fund an independent clinical evaluation and an independent functional behavioral assessment of J█████,

    c.  to convene an MDT meeting within thirty (30) days of ▮▮▮▮ enrollment at RCA, and

    d.  to convene an MDT meeting within ten (10) days of receiving J▮▮▮▮ independent clinical evaluation and independent functional behavioral assessment

are necessary attendees at any resolution meeting.

2. If these individuals are not going to be in attendance, Petitioner requests that DCPS provide counsel with a written notice waiving its right to a resolution session 48 hours prior to any scheduled meeting.

3. The Petitioner contends that any meeting not attended by the identified individuals is not a valid resolution session, but rather an informal settlement discussion.

4. The Petitioner will be accompanied by his or her attorney at any resolution session convened subsequent to the filing of this complaint and will record any resolution session by analog or digital means.

5. Any statements by the Petitioner or his or her representative during any resolution meeting or other settlement discussion incident to the filing of this complaint are for the purposes of compromise only.

Respectfully Submitted,

Douglas Tyrka
Tyrka & Houck, LLP
Attorneys for the Petitioner
1726 Connecticut Ave., NW, Suite 400
Washington, DC  20008
(ph) (202) 265-4260
(f) (202) 265-4264

116

3 of 3 DOCUMENTS

WEIL'S CODE OF D.C. MUNICIPAL REGULATIONS
Copyright (c) 2006 by Weil Publishing Co., Inc.
All rights reserved

*** THIS DOCUMENT IS CURRENT THROUGH THE MARCH 2006 REVISIONS ***

TITLE 5. BOARD OF EDUCATION
CHAPTER 30. SPECIAL EDUCATION POLICY

*CDCR 5-3019* (2006)

5-3019. Charter Schools.

3019.1 Pursuant to the D.C. School Reform Act, District charter schools shall elect to be Local Education Agencies ("LEA Charters") or District of Columbia Public Schools ("District Charters") for special education purposes.

3019.2 LEA Charters shall be responsible for ensuring that the requirements of Part B of the Act, including documentation of required policies and procedures, are met in regard to children enrolled in their schools, consistent with the requirements of Chapter 38.

3019.3 Except as provided in § § 3019.4 and 3019.5 below, LEA Charters are responsible for special education evaluations, and, if necessary, IEPs and placements for children with disabilities enrolled in their facilities.

3019.4 When a parent requests an evaluation for a determination of special education eligibility while his/her child is registered in a DCPS school, and does not enroll his/her child in an LEA Charter until the applicable 120-day period for assessment and placement required by applicable law has expired, the child's evaluation and, if necessary, IEP and placement remain the responsibility of DCPS.

3019.5 When a parent requests an evaluation for a determination of special education eligibility while his/her child is registered in an LEA Charter and does not enroll his/her child in another LEA Charter or a DCPS school until the applicable period for assessment and placement has expired, the child's evaluation and, if necessary, IEP and placement, remain the responsibility of the LEA Charter in which the child was enrolled during the applicable period unless it is determined by the LEA Charter that it can not serve the child, whereupon it shall make an appeal to DCPS pursuant to § 3019.9 of this chapter.

3019.6 When a child is enrolled in more than one LEA during the applicable period for assessment and placement, the LEAs are jointly responsible for the child's evaluation and, if necessary, IEP and placement. Every effort will be made by both LEAs to cooperate to achieve the necessary timelines and legal requirements.

3019.7 DCPS is responsible for special education evaluations, and, if necessary, IEPs and placements for children enrolled in District Charters.

3019.8 LEA and District Charters are responsible for providing all necessary related services to children with disabilities enrolled in their facilities, consistent with these children's IEPs.

3019.9 When an LEA Charter concludes that it cannot serve a child with a disability enrolled in its facility using the funds available to it, it shall appeal to DCPS, in its role as designee for the State Education Agency (SEA), for assistance.

3019.10 When a District Charter concludes that it cannot serve a child with a disability enrolled in its facility using the funds available to it, it shall notify DCPS, in its role as Local Education Agency (LEA), for assistance.

3019.11 If, following the appeal or notification described in § § 3019.9 and 3019.10 above, DCPS, as the LEA (or SEA, if applicable), agrees that a charter school cannot serve the child in question, DCPS will assume responsibility for the child and the charter school will remit to DCPS the child's entire per-pupil allotment, prorated for the time spent in the charter school during the school year.

CDCR 5-3019

3019.12 DCPS, in its role as the SEA, will arrange for and fund special education mediation and due process hearings involving charter schools if asked to do so by the charter school.

3019.13 Except as provided in § 3019.14 below, LEA Charters shall provide their own representation at, and be responsible for implementation of all agreements or decisions resulting from, mediation and due process hearings involving children enrolled in their school, unless implementation of the agreement or decision is the responsibility of DCPS as a result of any actions or inactions of DCPS while a child had been enrolled at an LEA Charter school or pursuant to federal or local law or regulation.

3019.14 When, in a mediation or due process hearing involving an LEA Charter, a responsibility or action of another LEA is at issue, the second LEA shall provide representation at, and be responsible for implementation of, all agreements or decisions pertaining to the second LEA resulting from the mediation or due process hearing. Every effort will be made by both LEAs to cooperate to achieve the necessary timelines and legal requirements.

3019.15 DCPS will provide representation at, and be responsible for implementation of all agreements or decisions resulting from, mediation and due process hearings involving District Charters.

3019.16 District Charters shall not convene a Multi-Disciplinary Team meeting without first providing sufficient notice to DCPS and giving DCPS an opportunity to reschedule the Multi-Disciplinary Team meeting if the proposed dates are unsatisfactory.

3019.17 DCPS will transfer a child's special education file upon request of any public charter school following the charter school's submission of appropriate documentation of the child's enrollment in that charter school.

History of Regulations since Last Compilation by Agency (December 2002)
December 2, 2005 amended at 52 DCR 10558 by the Board of Education
February 28, 2003 repealed and replaced at 50 DCR 1854 by the Board of Education

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**

**MULTIDISCIPLINARY TEAM (MOT)**

**Prior to Action Notice**

Check Purpose:

☐ Initial Evaluation
☐ Initial Placement
☐ Reevaluation
　☐ Change in Category Exit
　☐ Related Service Add
　☐ Related Service
　☑ Change in Placement
　☐ Annual
　☐ Other

Date  9/13/06

Student  J_____ R_____    DOB _____

School  FESA PCS

Current Disability Category

Setting  Outside the educational setting

Dear  Ms. Robinson

State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program.
Therefore, you are being notified of the following proposed changes:
☐ Proposes to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
☐ Refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
☐ Other _____

A multidisciplinary team (MDT), of which you were an invited member, has made the following decisions about your child: (check all that apply)

☐ Your child is not eligible for special education service(s).
☐ Your child is eligible or continues to be eligible to receive special education services as a student with _____
☐ Your child will begin receiving _____ as a related service(s).
☐ Your child will no longer receive _____ as a related service(s).
☐ Your child's category of disability is being changed from _____ to _____
☐ Your child's alternative placement on continuum (next setting) is being changed.
　from  Combine Educational Setting  to  Outside of General Education Setting
☐ Your child is no longer eligible and will be exited from the special education program.
☐ Other: _____

Location of Services  Prospect LC   Dr. Eve Byford Peterson  920 F St. NE WDC 20002
2 [698-3800]

**Description and Explanation of agency action proposed or refused.**

The student has been appropriately placed in a education Setting

**Description of Other Options Considered and reasons for rejection of each option**

General Education Setting — rejected
Combined Education Setting  rejected
Outside the general Educational Setting  accepted

Other relevant factors to the decision: _____

MDT Members: ☐ Principal or Designee    ☑ General Education Teacher    ☑ Psychologist
　☑ Parent    ☑ Special Education Teacher    ☑ Other: DCPS
　☐ Student    ☐ Speech and Language
　☐ Social Worker    ☑ *LEA & Interpreter  (*may be one)

Parents may bring individuals to participate in the MDT meeting. These participants should have knowledge or special expertise regarding the child. The following individuals invited by parent:  Sharon    Millis

Any questions you may have concerning your child's program may be directed to the principal.
You are protected under the Procedural Safeguards for parents, which are enclosed for your information.
If can be of assistance to you, or have questions regarding the Procedural Safeguards,
Please contact  Evan Murry  at  442-5144  (school telephone number).

See attachments for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

MDT Prior to Action Notice
7-02-2001

119

Friendship Public Charter Schools
_____ Campus

MULTIDISCPLINARY TEAM
(MDT)
MEETING NOTES

MDT REFERRAL DATE: _____

STUDENT: J~~~~~ R~~~~~~

MEETING DATE: **9-13-06**

SCHOOL: Friendship Southeast
Elementary
Academy

PARTICIPANTS: (PRINT NAME)

Carnecia Robinson

Willie Walke~
Jason Millis
Charlene Olymph
Bronwen L Miller
Paul S. Dalton
Evan Murray

PARTICIPANTS: (SIGN NAME)

Carnecia ~~~~
Willie Walk~
Charlene ~~
Bronwen L Miller
Paul ~~~~
by phone

POSITION

Parent
Gen. Ed. Teacher
Sp. Ed Teacher
Psychologist
Director of ~~
psychologist
Attorney F.P.C.S.
DCPS Placement
Specialist

---

Introductions were made. Procedural safeguards
were given to parent 2/16/06 and made
available this meeting. Purpose of this meeting
is to review evaluations for that we're completed.

Parent: Did not want to add anything to
the notes. (see advocates) comment

Friendship Public Charter Schools

_Southeast El._ Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES

page _2_ of _7_

MEETING TYPE: _Placement Mtg._

STUDENT: ▓▓▓▓ R▓▓▓▓    DATE OF BIRTH ▓▓▓▓ ·98

SCHOOL: _Friendship Southeast Elementary Academy_    DATE: _09·13·06_

(Ms. Wallace)

Gen. Ed. Teacher: She tends to mind the other students business. J▓▓▓ trys to comply with the token economy system. She accepts redirections quickly. She does not had any time outs. Teacher will provide us w/ behaviors for J▓▓▓ Brie/Morrison McCall scored 1.5. Currently in lowest reading groups. Has difficulty answering questions. Has difficulty with Higher Order thinking. Has difficulty writing.

Special Ed Teacher:

121

Friendship Public Charter Schools
_____
Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES
MEETING TYPE: _Placement Mtg._     page: 3 of 7

STUDENT: ~~J██████ R█████~~     DATE OF BIRTH ~~█████~~ 98

SCHOOL: FPCS Southeast Academy    DATE: 09·15·06

---

Psychologist (Dr. Bronwen Millet)

Dr. Millet reviewed the ADHD instrument, completed by Sharon Piner. Ms. Masimini completed the teacher portion. J████ scores were elevated in several areas (oppositional, emotional lability, hyperactivity, restless - impulsive, inattentive. Ms. Robinson (mother) completed the parent portion J████ scores were elevated in several areas (oppositional, cognitive - inattention, hyperactivity. Anxious shy and perfectionism. A clinical evaluation was also completed. The clinical included the Rorschach and the Children's Sentence Completion form - while her protocol was not scorable valuable information was able to be ascertained, J████ has significant cognitive difficulties that impact her ability to articulate herself and relate with others. Additionally J████ experiences a great deal of difficulty at frustration commensurate. Her ideas, Recommendation included therapy and an ADHD screen.

Her cognitive difficulties is what impedes J████ ability to progress.

122

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES
page: 4 of 7
MEETING TYPE: _____

STUDENT: ████████ ██████      DATE OF BIRTH ██/██/98

SCHOOL: FPCS - Southeast      DATE: 09·13·06
Academy

_Educational Advocate:_ Ms. Millis wanted it
noted that Mr. Massimini the Student Support
Manager (Counselor) was not ███████ teacher.
███████ teacher was released from contract
before the request for evaluations were made.
Mr. Massimini's interaction with ████████ was
on a frequent basis. He covered the students
class everyday for lunch and dealt with
behavior when she was not following class
expectation. Ms. Millis agrees with the
diagnosis of ADHD however she did not agree with
the assessments being completed. Ms. Millis
objected to Mr. Murray's ~~had~~ having to not participate
in the entire review of evaluations and was
~~unable to complete~~ would be available for
placement. Mr. Murray had to leave the meeting
via phone to attend another meeting. Ms. Millis
feels that the clinical is not appropriate.

123

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES                    page: 5 of 7
MEETING TYPE: _____

STUDENT: ███████████████        DATE OF BIRTH: ████████ 98
SCHOOL: FPCS Soul                DATE: 09.13.06

_Team Recommendations_

   The team has concluded that at this time
that the reports completed for ████████ are
valid and a current measure of her
ability. The team did recommend a
smaller placement for J███████



   The team has concluded that J███████
continues to qualify for services as a
multiple disabled setting students
that qualifies as Learning disabled and
Other Health Impairment. The team has
not concluded that J███████ is a student with
an emotional disturbance. The

124

Friendship Public Charter Schools

_____ Campus

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES                      page: 6 of 7

MEETING TYPE:

STUDENT: ███████████        DATE OF BIRTH: ███████ 98

SCHOOL: _WCA-Southeast_        DATE: _09·13·06_
              _Academy_

Ms. Murray the SEA Rep. asked the parent
attorney what placement are they proposing

Parent Advocates response:
Rock Creek Academy is the recommended
school by parents advocate. ████████
has ban accepted and a letter will be
provided.


SLGPL is recommending Prospect Learning Center

LD, SL & and OHI (ADD and ADHD) 7:45-2:15
      (13) homeroom teachers (certified in Sp Ed.
      (5) certified Specials   (1) OT
      (2) resource teacher
      ( ) special Ed. Coor.
      (3) Psychologist
      (2) Speech Pathologist

125

Friendship Public Charter Schools
_____ Campus

MULTIDISCIPLINARY TEAM (MDT)                    page: 7 of 7
CONTINUATION MEETING NOTES
MEETING TYPE: _____

STUDENT: _____    DATE OF BIRTH ▮▮▮▮▮ 98
SCHOOL: _FPCS Southeast Elem_    DATE: _09·13·06_
_Academy._

Dr. Peterson principal has received the
file and reviewed the folder and ▮▮▮▮▮
R▮▮▮▮ has been accepted. Dr. Peterson could
answer some questions however not extensive
questions. The table was terminated the call.


Parent advocate can not accept or reject the
placement until the parent has the opportunity
to go see the school.

126

I_____ R_____ MDT 9/13/05

Reg. ed teacher available by phone, no progress report or documentation provided.

Parent/Advocate feel student is ED. Inadequate testing in this area in order to make this determination has been done. Parent/Advocate request additional testing. HE SA states they will not do any other testing. This testing is crucial to student being placed in full time therapeutic setting. Parent/Advocate are requesting [?]

Team determined that student qualified for OHI classification.

DCPS representative did not participate in the entire meeting in since he was not physically at the meeting and there were phone problems.

Team determined that while there is EFSA information will be gathered for an FBA so a BIP can be constructed.

Parent/Advocate do not agree with the defined goals/objectives and do not think they address her disability.

Team feels she needs a small classroom of 5-6 students.

DCPS
Questions asked the DCPS representative were not able to be answered and

127

at Prospect to answer all questions regarding placement. Team called DPC faction who was unable to speak to the team. Parents Advocate to answer more than a couple of questions. She was busy with team member. Parent Advocate was unable to accept/reject DCPS placement due to lack of any information other than the number of teachers service providers and therapists which were told to the team as well as which disability classifications the school serves.

Requests to the team to clarify minutes and add parent concerns were refused, so full parent participation in this meeting was not possible.



**Friendship Edison**
**Public Charter School**
Community Vision … World Class Education

# ADHD SCREENING

STUDENT:      J~~essein Robinson~~,
DOB:         ~~____~~/1998
AGE:         8 Years, 6 months
SCHOOL:     Friendship Southeast Elementary Academy
GRADE:      3rd
EXAMINER:   Sharon Piner, School Psychologist
               D.C. Licensed
DATE OF REPORT:   08/22/2006
TEST ADMINISTERED: Conner's Teacher Rating Scale – 08/17/2006
                           Conner's Parent Rating Scale – 08/21/2006

## Interpretation of the Conner's Rating Scale

The Connors' Rating Scales-Revised (CRS-R) is primarily used in the assessment of ADHD; although additional subscales for the assessment of oppositional behavior, cognitive difficulties, perfectionism, social and emotional functioning, anxiety, and psychosomatic complaints are also assessed. Ms. Robinson completed the Conners' Parent Rating Scale-Revised: Long Version (CPRS-R:L), and Mr. Masimini completed the Conners' Teacher Rating Scale-Revised: Long Version (CTRS-R:L). The average scaled T score is 65, which means any score above 65 is an area of concern.

### Teacher Rating Scale Results and Interpretation

Mr. Masimini's responses on the CTRS-R:L yield an elevated profile. Most of his subscale and index scores exceed the cut-off point for clinical significance (i.e. *T*-score greater than 65), which is indicative of global problematic functioning. His standard scores on Oppositional Index ($T=90$), Emotional Lability ($T=86$), and Conner's Global Index-Total (T=80) fall in the Markedly Atypical range, indicating significant problems with breaking rules, problems with authority, and being more prone to more emotional responses such as crying, anger, etc. than is typical. Likewise, his standard scores on the Cognitive Problems/Inattention (T=73), Hyperactivity ($T=70$), Social Problems ($T=68$), Conners' ADHD Index (T=68), Restless-Impulsive (T=72), Inattentive (T=75), and the DSM-IV-Total (T=71) subscales fall in the Mildly Atypical range. Children who score in this range on the Cognitive/Inattention, Hyperactivity, Restless-Impulsive,

129

2

Inattentive subscales tend to have difficulty sitting still, feel more restless and impulsive than most children their age, and have the urge to always be "on the go."

In comparison, Ms. Robinson's responses on the CPRS-R:L yield a more Mildly Atypical elevated profile. Her subscale score for Social Problems (T=85) is Markedly Atypical which suggests that J██████ is likely perceived to have few friends, low self esteem and low self confidence. Her standard scores on the Oppositional (T=75), Cognitive-Inattention (T=78), Hyperactivity (T=75), Anxious-Shy (T=65), Perfectionism (T=69), Psychomatic (T=64), Conners ADHD Index (T=69), Restless Impulsive (T=70), Emotinal Lability (T=68), Conners' Global Index (T=70), Inattentive (T=71), Hyperactive-Impulsive (T=75), and DSM-IV Total (T=75) scales fall in the Mildly Atypical range and indicates J██████ may have problems in these areas. There are minimal discrepancies between the two raters thus both raters yielded two very similar profiles.

**Summary:**

After reviewing the results of the CPRS:L and the CTRS:L, J██████ yielded markedly A-Typical Scores in most of the indexes indicating an ADHD diagnosis is warranted at this time.

**Recommendation:**

The following recommendations are offered for consideration by the multidisciplinary team (MDT) based on the information obtained in this evaluation. Final decisions about eligibility determination, special education services, and interventions should be made at the MDT meeting in conjunction with results from any other evaluations conducted along with input from the parent and other members of the MDT.

1. To help J██████ develop appropriate interpersonal relationships and social behaviors at home and school, family and teachers are encouraged to share behavior-management strategies so that limits are well defined and consistently applied.

2. After reviewing, the Conners' Rating Scale, J██████ Behavior Intervention Plan continues to be warranted at this time and may need to be revised to meet her ADHD diagnosis.

3. J██████ should receive counseling one time a week for 30 minutes to address her atypical behavioral concerns.

4. J██████ should receive an evaluation by her pediatrician to evaluate the need for medication to treat this ADHD diagnosis.

Sharon Piner, School Psychologist
D.C. Licensed

8/22/06
Date

130



Office of the General Counsel
9th Floor
825 North Capitol St, NE
Washington, DC 20002
(202) 442-5000
Fax (202) 442-5098

# FACSIMILE

| | | **Date:** | 11-20-2006 |
|---|---|---|---|
| **TO:** | Douglas Tyrka, Esquire | **Fax No.:** | 202/265-4264 |
| **CO:** | Tyrka & Houck, LLP | **Tele. No.:** | 202/265-4260 |
| **FROM:** | Quinne Harris-Lindsey, Esq. | **Tele. No.:** | 202/442-5604 |

**No. Pages, Including Cover Sheet:** 2( pgs

**COMMENTS:** Re: 5 Day Disclosures for J█████ R█████, DOB: ███/1998.

### CONFIDENTIALITY NOTICE

*The information contained in this telefacsimile has been transmitted by an attorney. It is privileged and confidential, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If this communication has been received in error, please notify us immediately by telephone, and return the original message to us at the above address via first class prepaid US postage. Thank you.*

131

```
*************** -COMM. JOURNAL- ******************* DATE NOV-20-2006 ***** TIME 16:47 ********

        MODE = MEMORY TRANSMISSION              START=NOV-20 16:40     END=NOV-20 16:47

          FILE NO.=214

   STN   COMM.      STATION NAME/EMAIL ADDRESS/TELEPHONE NO.     PAGES      DURATION
   NO.

   001   OK        ☎92654264                                   021/021    00:06:38


                                              -DCPS GENERAL COUNSEL      -

***** UF-8000 ********************** -DCPS GEN COUNSEL- ***** -        2024425097- *********
```



Office of the General Counsel
9th Floor
825 North Capitol St, NE
Washington, DC 20002
(202) 442-5000
Fax (202) 442-5098

## FACSIMILE

|  |  |  |  |
|---|---|---|---|
|  |  | **Date:** | 11-20-2006 |
| **TO:** | Douglas Tyrka, Esquire | **Fax No.:** | 202/265-4264 |
| **CO:** | Tyrka & Houck, LLP | **Tele. No.:** | 202/265-4260 |
| **FROM:** | Quinne Harris-Lindsey, Esq. | **Tele. No.:** | 202/442-5604 |

**No. Pages, Including Cover Sheet:** 21 pgs

**COMMENTS:** Re: 5 Day Disclosures for J███████ R██████, DOB: ██████1998.

---

---

### CONFIDENTIALITY NOTICE

*The information contained in this telefacsimile has been transmitted by an attorney. It is privileged and confidential, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If this communication has been received in error, please notify us immediately by telephone, and return the original message to us at the above address via first class prepaid US postage. Thank you.*

132

GOVERNMENT OF THE DISTRICT OF COLUMBIA

DEPARTMENT OF PUBLIC SCHOOLS

OFFICE OF STUDENT HEARINGS


--------------------------------x
IN THE MATTER OF:            :
                            :
J███████ R███████           :
--------------------------------x


Washington, D.C.

Tuesday, January 9, 2007



The above-entitled matter came on
for hearing, pursuant to notice.


BEFORE:

    TERRY BANKS, Hearing Officer


APPEARANCES:

    On Behalf of the Student/Parent:

        DOUGLAS TYRKA, ESQ.

    On Behalf of the D.C. Public Schools:

        QUINNE HARRIS-LINDSEY

        This transcript was produced from
an audio CD provided by D.C. Public Schools.


**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C. 20005-3701        (202) 234-4433

133

I-N-D-E-X

| WITNESS: | DIRECT | CROSS | |
|----------|--------|-------|---|
| REDIRECT | | | |
| Ms. Millis | 35 | 48 | 62 |
| Karen Plowden | 66 | 77 | |
| Evan Murray  85 | 100 | -- | |


ITEM
PAGE

| | |
|---|---|
| Motion for default by Mr. Tyrka | 5 |
| Ruling on motion for default | 9 |
| Opening statement by Mr. Tyrka | 10 |
| Motion to dismiss by DCPS | 18 |
| Opening statement by Ms. Harris-Lindsey | 24 |
| Closing statement by Mr. Tyrka | 113 |
| Closing statement by Ms. Harris-Lindsey | 122 |
| Rebuttal statement by Mr. Tyrka | 134 |

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

134

P-R-O-C-E-E-D-I-N-G-S

HEARING OFFICER BANKS:    Today is
January the 9th, 2007.    This is an
administrative hearing for J███████ R███████
who was born ███████████, 1998.    This
hearing is being conducted in accordance
with the guidelines and rights established
by the Individuals with Disabilities
Education and Improvement Act of 2004, the
rules of the Board of Education for the
District of Columbia and DC Code Title 38.

My name is Terry Banks.    As an
independent hearing officer, I am not an
employee of the DC Public Schools.    I am not
related to or an acquaintance of the student
or parent.    I am prepared to hear both
parties and will act only on the evidence
presented during the course of this hearing
in accordance with applicable laws, rules
and regulations.

This hearing is closed to the

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

135

public.  The matters discussed here today
are confidential and must be treated as such
even after the hearing is completed.  The
hearing is being recorded and either party
may request a copy of the disk or a written
transcript of the proceedings by writing to
the Student Hearing Office.

At this time, I would like for
counsel to identify themselves for the
record.

MS. HARRIS-LINDSEY:  Quinne
Harris-Lindsey, Attorney Advisor on behalf
of D.C. Public Schools.

MR. TYRKA:  Douglas Tyrka,
counsel for the parent.

HEARING OFFICER BANKS:  Good
afternoon.  Mr. Tyrka, do you waive a
reading of the hearing rights?

MR. TYRKA:  Yes.

HEARING OFFICER BANKS:  Both
parties have submitted five day disclosure

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

136

statements.  Does either party object to the

introduction of the other party's statement

into evidence?

       MR. TYRKA:  No, Judge.

       MS. HARRIS-LINDSEY:  No for D.C.

       HEARING OFFICER BANKS:  Okay.

Mr. Tyrka, I've got a November 17th and a

January the 2nd, and Ms. Harris-Lindsey,

yours I have is November 20th.

       MS. HARRIS-LINDSEY:  Yes.

       HEARING OFFICER BANKS:  Are those

the latest?

       MR. TYRKA:  Yes.

       HEARING OFFICER BANKS:  Okay.

Mr. Tyrka, would you like to open?

       MR. TYRKA:  Yes.  I'd open with a

motion for default based on DCPS's failure

to serve complete prior notice or a complete

response to this case.  I want to review

some of the facts relative to the motion for

a second.  First, the complaint is primarily

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

137

about placement and a complaint to the fact

that while DCPS --

            HEARING OFFICER BANKS:  Have you

filed a motion to dismiss?

            MR. TYRKA:  For default?

            HEARING OFFICER BANKS: Yes.

            MR. TYRKA:  No.  But claims of

the -- complaints of the placement

determination, specifically failure to

provide accurate information at the MTD

meeting.

            HEARING OFFICER BANKS:  Say what

now?

            MR. TYRKA:  The complaint

complains of failure to provide accurate

information at the MTD meeting.

            HEARING OFFICER BANKS:  Wait.  Is

this the complaint filed on July 5th?

            MR. TYRKA:  No.  The claim was

filed September 28th.

            HEARING OFFICER BANKS:  I've got

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

138

the wrong file here.  Okay.  So that hearing

was withdrawn.

          MR. TYRKA:  Yes.

          HEARING OFFICER BANKS:  That was

withdrawn.  So now due process number three.

Okay.  Go ahead.

          MR. TYRKA:  The complaint

complains of --

          HEARING OFFICER BANKS:  Hold on.

          MR. TYRKA:  Sure.

          (Whereupon, off the record

discussion.)

          HEARING OFFICER BANKS:  Okay.

We're back on the record.  It's 1:34:53.

This is the case of J██████ R████████.  We

started this case in Room 8151, but because

another case had a lot more witnesses, we

agreed to move to 8142.  So we're picking up

the record from this point forward.  Mr.

Tyrka, you were commencing a motion?

          MR. TYRKA:  Yes, a motion for

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

139

default based on DCPS's failure to issue a
response or to otherwise explain its
placement recommendation.  As I said in our
complaint, the complaint is for evaluations
and for placement.  More specifically, if
you look at paragraph nine of the facts, it
talks about what happened at the MDT meeting
of September 13th and that DCPS couldn't --
excuse me -- paragraph eight -- excuse me --
that DCPS could not or would not provide any
specifics regarding the school and did not
actually participate in the meeting, rather
they just showed up and dropped the
placement on the table.  Furthermore, the
team never made any determination that the
placement was actually appropriate.

        In light of that, while I know
that the Hearing Officer will usually not
grant a default for DCPS has held a
resolution meeting, given the nature of the
complaint, the fact that DCPS has never

explained the placement, and then what did

happen at the resolution meeting is while

the meeting was convened, it was not

convened with the full IEP team as had been

requested by the parent in her complaint,

and nothing was every said about the

placement, the justifications for it, any

consideration of that in the resolution.

The only thing that was offered was simply

to do the evaluations.  So for that reason,

we're asking for a default, sir, as well as

-- I mean the Hearing Officer is familiar

with my argument generally, of course.  It's

in Massey (phonetic) DDC and the

requirements of 1415 of the response and of

prior notice.

          HEARING OFFICER BANKS:  Well, I'm

going to deny the motion because it wasn't

filed.  Please give the other side a chance

to respond to the motion.

          MR. TYRKA:  Well, the problem we

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

141

were having is that Mr. Smith had such a

backlog of those, we were almost never

getting a response to them by the time we

got in here.

HEARING OFFICER BANKS:  I can't

apologize for the system.  The system is

what it is, but I just don't like practicing

law by ambush, so I think dispositive

motions ought to be filed in time for the

other side to have a chance to respond to

it.  Now most of the time, DC doesn't

respond, but at least I like to give them a

chance.

MR. TYRKA:  That's fine.

HEARING OFFICER BANKS:  And plus

it sounds like everything you're alleging is

based upon that is there in the record, so

since we're all here, I might as well have

the opportunity to review the matter.

MR. TYRKA:  Okay.

HEARING OFFICER BANKS:  Why don't

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

142

you proceed with your opening.

MR. TYRKA:  Well, we've heard the bulk of it.  I'll just go with the evaluations briefly.  We're not going to press the claim for a clinical evaluation. We think the one that is here is pretty thin, but we do think that another one will end up being done in due course anyway.  And we do think an FBA is -- will cover some of the issues.

The need for the FBA was established --

HEARING OFFICER BANKS:  Wait a minute.  I don't have evaluations down as an allegation.  I've got placement, failure to review evaluations, classification and IEP.

MR. TYRKA:  It -- failure to conduct and review.  And then the ones we list are --

HEARING OFFICER BANKS:  Failure to conduct and review.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        (202) 234-4433

143

MR. TYRKA:  And in our facts section, we list the clinical and the FBA.

HEARING OFFICER BANKS:  Okay.  So you're not pressing for what?

MR. TYRKA:  Not pressing the clinical.  The FBA, however, is still outstanding.

HEARING OFFICER BANKS:  You want an FBA?

MR. TYRKA:  Yes.  The need for the FBA was established at the meetings of August 3rd which DCPS did not attend but which notice they did, I think, have when the attend at the September 13th meeting.

HEARING OFFICER BANKS:  Okay.  So with respect to evaluations, you just want an FBI -- FBA?

MR. TYRKA:  Correct.

HEARING OFFICER BANKS:  And you say that the need for that was established at a meeting on 8/3.  What exhibit is that?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

144

MR. TYRKA:  8/3 and 9/13.  Those
are Exhibits 9 through 12.

HEARING OFFICER BANKS:  Okay.

MR. TYRKA:  And just to note, the
child is currently at Friendship, but it's
been determined that the child has to leave
Friendship, so since 9/13 at the latest, the
child became DCPS's responsibility.  So
we're asking for an independent FBA and
then, as I said, the Bocovan (phonetic) plan
and a meeting to follow of course.  The
Bocovan (phonetic) plan regards the
placement.

It's been known for sometime that
Friendship where J██████ was attending was
not appropriate for her.  At those same
meetings on August 3rd and September 13th,
that was clearly stated in the notes that we
included.

Also, on August 3rd, they
determined that J██████ now needed a full-

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        (202) 234-4433

145

time IEP with specialized instruction, OT,

speech/language and counseling.

        HEARING OFFICER BANKS:  Okay.

Let me go back.  You say at the meetings, it

was established that Friendship was not

appropriate?

        MR. TYRKA:  Yes.

        HEARING OFFICER BANKS:  And what

-- that she needed a ---

        MR. TYRKA:  A full-time IEP, 25

hours specialized instruction, one hour OT,

one hour of speech and language and 30

minutes of counseling.  At that meeting,

also they classified her as LD OHI.  And all

the same conclusions were reiterated at the

meeting on September 13th.  September 13th

was nominally attended by DCPS.  However,

it's fairly clear in the notes, but also Ms.

Millis (phonetic) will testify, that the

DCPS rep did not participate fully in the

meeting, was participating by phone but was

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

146

barely available during the review of the

evaluations and discussion of J██████

needs and basically only participated at the

very end of the meeting during the

discussion of placement.

And the placement discussion,

unfortunately, was very brief.  DCPS

proposed prospect -- well, excuse me --

first, Ms. Millis (phonetic) proposed Rock

Creek Academy.  DCPS proposed Prospect and

gave some general information about Prospect

which is included on page six of the notes -

- excuse me, six and seven of number eleven.

And in the MDT notes here make note of this

and Ms. Millis (phonetic) makes note of it

that she asked for more specific information

regarding the school and the DCPS rep

refused to answer.  It was Dr. Peterson from

the school and she said something about

they're having some crisis of there at the

school.  So the parent was not able to get

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
WASHINGTON, D.C.  20005-3701
(202) 234-4433                                          (202) 234-4433

147

more than very general information about the school at the meeting. In the prior notice, DCPS gave her no information. That's our number 12.

And I'm calling it prior notice. That, you know, should be in quotes. I think this Hearing Officer has often noted that DCPS' prior notices are almost always inadequate under the law. This case is even worst than most. For a description and explanation of the action, it says, "The student has been appropriately placed in an educational setting." That's all it says, gives no reasons whatsoever, does not describe why other options were rejected. So in all, the parent was getting virtually no information about the school.

However, there was a discussion of performing a visit to the school. Ms. Millis (phonetic) went to perform that visit in November and Dr. Peterson turned her

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          (202) 234-4433

148

away, said that she could not visit the

school on that day I should say.  Dr.

Peterson also noted on that visit --

       HEARING OFFICER BANKS:  This is

Prospect?

       MR. TYRKA:  Yes.  Thank you.  Dr.

Peterson also noticed on that -- noted on

that visit that she had not received the

file for J██████ until October I believe she

said but certainly after the September MDT

meeting.

       So the parent was left in the

situation of knowing nothing about DCPS's

proposed placement, and DCPS is in violation

of the requirement that a placement be

determined at an MDT meeting with full

parent participation.  The only thing then

that the parent knows about Prospect is what

DCPS has determined from its own evaluations

as recorded in the No Child Left Behind data

that it publishes, and we disclosed that as

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433     WASHINGTON, D.C.  20005-3701     (202) 234-4433

149

our numbers 20 and 21.  And Prospect has
failed to meet those standards for three
years running.  That's established in our
disclosure number 20.  Our disclosure number
21 shows that its failures are across the
board, all populations included disabled.

            HEARING OFFICER BANKS:  Prospect
is what, a elementary school?

            MR. TYRKA:  Yes.  Twenty-one
shows that the failures are across the board
in all subsections of the population.

            HEARING OFFICER BANKS:  What
exhibit is it?

            MR. TYRKA:  Twenty-one.  So I
think most of everything I've said is
established in the documents that I refer
to.  I'd like to call Ms. Millis just
briefly to review some of these points and
then to call a witness from Rock Creek
Academy unless the Hearing Officer would
rather wait for DCPS's case before hearing

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

150

from Rock Creek?   Some Hearing Officers

prefer to do it that way.

        HEARING OFFICER BANKS:   Okay.

Ms. Harris-Lindsey, please?

        MS. HARRIS-LINDSEY:   Sure.  DCPS,

one, makes note that the parent isn't

present.  The parent is the moving party and

would ask for some direction either from the

Hearing Officer or counsel as to whether the

parent, who is the person that's bringing

the case, is she going to participate.   If

she's not, then we would ask that the case

be dismissed.

        HEARING OFFICER BANKS:   On what

basis?

        MS. HARRIS-LINDSEY:   She's a

material party.  She's the moving party.

        HEARING OFFICER BANKS:   She

doesn't have to be here.

        MS. HARRIS-LINDSEY:   Well, DCP --

I --

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          (202) 234-4433

151

HEARING OFFICER BANKS: Clifford

Janey is not here.

MS. HARRIS-LINDSEY:  Clifford

Janey isn't -- he does not -- he's a

material witness in this case.

HEARING OFFICER BANKS:  He's

DCPS.

MS. HARRIS-LINDSEY:  That's not

the same -- Clifford Janey didn't --

HEARING OFFICER BANKS:  Who's

your witness.

MS. HARRIS-LINDSEY:  Clifford

Janey did not --

HEARING OFFICER BANKS:  Who

represents DCPS --

MS. HARRIS-LINDSEY:  In this

case, the LEA representative -- sorry -- in

this case, the SEA representative is Evan

Murray (phonetic).  What I would say,

Hearing Officer, is that the parent is the

person that filed the complaint.  Clifford

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          (202) 234-4433

152

Janey didn't file the complaint.  It's
apples and oranges.

       HEARING OFFICER BANKS:  The
parent -- the moving party has the burden.
If the moving party chooses to try to meet
their burden without showing up, that's on
them but there's nothing in IDEA, there's no
regulation, and you didn't compel their --
did you compel their presence?

       MS. HARRIS-LINDSEY:  I did.  In
my disclosure, I compelled their presence.

       HEARING OFFICER BANKS:  Oh.  Is
that consistent with the regulations and the
SOP?

       MS. HARRIS-LINDSEY:  Well, it's
not -- the motion -- not the way the motion
is -- the way it's laid out but as the
moving party, I don't necessarily believe
that that is the person -- this is the way
to --

       HEARING OFFICER BANKS:  If you've

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

153

got some authority under IDEA that the

moving party has to be here, I'll enforce

it.  Otherwise, let's move on.

            MS. HARRIS-LINDSEY:  Well, I was

arguing the Rules of Civil Procedure

indicate that the moving parties both should

be present.

            HEARING OFFICER BANKS:  What

rule?

            MS. HARRIS-LINDSEY:  Well, I

don't have it with me.

            HEARING OFFICER BANKS:  I'm

unaware of any such rule.

            MS. HARRIS-LINDSEY:  I don't know

-- well, I don't know of any jurisdiction

except here where a complaint can be filed

and the moving party not show up and then go

forward.  You can't do it in court.  You

can't do it in DC Peer Court.

            MR. TYRKA:  That's not true.

            MS. HARRIS-LINDSEY:  No, you

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

154

can't.

HEARING OFFICER BANKS:  Yes, you can.

MS. HARRIS-LINDSEY:  The moving party -- then the case is dismissed.  No moving party --

HEARING OFFICER BANKS:  No, it's not.

MS. HARRIS-LINDSEY:  -- you can't go forward.

HEARING OFFICER BANKS:  Moving party has the burden of proof.

MR. TYRKA:  I do it all the time.

HEARING OFFICER BANKS:  I don't have to bring my client into court with me.

MS. HARRIS-LINDSEY:  If the party is -- the moving party should -- has to be -- is -- has to be present.

HEARING OFFICER BANKS:  What rule?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

155

MS. HARRIS-LINDSEY:  Well, I
don't have the rule with me.

HEARING OFFICER BANKS:  You show
me a rule.

MS. HARRIS-LINDSEY:  All right.
I ask for --

HEARING OFFICER BANKS:  It
certainly doesn't exist in IDEA.  I don't --

MS. HARRIS-LINDSEY:  Well,
there's a lot of things that --

HEARING OFFICER BANKS:  -- I'm
not aware of Superior Court Rule and --

MS. HARRIS-LINDSEY:  -- there are
a lot of things --

HEARING OFFICER BANKS:  -- I'm
not aware of Federal Rules of Civil
Procedure that say --

MS. HARRIS-LINDSEY:  Well, there
are a lot of things that don't exist under
IDEA, but there's all kinds of rule that
come out consistent, so that -- I'm not

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C. 20005-3701        (202) 234-4433

156

comfortable if that is the basis, but that's
fine.  I just wanted to make note for the
record that the parent is not here and is
not being called to testify.

HEARING OFFICER BANKS:  I have
told parent's counsel that -- and DCPS that
witnesses who aren't here or who testify by
phone, as far as I'm concerned, have very
little credibility, but they don't have to
be here.

MS. HARRIS-LINDSEY:  That's fine.

HEARING OFFICER BANKS:  The rules
don't require it.  I don't put a whole lot
of weight on testimony from people I can't
see but, you know, I can't dictate how
people try their cases.

MS. HARRIS-LINDSEY:  Okay.  Then
may I open now?

HEARING OFFICER BANKS:  Sure.

MS. HARRIS-LINDSEY:  Okay.  With
respect to the complaint as is drafted, only

two of three, under the law, are against --
can be brought against DCPS.  The timeframe
of the complaint my understanding is 2005-
2006.  At that time, the student was
attending an LEA charter school under IDEA
and under the -- under Chapter 30 where a
child that attends an LEA charter school
receiving federal funds, that LEA charter
has the responsibility for ensuring FATE
(phonetic) which is either evaluations, and
at this time, the student, there were
eligibility determinations made while the
student was attending and developing an IEP.

DCPS does not become involved in
this case under Chapter until Friendship
Edison indicates -- appeals to the SEA that
they are unable to provide services for the
student.  I believe counsel stated in the
opening that DCPS came to a meeting on
September 30th I believe, and the complaint
represents that DCPS --

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          (202) 234-4433

158

MR. TYRKA:  Thirteenth.

MS. HARRIS-LINDSEY:  Sorry --
attended a meeting September 13th, 2006, so
anything predating that, those claims can't
be brought against the SEA, because they
were not the direct provider of services.
The provider of services at that time,
unless and until, Friendship Edison puts
DCPS as the SEA on notice, they have full
responsibility under IDEA and Chapter 30.
When DCPS is involved as of the 13th,
they're coming in for the purposes of
ensuring FAITH (phonetic) and at that point,
the issue was that Friendship Edison could
not provide services for the student because
they had changed her IEP from a combination
setting to a full-time setting.  So DCPS,
Mr. Murray as the LEA representative
placement specialist, monitored the charter
schools, came in and identified a new site,
a location for the student.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          (202) 234-4433

159

The -- I don't believe there was any dispute as to the placement, which is -- been changed from combination education setting to outside general education setting and that the location that was identified was Prospect Learning Center. Based on the recitation of facts, DCPS has provided or made, at least a proffer -- made a proffer or proposed a program that could implement the IEP.

I do not -- the allegation was not that Prospect couldn't implement the IEP as is made. It just said that at a meeting, Mr. Murray didn't have -- didn't -- wasn't able to answer questions that were proposed by the parent. I don't know what those questions are, so that -- the facts have to bear that out. But the notes are in the record and so the allegations -- the violations, as they're laid out in the complaint, three, two through four, are --

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433     WASHINGTON, D.C. 20005-3701     (202) 234-4433

160

they can't be -- I don't believe they can be brought against DCPS as the SEA.  They're -- these are discrete to Friendship Edison.

The program that was -- the location that was proposed by DCPS is appropriate.  That wasn't the allegation. It doesn't say that prospect couldn't implement the IEP.  Any question as to the student disability, that decision was made by Friendship Edison, and that's the LEA, that was the LEA determination.

So based on the complaint as is drafted, the allegations as is written, DCPS will ask the Hearing Officer, after -- will ask for one clarification of what issues we're actually going forward on, what issues are being -- is DCPS as the SEA is going to be held to be responsible for.

HEARING OFFICER BANKS:  Did DC file a response to the complaint.

MS. HARRIS-LINDSEY:  Mr. Banks,

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        (202) 234-4433

161

to be honest with you, I have a partial

file.  So I can't really answer that

question.  If Mr. Tyrka's saying he didn't

receive one, I don't -- I can't speak to

that.  But I do know based -- I'm just -- so

--

HEARING OFFICER BANKS:  You know,

one party comes in, wants to file a motion

for default judgment without filing any in

advance.  The other one comes in and make

allegations as to the sufficiency of the

complaint --

MS. HARRIS-LINDSEY:  No, that's -

-

HEARING OFFICER BANKS:  Well --

MS. HARRIS-LINDSEY:  No, I'm not

arguing --

HEARING OFFICER BANKS:  -- you

said --

MS. HARRIS-LINDSEY:  --

sufficiency.  I'm arguing that --

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

162

HEARING OFFICER BANKS:  Okay.

MS. HARRIS-LINDSEY:  -- the
allegations that are their complaint, there
are issues that are being raised that are
not --

HEARING OFFICER BANKS:  Okay.

MS. HARRIS-LINDSEY:  -- discrete
to DCPS.

HEARING OFFICER BANKS:  It should
have been raised in a response within ten
days of the filing of the complaint and
subject to a motion to dismiss --

MS. HARRIS-LINDSEY:  No, that's -
-    HEARING OFFICER BANKS:  --
because you're asking --

MS. HARRIS-LINDSEY:  That three -

-

HEARING OFFICER BANKS: You are
asking for a dispositive ruling.

MS. HARRIS-LINDSEY:  I'm asking
that three of the complaint --

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

163

HEARING OFFICER BANKS:  -- at the hearing rather than filing a response raising those issues.  Go ahead.

MR. TYRKA:  I don't think we have dispute on those.  Maybe we can move passed that.

HEARING OFFICER BANKS:     So you're waiving two through four?

MR. TYRKA:  Well --

HEARING OFFICER BANKS:  She's saying two through four don't apply to DCPS. Are you conceding that?

MR. TYRKA:  That was,   no.  That was not my understanding of what she said, so I will --

MS. HARRIS-LINDSEY:  Yes.

HEARING OFFICER BANKS:  Is that what --

MR. TYRKA:  I will shut up then. Then never mind.

HEARING OFFICER BANKS:  Which is

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

164

why I asked why wasn't that in on a

response.  If you're saying two through four

don't apply to me, that seems to me a pretty

easy response in a response to a complaint.

Okay.  Go ahead.

MS. HARRIS-LINDSEY:  I was done.

HEARING OFFICER BANKS:  You're

done?

MS. HARRIS-LINDSEY:  Yes.

HEARING OFFICER BANKS:  Is that

what you said?

MS. HARRIS-LINDSEY:  Yes.  I was

done.  Let me close it out.

HEARING OFFICER BANKS:  With

respect to the placement?

MS. HARRIS-LINDSEY:  It's a fail

to provide a program placement but the

allegation

HEARING OFFICER BANKS:  But

you're saying --

MS. HARRIS-LINDSEY:  One,

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

165

placement is not the issue.  The placement

is agreed upon, full-time out of general

education placement.  There is no allegation

in the complaint that Prospect could not

implement the IEP.  It seemed like the issue

that's in the complaint was that Mr. Murray

either didn't answer to the parent's

satisfaction the questions posed by the

parent and/or her advocate or to the parent.

But a prior notice was issued and it was to

a full-time program consistent with the

determination of the LEA and the parent that

the student required full-time placement --

excuse me full-time -- has a full-time

setting.  Full-time placement and DCPS

identified the setting, because the LEA

doesn't have the authority to move, to

commit SEA resources and move the child to

another program.

        HEARING OFFICER BANKS:  Okay.

Mr. Tyrka, your witness.

MR. TYRKA:  Sure.  And just so
we're clear, we have no claims regarding 05-
06, so that's what I wanted to clear up.  We
mentioned that in our facts but that's just
for background.  But other claim says
failure to provide an appropriate placement
since the start of the 06-07 school year.
And let's call Sharon Millis, please

We are on the record.  Mr. Banks
is the Hearing Officer. Ms. Harris-Lindsey
is the opposing counsel.  And are you all
set?  Okay.

HEARING OFFICER BANKS:  Ms.
Millis?

THE WITNESS:  Yes, sir.

HEARING OFFICER BANKS:  This is
Terry Banks, the Hearing Officer?

THE WITNESS:  Hi there.  How are
you?

HEARING OFFICER BANKS:  I'm fine
and you?  Happy New Year.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

167

THE WITNESS:  Thank you, sir.
Happy New Year to you, too.  I'm recovering
thank you.

HEARING OFFICER BANKS:  Okay.
I'm going to place you under oath.  You'll
be asked questions by Mr. Tyrka.  When he's
done, you'll be cross examined by Ms.
Harris-Lindsey.

THE WITNESS:  Okay.

HEARING OFFICER BANKS:  Would you
raise your right hand?

THE WITNESS:  I am doing that
now.

HEARING OFFICER BANKS:  Do you
swear or affirm the testimony you're about
to give will be the truth, the whole truth
and nothing but the truth?

THE WITNESS:  I do.

HEARING OFFICER BANKS:  Thank
you.  Go ahead, Mr. Tyrka.

MS. MILLIS

having been called as a witness by the

complainant and being first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MR. TYRKA:

    Q    Ms. Millis, could you tell us

what your occupation -- oh, first off,

relative to something the Hearing Officer

was saying a few minutes ago, Ms. Millis,

are you mobile right now?

    A    No.  I am not.  I am recovering

from a full left hip replacement, and I have

not been told by my orthopaedist that I can

get in my car and drive yet, so I'm sort of

stuck at home.

    Q    Can you tell us your occupation,

please?

    A    I am currently an independent

special education advocate and expert.

    Q    And for how long have you been

doing that?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

169

A     This is now my eighth year.

Q     And is J‾‾‾ R‾‾‾, one of

your clients?

A     Yes, she is.

Q     Do you recall meetings regarding

J‾‾‾ on August 3rd '06 and September 13th

'06?

A     Yes, I do.

Q     You participate in those

meetings?

A     Yes, I did.

Q     I'm going to turn your attention

to the September 13th meeting.

A     Okay.

MS. HARRIS-LINDSEY:  Can we --

I'm sorry.  Can we determine whether she's

looking at anything, has any documents in

front of her or anything?

MR. TYRKA:  Sure.

BY MR. TYRKA:

Q     Ms. Millis?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

170

A     Yes.

Q     Do you have documents there with you?

A     Yes, I do.

Q     What do you have with you?

A     I have the meeting notes from the August the 3rd meeting.  I have the meeting notes from the 13th of September meeting.  I have -- let me see what else do I have --

Q     Okay.  Well, I think probably opposing counsel concern is can you just assure us that during your testimony, you're testifying from your recollection and not from those notes unless you're directed to them?

A     Absolutely.

Q     So turning your attention to the September 13th meeting, do you recall that meeting?

A     Yes, I do.

Q     Can you tell us how -- well, I'm

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

171

interested in DCPS's participation in that

meeting.

    A    Okay.

    Q    Were evaluations reviewed at that

meeting?

    A    Yes.  There were evaluations that

were reviewed at that meeting.

        MS. HARRIS-LINDSEY:  Which

meeting?

        MR. TYRKA:  September 13th.

BY MR. TYRKA:

    Q    And was there a DCPS

representative present at the meeting or

were they --

    A    No.

    Q    -- by phone?

    A    The DCPS representative was not

present at the meeting.  The DCPS

representative was partially by phone, and I

say partially because he was not there at

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

172

the beginning of the meeting.  He was only

there for a very small portion of the

meeting.  Actually, the very end of the

meeting is when he was there.  And there was

phone trouble, so he faded in, he faded out,

we lost him.  We had to get him back again.

And there was really very little that he

participated in while the meeting was

occurring.

     Q    Now you're referring to he.  Is

that Evan Murray?

     A    Yes.

     Q    Now I want to direct your

attention to the notes, pages six and seven.

     A    Their notes.  Okay.  Hold on a

second.

     Q    Yes, their notes.  Thank you.

     A    Yes.

     Q    Now on top of page six, it says

Mr. Murray, the LEA rep, etcetera, etcetera,

and then on page seven, it talks about what

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        (202) 234-4433

173

Dr. Peterson was saying.

A       Okay.

Q       So Dr. Peterson is who?

A       Dr. Peterson is the Principal of Prospect Learning Center.

Q       Okay.   How did Dr. Peterson get involved in the meeting?

A       Well, eventually, DCPS made the proposal of Prospect Learning Center for placement for J███████, and the team was told to get Dr. Peterson on the telephone.

Q       Okay.   And so they ended up calling her?

A       Yes.

Q       Okay.

A       The team ended up -- well, actually Southeast Academy, that particular group of people ended up calling her, yes.

Q       Okay.   Now I'm going to take you back to how the meeting was conducted.   So was there any DCPS participation in the

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433       WASHINGTON, D.C.  20005-3701       (202) 234-4433

174

review of the evaluations?

A    No.

Q    Any DCPS participation in the
discussion of what J▇▇▇▇ needed?

A    Actually, I do not -- I -- he
didn't participate in the meeting, and by
the time he did get on the phone, I -- I
think it was at the very, very end of the
meeting and so there was very little that he
had been a part of regarding this particular
meeting.  And the reason that he really got
on the phone was to discuss the placement
issue and then make a proposal.

Q    Okay.  And he proposed Prospect?

A    Yes.

Q    Okay.  And we have some notes
here.  On page six of their notes, it
reviews what appears to be what Mr. Murray
had to say about Prospect?

A    That is not what Mr. Murray had
to say.  As a matter of fact, he didn't know

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

175

very much about Prospect at all.

Q     Okay.

A     His recommendation was to call
Dr. Peterson and have her discuss Prospect.

Q     So did he give any explanation
for the -- for DCPS's basis for proposing
Prospect then?

A     No.

Q     Okay.  All right.  So you said
the team called Dr. Peterson?

A     Correct.

Q     Okay.  And so then what we see
here in the second half of page six of their
notes --

A     Correct.

Q     -- and for the record, reflect my
disclosure, parent's disclosure number 11 --
on page six -- so this from Dr. Peterson?

A     Yes.

Q     Okay.  Now was Dr. Peterson's
participation limited in any way or --

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

176

A    Yes, it was.  Dr. Peterson ended up giving an overview of the school, and my concern was not just the school itself but how J█████ was appropriate for the school and how the determination that J█████ was accepted for the school had come about and whose class she was going to be in and the disability classifications of the students in that class and the credentials of the teacher in that class.  And I had quite a few questions to ask Dr. Peterson regarding how the appropriateness of J█████ for that particular setting had occurred.

Q    And did you ask those questions?

A    I was not able to ask any of those questions.

Q    Well, let me rephrase.  Did you try to ask those questions?

A    Yes, I did.

Q    And what occurred?

A    Dr. Peterson informed us that she

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

177

had a crisis situation with text books and
that she was in the middle of a book meeting
and that she was going to be unable to tell
us anything more than what had already been
noted on the meeting notes, and she was
sorry but she was unable to continue the
conversation.

Q    Now did -- if you know -- she
might not have said, but did she indicate in
any way whether she knew anything about
J███████ in particular?

A    No, she didn't.

Q    Now do you see on page -- I'm
going to refer you to page seven again of
their notes.

A    Okay.  I'm at page seven.

Q    It says,"Dr. Peterson, Principal,
has received the file and review the
folder".  Now did you ever have a discussion
with Dr. Peterson about that after this
meeting?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

178

A    Yes, I did.

Q    When did you have that discussion?

A    I discussed that with Dr. Peterson on the 22nd of November.

Q    And what was the context of that? Was that in person?

A    Yes.

Q    Okay.  And what did Dr. Peterson tell you that time?

A    Actually, what Dr. Peterson said was that she did not receive the information until after the start of school.  She didn't receive the file until after the start of school, because she had a list of students that she kept, and they were either students that had been referred or students that were pending placement.  And I asked her how she knew that, and she said, by the position of the student's name on the list.

Q    J███████ name?

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        (202) 234-4433

179

A     Right.  Exactly.  If she had been given the information earlier, she would have been further down on the list, so she did not receive the information until after the start of school.  I asked her does she -- did she know when she got the file, and she said she wasn't sure but it was after the start of school.  I asked her who provided the file.  She said she didn't know who gave her the file, and she was unable to tell me anything other than that.

Q     Now what was the context of that November 21st discussion?

A     Well, I had gone there in order to talk about the questions that I was unable to have answered when we were at the meeting.

Q     Gone to Prospect?

A     Right.  Exactly.  And I also wanted to take a look at the proposed classroom.  I wanted to talk to the teacher

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

180

and find out, you know, what her experience and what her background was, and I just wanted to make sure that related services were in place.

Q    So now did you make that request of Dr. Peterson at that time?

A    Yes, I did.

Q    And did she allow you to visit the classroom?

A    No, she did not.

Q    Did she allow you to --

HEARING OFFICER BANKS:  What date was that?

MR. TYRKA:  November 21st.  Is that correct, Ms. Millis?

THE WITNESS:  Twenty-second.

MR. TYRKA:  Twenty-second, excuse me.

BY MR. TYRKA:

Q    Did she allow you to check into the related services being provided at all?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

181

A      No, she did not.

Q      Were you able to even look around the school?

A      No.  I got as far as her office. I had a conversation with her, and I was told that's all that I was going to be allowed to do and that was that.

Q      Now we talked about what was said about Prospect at the September 13th meeting.

A      Yes.

Q      Did the team come to a conclusion about the appropriateness of Prospect either way?

A      No, they did not.

MR. TYRKA:  I have no further questions.

HEARING OFFICER BANKS:  Ms. Harris-Lindsey?

MS. HARRIS-LINDSEY:  Sure.

CROSS EXAMINATION

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

182

BY MS. HARRIS-LINDSEY:

    Q    Ms. Millis?

    A    Yes.

    Q    Let me ask you a question.  You say you're -- J███████ on your client list. How long have you been the advocate?

    A    For the Robinson family?

    Q    No, no, for J██████.

    A    For J██████, probably about a year.

    Q    Okay.  Now how familiar are you -- you're pretty familiar with Prospect --

    A    I'm very familiar with Prospect, yes.

    Q    Do you have other clients on your list that attend Prospect?

    A    I don't believe I have any that attend -- well, actually I do have one that attends Prospect.  Others have been referred to Prospect.

    Q    Okay.  I just want to go from the

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

183

most recent questions back.  You said you
went to the school on the 22nd.  Is that --
that's the 22nd of November?

    A    Yes.

    Q    That was the week of
Thanksgiving?

    A    I guess.  I don't know.

    Q    You indicated that -- was that
meeting scheduled?  Was it planned or did
you stop by?

    A    I had called and told the office
that I was going to be coming in, and no one
said don't so I did.

    Q    Okay.  Did you -- you said now
you called.  When did you call?

    A    I believe I called that Monday.

    Q    Okay.  So if I told you the 22nd
was the Wednesday before Thanksgiving, would
that sound familiar?

    A    I would have to look at my
calendar, but I don' know.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

184

Q      Okay.

HEARING OFFICER BANKS:  Let's
assume it is because I think it is.

MS. HARRIS-LINDSEY:  It's the --
right.  That's the -- just for Hearing
Officer, looking at my calendar, the 22nd is
the Wednesday before Thanksgiving.


BY MS. HARRIS-LINDSEY:

Q      Now you indicated -- you said you
called that Monday, the 20th?

A      Correct.

Q      And you spoke with whom?

A      I spoke with someone in the
office, let them know who I was, told them
that I was going to be coming by on
Wednesday to speak with Dr. Peterson and
hopefully to do some observation in the
classroom.

Q      Did you make a request or you
just told them you were coming by?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433     WASHINGTON, D.C.  20005-3701     (202) 234-4433

185

A      What I did was I said that I
would like to do that, if there was a
problem, if there were any questions or
concerns, that I would hope someone would
get back to me.  And I have known Dr.
Peterson and staff at Prospect for a very
long time, and no one ever got back to me
which is why I showed up on the 22nd.

Q      Was Dr. Peterson prepared for
your visit?

A      I'm not sure what you mean by
the.

Q      You said you called on Monday and
you went over -- you appeared on Wednesday.

A      Right.

Q      Was she -- did she -- was she
prepared for you?  Was she waiting for you?
Was she expecting your visit?

A      Well, that I don't even know
because I didn't ask her, but she had
J██████ file and she had information, so I

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

186

assumed someone had told her something.

Q    And what time was your visit?

A    I don't know.  I don't put the times down.  I just put the days.

Q    At the time that you came to the school, was school in session?

A    Yes.  I believe actually it was in the morning.  It was probably around 10 o'clock.

Q    Okay.  You indicate you've known Dr. Peterson and the staff very well?

A    Well, the office staff, yes.

Q    Office staff?

A    Yes.

Q    Now did Dr. Peterson tell you why you were not going to be allowed to walk through the building?

A    Dr. Peterson said it was before a holiday, although I have no idea what that has to do with anything.

Q    Did you ask her why?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

187

A    She said it's right before a
holiday.

Q    And there's no further inquiry by
you as to what that meant?

A    No, because I said, well, I still
would like to talk to the teacher.  I'd like
to observe the classroom.  She said, no, not
a good time.  This is right before a
holiday.

Q    Okay.  Did you -- now the request
that you made for this meeting, did you put
it in writing?

A    No, I did not.

Q    In a phone call?

A    I called.

Q    Do you normally make your
requests in writing?

A    No.  As a matter of fact, Dr.
Peterson has said on several occasions just
to call and let her know.

Q    Did Dr. Peterson tell you that

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        (202) 234-4433

188

they were -- that Prospect could not

implement the IEP?

    A    I don't even believe we discussed

that.

    Q    When you went to the school on

the 22nd, was Ms. Robinson with you?

    A    No, she wasn't.

    Q    How long was your visit?

    A    Probably about an hour since I

was limited in what I could do.

    Q    In a hour's time, you all never

discussed whether the school could implement

the services on her IEP?

    A    No.  I don't believe we did.  I

was really interested in how she had

obtained J█████████ package, when she had

obtained J█████████ package, who had reviewed

the package, who had made the determination

about the appropriateness, what class she

was going to be in, what the disabilities

were.  All the questions that I wanted to

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    (202) 234-4433

189

ask, those are the things that she and I

talked about.

Q     Now tell me what's -- you say

you're very familiar with Prospect.  What's

your understanding of Prospect?

A     My understanding of Prospect is

that it started out as a Center for Children

with Learning Disabilities.  However, now

they have branched out into other

disabilities which they may or may not be

able to address.  It's also on the No Child

Left Behind last for the last three years

which is of great concern to me.  And I

don't know whether the teachers really have

the background and the credentials to be

able to deal with all of the disability

classifications of the students who are

currently there.  J████ was more than

learning disabled, so that was of great

concern to me.

Q     Okay.  So you said your visit was

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

190

an hour.  Now you say you were concerned
about how Dr. Peterson received the
information?

A    Well, the team wrote down that
Dr. Peterson had the file and she was
already accepted.  So when I went, I asked
Dr. Peterson when she got the file and when
she was accepted.  And Dr. Peterson stated
that she had gotten the file after school
started, but she couldn't tell me when after
school started, and she couldn't tell me who
gave it to her or who it was provided to
her.  She couldn't give me any of that
information, so I don't know even know if
Dr. Peterson had the file when we had the
meeting.

Q    Now September 13th was after
school started.  Is that correct?

A    That's correct.

Q    Okay.  And you say when you went
there, Dr. Peterson did have the file in her

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        (202) 234-4433

191

possession or had it --

A    She did, right.

Q    -- or had a file with J███████

name on it?

A    She did have a file, that's

correct.

Q    Okay.  Did Dr. Peterson tell you

that J█████ had been accepted?

A    Dr. Peterson stated -- I'm going

to refer to my notes here, because I want to

get this exact.

Q    What notes are you referring to?

A    My notes for my visit there.

MS. HARRIS-LINDSEY:  Are those in

the record?

MR. TYRKA:  No.

MS. HARRIS-LINDSEY:  Hold on, Ms.

Millis.  If they're not in the record, I'm

going -- I think I'm going to have to object

to that.

MR. TYRKA:  Well, she's allowed

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    (202) 234-4433

192

to refresh her memory.  They don't have to
be admitted.

　　　　　HEARING OFFICER BANKS: Is there
anything that needs refreshing right now?

　　　　　MR. TYRKA:  My understanding is
that she said she couldn't remember the
answer to Ms. Harris-Lindsey's question
without checking her notes.

　　　　　HEARING OFFICER BANKS:  Well,
she's not here.  I'm not going to allow it.
BY MS. HARRIS-LINDSEY:

　　　Q　　And Ms. Millis, at the --

　　　A　　I'm sorry.  If you repeat the
question, then maybe I can do it without my
notes.

　　　Q　　I think the question I asked was
whether -- I forget my question.  I didn't
write it down.  Don't worry.  Just scratch
that, Ms. Millis.  The -- Dr. -- the
information -- you indicated that the
information on page six and seven of the MDT

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433　　　　WASHINGTON, D.C. 20005-3701　　　　(202) 234-4433

193

notes where the general information of

Prospect Learning Center?

    A    Right.

    Q    Was that --

    A    I mean that's --

    Q    Was that information -- hold on,

let me ask you the question first.

    A    Okay.

    Q    That -- was that information

provided by DCPS?

    A    No.  Dr. Peterson had to provide

that information.

    Q    Is Dr. Peterson employed by DCPS?

    A    Yes.

    Q    Okay.  So someone from DCPS

provided that information then, that

correct?

    A    Dr. Peterson did.  Yes, she did.

    Q    Okay.  And just bear with me.

I'm sorry.  I just want to make sure.  I

don't want to go outside what was asked on -

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

194

- in your hour long meeting, did you talk to

Dr. Peterson about evaluations?

    A    No, I didn't talk to her about

evaluations.

    Q    Did you talk about class size?

    A    Yes, I did.

    Q    And what information were you

provided about class size?

    A    Dr. Peterson stated that the

class that she probably would be in had nine

students currently, so she would be the

tenth.

    Q    Okay.  Did she talk about the

student's disabilities in that class?

    A    She said she thought that the

disability classifications were learning

disabilities and speech and language

impairment.

    Q    Okay.  Just a minute, Ms. Millis.

Just bear with me for a minute.

    A    Okay.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    (202) 234-4433

195

Q     Did you ask her about teacher qualification and certification at that time?

A     She said she didn't know.  She said she thought that the teacher was certified but she couldn't tell me about her specific qualifications.  She didn't have that information --

Q     Okay.

A     Which is one of the reasons why I wanted to talk with the teacher.

Q     Did you -- when you made your appointment to go to the school, did you tell her that's one of the issues you wanted to talk about?

A     Absolutely.  I said I wanted to speak with Dr. Peterson regarding the file. I wanted to do an observation of the school and speak with teachers and related service providers as well.  And that's usually what I end up doing when I come to the school

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

196

anyway.

Q    Okay.  Did you remember -- yes, I'm just going to ask you this one -- just one last time.  Do you remember who you scheduled that meeting with?  You said you're familiar with the folks in the office?

A    Right.  But I couldn't tell you by phone who it was and there are several people in the office.  They sort of -- I can tell you that it was not Mrs. Mingo (phonetic) who sometimes spends time in the office.  It was someone else, so I just don't know.

MS. HARRIS-LINDSEY:  Okay.  Thank you.  I have nothing further.

HEARING OFFICER BANKS:  Mr. Tyrka, redirect?

MR. TYRKA:  Yes.

REDIRECT EXAMINATION

BY MR. TYRKA:

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

197

Q    Was class size an issue.  Did the
team believe that class size was an issue
for J_____?

A    Yes.

Q    Do you recall any discussion of
class size and J_____ needs?

A    A very small structured setting
is what was required, and I think the
evaluation actually said five to six
students in the classroom.

Q    And --

A    Yes, five to six students, so she
needs a small classroom of five to six
students.

Q    And at the August and September
meetings, was there discussion of J_____
behavior as an issue in her education?

A    That was an ongoing discussion.
J_____ had had --

HEARING OFFICER BANKS:  Wait a
minute.  He asked you about a particular

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        (202) 234-4433

198

meeting and a particular discussion.

THE WITNESS:  Right.  Okay.  Yes,
behavior was a concern.  Behavior was a very
large concern.  Both the parent and I felt
as though she needed a therapeutic setting,
and she was not just learning disabled but
she was emotionally disturbed as well.  And
behavior was a concern with both the team
and with the parent and the advocate.

MR. TYRKA:  I have no further
questions.

HEARING OFFICER BANKS:  Okay.
Thank you very much.

THE WITNESS:  You're welcome.

HEARING OFFICER BANKS:  Okay.

MR. TYRKA:  I'd like to call
Karen Plowden from Rock Creek Academy.

(Whereupon, off the record
discussion.)

MR. TYRKA:  Okay.  We are on the
record right now.  Mr. Banks is the Hearing

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

199

Officer and Ms. Harris-Lindsey is opposing

counsel.  And I'm going to put you on

speaker phone.  Mr. Banks will swear you in.

        HEARING OFFICER BANKS:  Okay.

Ms. Plowden?

        THE WITNESS:  Yes.

        HEARING OFFICER BANKS:  Hi.  This

is Terry Banks, the Hearing Officer.

        THE WITNESS:  How are you?

        HEARING OFFICER BANKS:  Fine and

you?

        THE WITNESS:  Good.

        HEARING OFFICER BANKS:  Happy New

Year.

        THE WITNESS:  You too.

        HEARING OFFICER BANKS:  I'm going

to swear you in.

        THE WITNESS:  Yes.

        HEARING OFFICER BANKS:  You'll be

asked questions by Mr. Tyrka.  When he's

done, you'll be asked questions by Ms.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

200

Harris-Lindsey who's counsel for the school system.

THE WITNESS:  Okay.

HEARING OFFICER BANKS:  Would you raise your right hand.

THE WITNESS:  I am.

HEARING OFFICER BANKS:  Do you swear or affirm the testimony you're about to give will be the truth, the whole truth and nothing but the truth?

THE WITNESS:  Yes, I do.

HEARING OFFICER BANKS:  Thank you.  Go ahead, Mr. Tyrka.

KAREN PLOWDEN

having been called as a witness by the complainant and being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. TYRKA:

Q    Ms. Plowden, can you tell us what your occupation is, please?

A    Sure.  I am currently the
Executive Director of Student Services at
Rock Creek Academy.

Q    And is it part of your duties
there to be familiar with Rock Creek's
programs and services?

A    Yes, it is.

Q    Is it part of your duties to
participate in acceptance decisions at Rock
Creek?

A    Yes, it is.

Q    Are you familiar with J█████
R████████?

A    Yes, I am.

Q    Has Rock Creek agreed to accept
her pending placements and funding?

A    Yes, we did.

Q    Can you tell us what documents
you've reviewed relative to or regarding
J████████?

A    Sure.  I've reviewed several.  I

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433      WASHINGTON, D.C.  20005-3701      (202) 234-4433

202

reviewed an adaptive evaluation, a speech
and language assessment, psychoeducational
assessment, an ADHD screening assessment, a
clinical evaluation.  There was like two of
those.  There was a psychological evaluation
and occupational therapy evaluation.  I also
reviewed an IEP from August 3rd, 2006 as
well as some meeting notes and
correspondence regarding that.

      HEARING OFFICER BANKS:  Wait a
minute.  Let me slow down.  You --

      THE WITNESS:  Sure.  Am I going
too fast?

      HEARING OFFICER BANKS:  Well, I
wasn't expecting quite that many
evaluations.

      THE WITNESS:  It was a lot of
records.

      HEARING OFFICER BANKS:  ADHD
screening, a clinical?

      THE WITNESS:  A clinical.

There's another psychological which included

a C-TONY.  That was from June of '06.

HEARING OFFICER BANKS:  Okay.

THE WITNESS:  An occupational

therapy evaluation.

HEARING OFFICER BANKS:  Right.

THE WITNESS:  And then the IEP

dated August 3rd, 2006.

HEARING OFFICER BANKS:  Okay.

THE WITNESS:  There were also

meeting notes.  I think they were prior to

that, June of '06.

HEARING OFFICER BANKS:  Okay.

BY MR. TYRKA:

Q    And do you have the meeting notes

from August '06 as well?

A    Yes, I do.  Yes.

Q    Now I'm not asking for your

opinion, but I'm asking for how Rock Creek

is regarding J▮▮▮▮▮?  What is your

understanding of her special education

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          (202) 234-4433

204

needs?

A      My current understanding based on
the IEP that I reviewed is that she's
identified as a student with a learning
disability requiring specialized
instruction, occupational therapy, speech
and language therapy and counseling services
(inaudible) on that IEP.   In addition, there
are some additional reports that appear to
be warranted based on those meeting notes.
They include clinical -- additional clinical
data, consideration of the behavior
intervention plan, and there was something
else I think they were waiting for.   Well,
let's see --

          MS. HARRIS-LINDSEY:   Can you ask
what she's referring to?

          THE WITNESS:   -- clinical
evaluation to be updated and (inaudible) --

          MR. TYRKA:   Ms. Plowden, can you
stop for a second.   Opposing counsel was

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          (202) 234-4433

205

asking if -- if you could identify what
you're referring to as you answer the
question.

THE WITNESS:  I was referring to
the services listed on the IEP dated August
3rd, 2006 as well as the recommendations
made by that team in the meeting notes.

MS. HARRIS-LINDSEY:  Is the IEP -
-

THE WITNESS:  And then any other
information I may have gleaned from the
evaluations that I received.

MS. HARRIS-LINDSEY:  I have an
objection.

HEARING OFFICER BANKS:  What's
the objection.

MS. HARRIS-LINDSEY:  Counselor is
-- the witness is referring to documents not
in the record.  The IEP isn't in the record.

MR. TYRKA:  I'm only asking for
her understanding.  I'm not asking or her to

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        (202) 234-4433

206

testify as what anything contains.

        HEARING OFFICER BANKS:  Well, Ms.
Plowden, please don't refer to any notes
while you're testifying --

        THE WITNESS:  Oh, okay --

        HEARING OFFICER BANKS:  -- or any
of the documents.

        THE WITNESS:  Okay.  Can I refer
to the IEP but just not the notes?  Is that
correct?

        HEARING OFFICER BANKS:  Well,
let's do it from memory, because I don't
even have the IEP.

        THE WITNESS:  Oh, okay.

BY MR. TYRKA:

    Q    Have you identified a class for
J███████?

    A    Yes, there are two potential
classrooms for her.  In addition, we are
opening a third classroom in which we will
hire a separate staff member.  But there are

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    (202) 234-4433

207

currently Ms. Wersham (phonetic) and Ms.

Wilcox.  Based on her age, those are both of

our third grade classrooms.

Q    Could you tell us their

qualifications?

A    Yes.  Those teachers are licensed

special education teachers and they both

actually hold a master's degree in special

education.

Q    Okay.  And can you tell us about

the class size of those classes?

A    Those classes currently have six

students in the classroom.

Q    Okay.  And what is Rock Creek's

class size limit I guess I'll say?

A    We usually -- we maintain a six

to one classroom ration which is why I

indicated we will be hiring a third

classroom teacher to maintain that ratio.

Q    Okay.  And that hiring, is that

something that's already in progress?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        (202) 234-4433

208

A     It's already in progress,

correct.

Q     So it's not particular to

J██████? That was --

A     No.  We are recruiting and

interviewing currently.

Q     Okay.  And in your recruitment,

do you look for similarly qualified teachers

to the ones you listed?

A     We will only hire -- yes, someone

who's a licensed special education teacher.

Q     Okay.  Can you tell me the

disabilities of the children in those

classes?  You don't have to itemize each one

--

A     But there's --

Q     -- but if you could tell me the -

-

A     Yes.  I mean most of those

students are primarily students with

multiple disabilities, so that's any

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

209

combination of learning disabilities,
emotional disabilities, other health
impairments such as ADHD.

Q    Okay.  And is Rock Creek a
therapeutic placement as you understand that
term?

A    Yes, we are.

Q    And can you tell me what that
means?

A    We provide crisis intervention
services as well as related services,
psychological counseling.  We have a staff
of clinical psychologists who are able to
also respond to any clinical issues.  We
provide small structured services,
instructional services and, as I said,
maintain a six to one classroom ratio so
there's a lot of individualized attention.
Modifications and accommodations can be made
for the individual students.

Q    And is there a behavior

modification -- well, is there a general

behavior modification program in place at

Rock Creek?

    A    Yes.  There's a school wide

behavior modification program for all of our

students, and that program is also

individualized per student, so we use a

point sheet and a level system which is

basically a positive reinforcement program

for our students where we're constantly

reinforcing the positive and proactive

behaviors of our students.

    Q    And you said that's personalized?

That's something that can be personalized to

J███████ once she has an FBA and a BIP?

    A    Yes.  And then every student has

an individual behavior goal that they're

working on as part of the point sheet

system, so that's reinforced daily in all of

their classes, and they're earning points as

they meet those goals and expectations of

their individual goals.

Q      What about related services?  Can Rock Creek provide occupational therapy?

A      Yes, we can.

Q      And what about speech and language services?

A      Yes, we can.

Q      And counseling?

A      Yes, we can.

Q      And are your providers all licensed?

A      Yes, they are.

Q      Give me just a minute.  Now based on your understanding of J█████████ needs as you discussed them and your understanding of Rock Creek's programs and services, do you know of any reason why Rock Creek cannot provide her with educational benefit?

A      No, I do not.

MR. TYRKA:  I have no further questions.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

212

HEARING OFFICER BANKS:  Ms.

Harris-Lindsey?


MS. HARRIS-LINDSEY:  Yes.

CROSS EXAMINATION

BY MS. HARRIS-LINDSEY:

Q    Ms. Plowden, hi.  I just have a -

-

A    Good, how are you?

Q    Good.  I have a few questions for

you.

A    Okay.

Q    What is the scope of Rock

Creek's, I guess, authority over students

when they're enrolled in your school?  If

they need an evaluation, do you do the

evaluations or do you request DCPS do them?

A    We actually do them on behalf of

DCPS.  It depends on the type of evaluation.

There are very few that we don't do such as

a neurological evaluation.  But for the most

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          (202) 234-4433

213

part, we conduct our assessments on site,

and we do that free of charge.  It's a

service that we provide for our students,

and it's an agreement we have with DCPS.

Q     And what about holding meetings

to review?

A     We can also schedule meetings.

We do that in accordance with -- Sherry Wall

(phonetic) is our placement specialist, so

we will send out -- usually what we do is 30

days after a student starts, we will hold a

30 day review.  If there are (inaudible)

issues or any other issues that have been

unaddressed, we can do that at that time.

So it -- the meeting is scheduled with the

student's representative, parent and DC

Public Schools.

Q     Have there been times that your

schedule has been able to coordinate with

your monitor?

A     Yes.  This particular school

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433      WASHINGTON, D.C.  20005-3701      (202) 234-4433

214

year, she has been assigned to do some audit

work, so she wasn't available but had been

made aware of all the meetings, and we had

tried, you know, get -- been given

authorization to go forward just depending

on what the issues are.  But Ms. Wall is now

back with us and is available for meetings.

Q    Okay.  So you say you're

authorized to move forward without --

A    Yes.  I mean to -- well, to the

extent to which we can.  There are some

issues where DCPS is not -- obviously, we

can't make decisions regarding compensatory

education, permanent placement decisions,

anything to that nature.  But in our

correspondence with DC Public Schools,

they've allowed us to update IEPs, review

assessments if the appropriate staff are

there and so forth.

Q    You say -- what's the -- what'd

you say?  You said update IEPs and what

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

215

about assessments?

A     Review assessments --

Q     Review assess --

A     -- if the appropriate providers
are there to review the assessments, we will
do that.  We will update the IEP
accordingly.

Q     Okay.

A     So we move forward as much as we
can if the DCPS person is not available, but
then we have to reconvene with their
attendance.

Q     Okay.  And you have students -- I
think the program, the classroom you've
identified for J█████, you said those
students are LD, ED and OHI?

A     Right?  They're predominantly
students that are listed as multiply
disabled, and so it's any combination of --
those are the three disability
classifications at --

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

216

Q    What is the predominant disability that your school services?

A    Multiply disabled.

Q    Of those -- of the disabilities in that multiple disability, is it -- is the primary -- is the prominent or predominant disability emotional disturbance?

A    Primary or secondary.  Learning disabled is also -- we have a high percentage of students with learning disabilities.  And I would say that probably the third would be other health impairment such as ADHD.

Q    Okay.

A    We also do service students with speech and language impairment, mild mental retardation.  There's a few other outliers like disability classification subgroups that we service as well.

Q    Okay.  And how many -- you have a speech pathologist on site?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          (202) 234-4433

217

A    Yes, we do, full-time providers.

Q    How many?

A    There's -- currently I believe we have four, three that are full-time, one that is four days a week.  That's correct.

Q    Okay.  And bear with me one minute.  When was the acceptance decision made for J██████?

A    September, I believe, and we forwarded those records -- yes, September 8th was the letter of acceptance.  And then we also forward a copy to the Office of Special Education, so that was also dated September 8th.

MR. TYRKA:  It's in the record by the way, our Number 15.

BY MS. HARRIS-LINDSEY:

Q    Now your -- what are the ages of your students?

A    The students are all born in the same year in that -- in those two

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

218

classrooms.

Q    Well, yes, in that classroom.
You say all in the same year?

A    Yes, so they're all within months
of each other born in '98.

Q    Okay.  And all your students, are
they all in the same building or is it
divided up now?

A    They are in the same building,
but the programs are separated so the
students are not all interacting.  We have a
program -- the program that J██████ will be
part of is K through 6.  So in that program,
there is currently 52 students.

Q    Okay.  And they're located on a
different level?

A    They're located on different
floors, correct.

Q    Okay.

HEARING OFFICER BANKS:  Did you
say K through six?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433         WASHINGTON, D.C.  20005-3701         (202) 234-4433

219

THE WITNESS:  Yes.  That program

is a K through six program and our current

enrollment is 52 students --

MS. HARRIS-LINDSEY:  What's your

--

THE WITNESS:  -- range K through

six.

BY MS. HARRIS-LINDSEY:

Q    Okay.  Do you have a maximum that

you can take at that level?

A    At that level?

Q    Yes.

A    Well, with adding the new

teacher, yes, it would be --

Q    Well, let's go with present, not

prospective.

A    Sixty students.

Q    You say how many?

A    Sixty.

Q    Sixty?

A    Right.  But as I said, we are

hiring a new teacher so that would be 66.

MS. HARRIS-LINDSEY:  Okay.  I don't have anything further.  Thank you.

THE WITNESS:  You're welcome.

MR. TYRKA:  Nothing further.

HEARING OFFICER BANKS:  Any redirect?

MR. TYRKA:  No, thank you.

HEARING OFFICER BANKS:  Okay. Thank you very much.

THE WITNESS:  You're welcome. Have a great day.

HEARING OFFICER BANKS:  You, too.

THE WITNESS:  Okay.  Bye-bye.

HEARING OFFICER BANKS:  Do you have another witness?

MR. TYRKA:  No other witnesses.

HEARING OFFICER BANKS:  How many witnesses do you have?

MS. HARRIS-LINDSEY:  One.

HEARING OFFICER BANKS:  Who's

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

221

that?

      MS. HARRIS-LINDSEY:  Evan Murray.

      HEARING OFFICER BANKS:  Five minute break.  I'll be right back.

      (End of tape 4.)

      (Whereupon, a brief recess was taken.)

          EVAN MURRAY

having been called as a witness by the respondent, DCPS, and being first duly sworn, testified as follows:

      (Beginning of Tape 3.)

      THE WITNESS:  I am a Placement Specialist Monitor with the Office of Special Education.

         DIRECT EXAMINATION

BY MS. HARRIS-LINDSEY:

    Q    Okay.  Can you give me a brief overview of your education and employment experience including your -- any degrees and certification.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433     WASHINGTON, D.C.  20005-3701     (202) 234-4433

222

A     Okay.  I have a master's in
teaching and in special education, certified
in secondary education and special ed.  I've
taught for -- since 1992.  I've worked in
New York City, and I've worked in Baltimore,
and I work in the District of Columbia.
I've been in my position currently since May
31st of 2006.  Prior to that, I was a
transition specialist for the District of
Columbia Public Schools.

Q     Okay.  Now what -- and Mr.
Murray, what schools do you monitor in your
-- can you tell us what your duties and
responsibilities are as a placement
specialist monitor.

A     Okay.  I have several schools.  I
have schools that DCPS is the LEA and I have
schools that they're own LEA.  Some of my
duties that I have to do is I have to
monitor the IEPs to ensure the current IEP -
- I'm sorry, I'm in an area where it's

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

223

noisy, so I apologize -- I have to make sure

the IEP is current and I also have to

determine to see if evaluations were done if

they were requested, then to ensure that the

evaluations are done.  I sit in IEP meetings

whether it's to discuss eligibility, whether

it's to review evaluations.  I also sit in

resolution meetings where we are trying to

resolve a complaint.  I also -- the schools

that service -- the schools that DCPS

service, the LEA, they -- we are required to

provide all of their related service

requests meaning like the evaluations,

whether it's -- they use psychological or

clinical OT.  So when -- if it comes to the

charter school, that's an LEA, and they send

it to me, then it's my job to ensure that

the appropriate people get the evaluations.

So my -- those are some of the duties I am

responsible for doing.  I have -- City Life

is one of my schools, Eagle Academy, all the

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        (202) 234-4433

224

KIPPs, Marshall, Tri-Community, Washington,
all the Washington Academies that's in my
jurisdiction.

Q    Okay.  Mr. Murray, just for
clarification, when you're talking about
schools that are the LEA and non-LEA, what
type of schools are you referring to?

A    Schools that are not the LEA?

Q    Why type of schools are you
referring -- are you referring to charter
schools?

A    Charter schools, yes, ma'am.

Q    Okay.  Just for the record so we
want to have that clear.  Now when -- how is
this -- how is the process different from a
school -- well, you indicated non-LEA versus
the LEA, when an LEA -- well, how do you
become involved when an LEA has a student
and they need help?

A    A school that's their own LEA?

Q    Yes.

A      It is an agreement with the --
because, I guess, the student is a DCPS
student, when a school realizes that they no
longer can service the student's needs
because they can't meet the IEP, then they
send me a packet of the student's current, I
guess, the IEP that they determined that
they cannot meet the student's needs with
the evaluations.  And then as I get it, I
look in -- in the packet, there has to be
some discussion about placement.  I won't
consider placement unless there is some
discussion about placement and the end of
the files list -- there's some forms that,
you know, things have to be in the packet.
Certain interventions have to be in the
packet.  Evaluations have to be in the
packet as well as the IEP. And one of the
things that we require, you know, just to
have and we can get both of the IEPs because
in some cases, they might not have an IEP.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

226

You know?  So we just want to get as much

information on the kid as possible since I·

don't physically deal with the kid, I want

to at least get as much information as

possible.

      Q    Okay.  Are you familiar with

J██████, R████████?

      A    No.  Other than just the

information that was submitted to me by Mr.

Walker, the Special Ed Coordinator at

Friendship Edison Southeast.

      Q    Okay.  Do you recall or can you

tell us when -- around what time you receive

information from Friendship Edison?

      A    They sent me a packet in mid

August, and when I got the packet, then I

had to identify some settings, the

appropriate settings to at least see that if

DCPS could actually meet the student's

needs.  So in mid August, I think, is when

and I got the information.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

227

Q    Now are you responsible for convening meetings after you've been put on -- after you've been contacted by the LEA charter school?

A    I'm responsible convening a placement meeting but not -- I'm not re-- I'm responsible for having -- doing the placement meeting, yes, but not -- but in this -- in this particular case, I believe that there was still some other -- this was not just a placement meeting.  They -- they were still reviewing --

MR. TYRKA:  Object. Nonresponsive.

THE WITNESS:  -- I think an eval or two.  I came in towards the end of the meeting, not the beginning of the -- I mean I was in there for the meeting, but I wasn't needed to participate until the end of the meeting.

MS. HARRIS-LINDSEY:  Okay.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

228

MR. TYRKA:  Withdraw my

attention.

BY MS. HARRIS-LINDSEY:

    Q    Mr. Murray, I'm just going to ask

you -- there is background noise --

    A    I'm sorry.

    Q    I'm sorry.  No --

    A    I'm -- I'll try to find another

place.  Hold on for a second.  People are

very noisy around here.  Let me just find

something.  I'll slip in this office here.

    Q    That's fine.

    A    Okay.  I'm in an office no one is

in.

    Q    Okay.  Thank you.  Mr. Murray,

just for the record, can you -- is there a

reason why you can't be here today?

    A    Because I actually had prior -- I

had some other plans, some other engagements

so I was not feasible nor I don't -- I

wouldn't have -- I couldn't have committed

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

229

because I had something already scheduled,
and I actually had to leave my meeting to
come to this.

Q     Okay.  That's fine.  Now you
indicated that you received a packet from
Friendship Edison in mid August?

A     Yes, ma'am.

Q     And then you were a part of the
placement part of the meeting?

A     Yes.

Q     Okay.  Now tell me, what's the
process or what steps did you take once you
received notice form Friendship Edison that
they needed assistance and a meeting --
placement meeting needed to be held?

A     Well, when I get the -- when I
get the packet, I -- I check inside it to
make sure that, you know, I have a current
IEP, the IEP is --

MR. TYRKA:  Wait a minute.  I
heard the question as being what steps were

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

230

taken in this case.  It sounds like he was

talking about general procedure.

THE WITNESS: Is it?

HEARING OFFICER BANKS:   Hearing

your objection --

MR. TYRKA:  If he's -- well,

nonresponsive but also, if he's testifying

to his general procedure, I'd say

irrelevant.  He must talk about what

happened in this case then.

HEARING OFFICER BANKS:

Overruled.  Go ahead.

MS. HARRIS-LINDSEY:  Go ahead --

HEARING OFFICER BANKS:  Go ahead.

THE WITNESS:  So you want me to

discuss what happened in this case?

MS. HARRIS-LINDSEY:  That's fine.

Just continue what you were going to say.

THE WITNESS:  Okay.  When I

received the packet from the Special Ed

Coordinator, I reviewed it to make sure that

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

231

everything was in the packet so I -- so
there would not be any concerns or questions
whether, you know, the packet is
appropriate.  Once I noticed that the --
once the packet was appropriate, then I
researched the schools that are in the
district that can actually meet -- or to
research the appropriate setting that can
meet J█████ needs, and we were able to
target one particular -- we were able to
target a school.

BY MS. HARRIS-LINDSEY:

        Q       And what school were you able to
identify?

        A       That was Prospect Learning
Center.  And then -- but let me just say
this -- when I identified the setting, I
then take the packet over to the school
prior to having the placement meeting, so if
the -- if I got the package on 8/18 and I
knew that my meeting was scheduled for 9/3,

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433      WASHINGTON, D.C.  20005-3701      (202) 234-4433

232

between 8/18 and once the packet was

approved, I would physically take the packet

over to the school to Dr. Peterson who is

the principal at the school and then she

would, you know, meet with all of her

service providers and, you know, --

        MR. TYRKA:  I'm going to object

on this --

        THE WITNESS:  -- but, of course,

here's --

        HEARING OFFICER BANKS:  You get

to cross examine him, okay.

        MS. HARRIS-LINDSEY:  I asked the

process.

        MR. TYRKA:  Is that --

        HEARING OFFICER BANKS:

(Inaudible/crosstalk.)

        MR. TYRKA:  -- is that that

question?

        MS. HARRIS-LINDSEY:  (Inaudible)

the process.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

233

HEARING OFFICER BANKS:  -- what he did in this case.

MR. TYRKA:  I don't -- I think he veered into -- he started saying she would do this and I would do this.

HEARING OFFICER BANKS: Overruled.  Cross examine him.

BY MS. HARRIS-LINDSEY:

Q      Okay.  You indicate you physically took the packages down to Peterson.

A      Take the packet over to the school and then the appropriate individuals would review the packet to see that if it's also appropriate setting and which they did. And then I notified the Special Ed Coordinator at Friendship Edison of possible three dates to have the meeting.  And we, you know, coordinated with the parent and, I guess, the advocate of the appropriate date,

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

234

and that's how we came to the date and the selection was made.

Q    Okay.  Now at the meeting, what was the extent of your participation in the meeting?

A    Just that I have -- when it was my part, I asked a certain amount of questions.  We have to go on record to make sure that everything is being considered, and I -- DCPS -- I guess after I described the program and whether I described, you know, the location, who were the contract people, what services they provide, what disabilities they service, I went through that whole piece.  And I asked them about, you know, their schools of interest as well, and we record all that information.  Then I -- after that, I issue prior notice to the placement.

Q    Okay.  Now were there questions asked that you were not able to answer?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C. 20005-3701        (202) 234-4433

235

A    I think there -- I can't remember
verbatim.  I think at one point there was
maybe a question, and I offered that I -- if
I could not answer the question, they are
welcome to contact Ms. Peterson.  And
apparently Ms. Peterson was not available, I
think, when they had called.  I'm not sure
but I -- you know what they questioned was
not -- it was an cadre of questions, because
I -- I'm sorry --

Q    No.  That's fine.  Has there been
any follow-up with you about J███████
attending Prospect after that meeting?

A    Not at all.  I have not heard
anything from the parent nor have I heard
from the Special Ed Coordinator at
Friendship Edison Southeast, so this is
actually the first time since that meeting.

Q    Okay.  Just -- I want to go back
and clarify a couple of things, Mr. Murray.
Would you participate in an LEA school, in

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

236

this type of school where they're their own

LEA, would you participate in meetings where

they're talking -- where they're discussing

evaluations or reviewing evaluations?

A       No.  They're not -- they don't --

usually, they don't invite us.  They don't

invite DCPS until, I guess, they realize

that it -- (inaudible) -- no.  To answer the

question, no.  DCPS is not invited until

they recognize that their setting is not

appropriate.  Now I call school setting,

because that's what they really are,

settings, the appropriate setting the meet

the student's needs.  So until that setting

can no longer provide the services for their

students, then now DCPS is involved.  I'm

not involved at all in any other prior

meetings.

MS. HARRIS-LINDSEY:  Okay.  Thank

you.  Now I have nothing further.  I'll turn

you over to the Hearing Officer for further

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        (202) 234-4433

237

direction.

        HEARING OFFICER BANKS:  Mr.

Tyrka's going to cross examine.  Mr. Tyrka?

        CROSS EXAMINATION

BY MR. TYRKA:

    Q    Mr. Murray, hi.  Can you hear me

okay?

    A    Yes, sir.

    Q    Okay.  Please let me know if you

can't hear me because I'm across the tables

talking to the phone.  The packet that you

said you got from Friendship, did that

contain the August '06 meeting notes?

    A    Excuse me?

    Q    Did it contain the August '06

meeting notes?

    A    I don't -- I can't -- you want me

to open up the file?

    Q    August 3rd '06?  Does that --

    A    August 3rd?  It was an August

meeting.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

238

Q    Well, you were aware --

MS. HARRIS-LINDSEY:  Do you want him to refer to the file?

MR. TYRKA:  Yes.  Yes, you may.

THE WITNESS:  Okay.  Yes.  I got the -- let me see -- the August 3rd was the actual -- the meeting where they determined that -- let me see -- August 3rd, yes, sir.

BY MR. TYRKA:

Q    Okay. Now on direct you said that you do not participate -- when you go to these meetings like this one on September 13th for J████████, you don't participate in the portion of the meeting that deals with evaluations, correct?


A    I said I don't participate in schools that they're own LEA.  I traditionally do not participate until they realize at the meetings are not -- unless they realize that they can no longer meet

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

239

the students needs.  So I -- like I wasn't

at that meeting to answer that question.

Q    Right.  You were at that meeting

to present Prospect as DCPS's proposal,

correct?

A    Not -- not at the 9 -- the 9 --

Q    On September 13th --

A    -- (inaudible).  Yes.

Q    Right.  You were there --

A    Yes.

Q    -- to present Prospect as a

proposed placement, correct?

A    Yes, sir.

Q    Okay.  So you weren't there to

review --

HEARING OFFICER BANKS:  Now wait

a minute.  You all are talking passed one

another.  I think what he's saying was he

wasn't at the August 3rd meeting because

they had not yet determined that they

couldn't meet the need.  He was at the 9/13

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433              WASHINGTON, D.C.  20005-3701          (202) 234-4433

240

meeting because placement was going to be an
issue.  Is that correct?

       THE WITNESS:  Yes, sir.

       MR. TYRKA:  Okay.

       HEARING OFFICER BANKS:  Okay.

BY MR. TYRKA:

    Q    You were at that September 13th
meeting in order to present DCPS's placement
of Prospect, correct?

    A    Yes, sir.

    Q    Okay.  So you were -- my
understanding from your questioning on
direct is that your -- the purpose of you
participating in that September 13th meeting
was not to hear discussion of the
evaluations or of J█████ needs.  Is that
correct?

    A    Well -- but, you know, to answer
your question, I was there to discuss
placement but for the record, there
oftentimes at some of these meetings, these

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433      WASHINGTON, D.C.  20005-3701      (202) 234-4433

241

things do come up.  So I mean I've been to

meetings where psychologists and other folks

have gone over evals, and I have had

questions in my meetings when I do place,

especially if the school is the own LEA, I

have -- sometimes I have questions about the

assessment and the differences of the

categories.  They sometimes will change --

at the meeting that I'm not at -- I don't

attend, the disability is one thing, and

then the meeting I am attending, after I get

the packet, they'll change the disability.

So, you know, they're -- I don't want to go

on record saying that I don't listen to

those types of meetings because I do hear,

psychologists will talk at placement

meetings.  I've been at numerous placement

meetings where psychologists have talked.

Q    Okay.  But in this case, you

didn't participate in a review of

evaluations or discussion of her needs,

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433         WASHINGTON, D.C.  20005-3701         (202) 234-4433

242

correct, September 13th?

    A    The meet -- it was a -- that was the first part of the meeting.

    Q    I'm sorry, that was what?

    A    The -- they talked about the -- in the (inaudible) -- I guess it was two parts of a meeting.

    Q    Right.  And you're saying the first part is when they talked about he evaluations and her needs?

    A    Yes.

    Q    And you were not -- you did not participate in that part, correct?

    A    No, I did not.

    Q    Okay.  So you went through your procedure once you get the packet and what you did in this case when you got that packet in mid August from Friendship?

    A    Yes.  You want me to go back over the --

    Q    No, no.  I just have a few

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

243

questions about what you said.  You said

that you took the packet and you brought it

-- you did a search for a school?

     A    I identified a setting.

     Q    Now can you tell me a little bit

more about that process?  I mean did you do

that personally.  Did you send that to -- do

you know what a -- have you heard the time

site review committee?

     A    I've heard that, yes.  Because I

am site review.  I determine the appropriate

site --

     Q    Okay.

     A    (inaudible)

     Q    So you did the determination on

your own?

     A    -- (inaudible) -- the disability

-- what school I pick would be appropriate.

     Q    So you do that determination on

your own?

     A    Yes.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    (202) 234-4433

244

Q    Okay.  And when you went to the meeting on September 13th, the only option on the table from DCPS's perspective was Prospect, correct?

A    Yes, because the -- you know, the law said that if there's a school that could meet the needs of the student, you know, and I found one.  Then we offer it.  Prospect and the principal wasn't just -- let me just say for the record -- for site review, I guess one would consider Ms. -- Dr. Peterson being a part of that process because after I identified, as I said, I had to ensure that that was appropriate with her as well.  And Dr. Peterson also reviewed it as well.

Q    Okay.  So you determined on your own and then --

A    (Inaudible) --

Q    -- and then you ran it by Dr. Peterson?

A    Yes.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

245

Q     Okay.  And that was the only option available on September 13th?

A     Yes, it was.

MR. TYRKA:  I have no further questions.

HEARING OFFICER BANKS:  Ms. Harris-Lindsey, do you have any redirect?

MS. HARRIS-LINDSEY:  No.  I have none.

HEARING OFFICER BANKS:  Okay. You were about to say something and stopped. This is the Hearing Officer.

THE WITNESS:  Yes, sir.

HEARING OFFICER BANKS:  Okay. You said that with this particular placement, you conducted the site review and you determined PLC was the appropriate placement.  And then I think Mr. Tyrka asked whether or not that was the only option, and you said something about the law says.  I'd like you to finish that thought.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

246

THE WITNESS:  It's just DC law says that DCPS, if they -- if DCPS can offer -- if a school can meet the needs of the student, then we have to offer placement at that particular school, so I -- and in my research I noticed that I identified Prospect as a school that could meet -- that that's the appropriate setting, and that's what I did.  I would not want to place a kid somewhere and the school cannot meet that child's needs.  You know?  I would feel -- I would think that be a professional mistake.

HEARING OFFICER BANKS:  Okay.  So your understanding of the law is that if you can identify a school that meets the child's needs, you have to offer that school and that school alone?

THE WITNESS:  No, no, no, no. Not that school alone but I would offer that school.  If there's a school that can meet the child's needs, I would believe that I'm

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433                WASHINGTON, D.C.  20005-3701                (202) 234-4433

247

supposed to offer the school.

HEARING OFFICER BANKS:  Okay.

Suppose there's 10 schools that meets the

child's needs, would you put 10 schools on

the table?

THE WITNESS:  I guess I would or

two -- usually -- just might be two.  I

don't -- I haven't been in an environment

where there's been ten schools that can meet

one child's needs.  Traditionally, it might

be one or two, so I would issue those two

schools.  I would put those two schools on

the table and then, you know, it would be a

decision that the parent and the team would

have to make to determine whether, you know,

that's the school they want to choose.  Then

very rare that at my placement meetings that

everyone agrees with everything.

HEARING OFFICER BANKS:  Well,

this child -- what's this child's -- the

classification?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

248

THE WITNESS:  LD, learning
disability.

HEARING OFFICER BANKS:  Okay.  So
this child is LD.  There certainly are a
large number of schools -- are there a large
number of schools in DC that handle LD
student?

THE WITNESS:  They do but also
there was concerns about the student -- I
think there was a ADH -- there was a issue
about ADHD also.  There was a concern.  I
think it's stated in the notes.  And
Prospect would be a school that could meet
their needs because they do ADHD.  They have
a component that deals with ADHD as well.  I
think the main thing is that you want to
match everything, not just because you have
-- and I -- my opinion now is that you would
want to put the kids in the appropriate
setting.  And the student had -- there was
some concern about ADHD, some concerns about

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

249

the learning disability, so you want to put

the child in appropriate setting.

HEARING OFFICER BANKS:  Okay.  I

was just wondering why PLC is the only

school in DC that's appropriate for this

child?

THE WITNESS:  I understand.

HEARING OFFICER BANKS:  And

you're saying that because of the ADHD

component and a concern about the child's

ADHD that you believe Prospect was uniquely

suited to meet her needs?

THE WITNESS:  Yes.  And I offered

to the parent -- the parent and the advocate

stated that they were going to visit the

school.  I don't know whether they did that

or not, so usually, traditionally, you know,

and then get back, which I hadn't gotten

that information, but I think that that

would have been the appropriate -- yes, sir.

I'll go on record for that.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

250

HEARING OFFICER BANKS:  Okay.

Anything else from either counsel?

MR. TYRKA:   Nothing from me.

HEARING OFFICER BANKS:  Okay.

Thank you very much.  Thank you.

THE WITNESS:  Thank you, sir.

Have a good day.

MS. HARRIS-LINDSEY:  Okay.  Evan?

Okay.

HEARING OFFICER BANKS:  You have

another witness?

MS. HARRIS-LINDSEY:  No.  DCPS

rests.

MR. TYRKA:  I have nothing on

rebuttal.

HEARING OFFICER BANKS:  All

right.  Mr. Tyrka, would you like to close?

MR. TYRKA:  Yes.  I'd like to

start with Mr. Murray's testimony.  I really

appreciated his honesty, because I think Mr.

Murray confirmed some things about DCPS

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

251

procedure generally that I think we've all seen a lot of evidence for for a long time, namely that placement process in this case was that the packet got sent and arrived on his desk, that he looked around and found a school that fit the disability classification, and that that was the extent of his search.  The -- he then ran it passed the school and I guess Dr. Peterson, sounds like, he said approved of it.

And then it went to the meeting. Now at this meeting, there was nothing for DCPS to do, nothing they were going to do other than put this placement on the table. They weren't willing to hear any other options.  They didn't come with any other options, and they hadn't -- he had no authority to approve any other option.

So what we have from start to finish is one person, or in this case, I guess, two people (inaudible) independently,

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

252

outside of the parent's view, outside the

participation of any qualified expert or the

rest of the IEP team making a decision about

placement based solely upon the disability

classification.  And the law is very clear -

- when I saw they law, I'm referring to case

law -- I'm sorry I don't have a specific

cite, however, I can provide one.  But there

is clear case law that says a placement

decision cannot be made solely upon

disability classification.  Even if it

could, in this case, obviously the true

placement determination, and when I said

that something we've seen plenty of evidence

before but I haven't heard anybody confirm

exactly as clearly as Mr. Murray did just

now, the true placement determination

occurred long before this placement meeting

every happened.  And I don't know if I

really need to say anything more about that.

It's an obvious blatant violation of the

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

253

law.

As far as the case -- the rest of the case and the case that we made in our case in chief, we had, as I said in my opening, minimal information given at the meeting, so the parent was not given true participation. Mr. Murray was -- had barely any participation at all as he confirmed. Dr. Peterson's participation was very short, and she could not answer specific questions, as Ms. Millis testified, and all she could provide was just the overall schooling, so nothing on the class size or teacher qualifications, how they might be able to deal with some of the behavioral issues that J████████ has as well as her LD classification, what kind of individual attention they can provide and how they could meet J████████ particular needs. That was -- most of that was Ms. Millis' testimony, but all of that is confirmed by

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          (202) 234-4433

254

the MDT notes to which I've already

referred.  They're perfectly in agreement.

Furthermore, at that meeting, the

team did not make any decision regarding the

appropriateness of Prospect because of the

insufficience of the information provided by

DCPS.  Now Ms. Millis did go to do a school

visit as she testified, and that is all

uncontradicted testimony.  And she got more

information from Dr. Peterson on that visit.

Unfortunately, the information was not good.

she was told there's a class of ten

students, that all of the classifications of

the other students in the class -- they were

all LD, SLI and nothing about any behavioral

issues or OHI and that Dr. Peterson didn't

know the teacher qualifications and

obviously the bigger issue that Ms. Millis

was not allowed to meet with the teacher and

talk to her about her classifications, to

visit the school in any substance, to meet

with the service providers or anything like that.

So I think DCPS has failed in this case. We have proven that they have failed to follow any of the procedural requirements of providing an appropriate placement. And I do want to address that for a minute, because I think in a couple of minutes, we're going to hear a -- an argument from DCPS that if there's a procedural, it doesn't rise to a denial of FAITH, etcetera, etcetera.

There is no question that parent participation in the placement process, which is part of the IEP process, is a full part of the provision of FAITH and a vital part. As this Hearing Officer has observed many times, DCPS's prior notices are almost perfectly, consistently inadequate. This one is even something of a standout even by those standards. The prior notice has no

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433      WASHINGTON, D.C. 20005-3701      (202) 234-4433

256

information.  Now case law has held in the absence of a prior notice, the real prior notice, like in this case, the meeting can sometimes substitute.  But in this case, DCPS did not provide that information at a meeting, so it did not provide any of the information as required in the prior notice and in a true parent participation placement discussion.

Now regarding J█████████ needs and the appropriateness of Rock Creek, I think we are in disagreement that the -- she needs a full-time setting.  I guess the most recent -- the notes that we have here talk about 25 hours of specialized instruction along with OT, speech and language and counseling.

Now there's been some dispute in some of the meetings as is clear in the notes and Ms. Millis started to refer to, but as is clear in the notes and some of the

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          (202) 234-4433

257

evaluations, behavior has been a big concern

with J_____.   And while she has not been

classified as ED yet, she has kind of been

walking on the edge for a while now.  Both

the parent and Ms. Millis have actually been

arguing for an ED classification.  While

that was not made at the -- either of the

last meetings, the evaluator made clear, as

is in our clinical evaluation, our Number

16, the evaluator made clear that J_____ is

certainly in great danger of developing

behavioral issues that would go fully into

that category of ED.  So she's LD OHI but

the -- you know, whether it's part of her

ADHD or whether it's part of something else,

her behavior is certainly a main issue.

     So Rock Creek has established

that it can provide the small classroom

setting that is required that the team

recommended, five to six students are what

the note says -- the notes say and that's

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C.  20005-3701        (202) 234-4433

258

what Ms. Millis said as well.  Ms.  Millis

said six students.  I think Ms. Plowden

testified right now that it would -- J█████

would be actually the seventh student in the

class, but they are just about to open a new

class, so it would bring that down to their

level which is -- their standard level which

is six students maximum.  They can provide

her her specialized instruction with

qualified teachers in that small setting.

They have behavior plans overall for the

school, and they also specialize them to

meet the needs of the students.  And they

can provide the related services with

certified providers of those services.

Finally, I don't think there's

been any contest regarding the FBA and the

failure to conduct that, so we would ask for

-- well, in this case, given actually the

testimony that was taken out on cross, we

would not object to Rock Creek performing

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

259

the FBA if J_____ does move to Rock Creek.
And if she does not, we would ask for an
independent FBA.

If the Hearing Officer is not
inclined to place J_____ at Rock Creek, we
would ask that obviously a meeting be
scheduled as soon as possible to have the
real parent participation in the placement
discussion.  And at that meeting, we would
ask that there be a determination of
compensatory education for the failure to
provide an appropriate placement from the
start of the school year, or from September
13th I guess -- no, from the start of the
school year, excuse me, until the present.

HEARING OFFICER BANKS:  Okay.

MR. TYRKA:  I'm sorry, if I may?
The reason I jumped back and forth on that
was because Mr. Murray actually testified
that he had gotten the packet in mid August
so.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          (202) 234-4433

260

HEARING OFFICER BANKS:  Okay.

Ms. Harris-Lindsey?

MS. HARRIS-LINDSEY:  Okay.  Based

on the testimony that's come down, that's

provided and the information in the record,

first, the Hearing Officer doesn't have the

IEP, so there's a limit to -- I guess we're

taking a whole lot of things just based on

what we're hearing.  The process -- the

basic -- to the issues that were actually

raised, the FBA, there was nothing on direct

given at all as to why DCPS is responsible

for the FBA.  The student was attending --

attended up until mid -- attended up until

August -- mid August, an LEA charter school

that the law requires be responsible for

conducting evaluations.  So there is no --

there was no dispute as to the -- where the

responsibility lies for that -- conducting

that evaluation.  To the extent that another

setting is determined for her, the more

NEAL R. GROSS
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

261

appropriate setting would be where the student actually attends for -- to conduct an FBA.

With respect to what's being termed as a placement, Mr. Murray consistently said he looked a setting and he considered the school to be the setting where the IEP could be implemented.  It was the parent and the LEA in conjunction with her advocate, Ms. Millis, who agreed to a change in the student's placement which is a level of care.  And that is -- that's in IDEA that the level -- that continue alternative placements are the actual combination setting, full-time setting out of general education resource room.  It could be even home school.

So placement, that determination was made outside of DCPS and because they were at an -- the child attended the LEA, consistent with Chapter 30, 5019, and

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

262

consistent with 300 2.209, the DCPS is brought in as the SEA to identify where a program, a setting where the could be implemented. Under 3825.01, the priorities are already in placement with the law which Mr. Murray's correct. The law specifically says that where the DCPS has the obligation to look within its programs first before it moves a child into another -- outside of the DCPS system. So Mr. Murray indicated that he looked within DCPS's programs and identified -- researched DCPS programs and identified Prospect Learning Center as a setting that can implement the student's IEP. And once he looked at that --

HEARING OFFICER BANKS: Which SIT was it?

MS. HARRIS-LINDSEY: Thirty-eight -- DC Code 3825.01©), priority of placements.

HEARING OFFICER BANKS: 25.01©)?

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433        WASHINGTON, D.C. 20005-3701        (202) 234-4433

263

MS. HARRIS-LINDSEY:  Yes.

HEARING OFFICER BANKS:  Go ahead.

MS. HARRIS-LINDSEY:  And then once he identified a program within DCPS, then he took the packet to the -- to Dr. Peterson who is the principal of the program -- or that school -- and asked her to look at it to determine whether she believed this student was appropriate for her program.  He did not indicate in any of his testimony that he found a school that fit her disability.  He said -- he made a point of saying repeatedly that he wanted to find a program that was appropriate for the student, and Prospect was appropriate because it could meet, in addition her LD issues, her ADHD, or the Other Health Impaired issues.

The -- and when they went to the meeting, DCPS's only involvement at that point was to identify the setting, not

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

264

placement, not to change what level of care
she required but to identify what in DCPS's
panoply of schools she could -- they
believed was appropriate that could
implement the IEP.  Prospect was what was
proposed at that meeting, and Ms. Millis
indicated that the notes are consistent.
What she didn't indicate, the notes don't
change.  It says that there -- when they
described the Prospect Learning Center,
which she indicated she was very familiar
with, is that they could service her,
service J██████ disability classification,
which is LD, SLI and OHI, which is the ADD
and the ADHD type, that they had 13
homerooms, teachers all certified in special
education, that they had five certified
specialists, one OT, two resource teachers,
one special education coordinator, three
psychologists, two speech language -- speech
pathologists.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

265

The parent advocate indicated that she wasn't going to accept or reject the placement until they had an opportunity to go see the school. Now that's fine because I think the parent had she's going from the charter school into another program so that no one objected to her doing that. What I find -- what was interesting is Ms. Millis -- this is 9/13 -- Ms. Millis went to Prospect on 11/22, the day before Thanksgiving. Now she says she knows the program very well. She even has a student that's attending the program and has several students, I think she indicated, that had been referred to the program, had been referred to Prospect and that she called and just said I'm coming by is what she said. She spoke to someone in the office, told them she was coming.

In an hour long conversation with Dr. Peterson, she couldn't remember what she

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

266

was provided.  She couldn't remem-- she said
she didn't know or she didn't recall if Dr.
Peterson said that they could implement the
IEP at the school, but she did remember, on
cross, that she was given class size and she
was given the information about the
disability of the students in that
classroom.  But it was on her testimony on
direct, I'm sorry, on cross, that she
indicated that what she wanted to do was
walk around the school and talk to the
teachers.  And Dr. Peterson said it's the
day before a holiday, it's not a good time.

There was a lot of emphasis
placed on when -- who gave Dr. Peterson the
file and when it was received, but there's
nothing inconsistent with the fact that the
packet was received.  Dr. Peterson said she
had the packet at the meeting.  She
indicated she had received the file, and
then found that J█████ had been accepted.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

267

And Mr. Murray indicated that after he
received the packet from Friendship Edison
and before the 9/13 meeting, he went to --
he had provided the packet to Dr. Peterson.
So I don't what the significance was.  It
wasn't really followed up on, but regardless
of whether she received it on the 29th of
August or the 1st of August or the 4th of
August, she had the -- she had reviewed the
packet and had -- Dr. Peterson had reviewed
the packet and had made a programmatic
decision as to whether J▇▇▇▇▇ was
appropriate and whether Prospect could
provide services for -- for her.

        The Hearing Officer asked a
question about Prospect Learning Center.
Prospect Learning Center is the only full-
time LD program DCPS has for students of
ages -- I think there's primary K through
sixth grade up through 13.  I think you were
asking that question.  That's just a fact.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          (202) 234-4433

268

There is no other full-time LD program that
DCPS has for that age group of children.

Now Ms. Millis made an issue
about teacher certification, but that
information was provided at the meeting, and
it's in the meeting notes.

HEARING OFFICER BANKS:  Well, see
that's in the nature of testimony, and
that's what I was trying to get familiar
with.

MS. HARRIS-LINDSEY:  Okay.  I'm
just going through the record.

HEARING OFFICER BANKS:  No.  I'm
talking about what you just said about
Prospect.

MS. HARRIS-LINDSEY:  About --

HEARING OFFICER BANKS:  I wanted
him to tell me why --

MS. HARRIS-LINDSEY:  Oh, okay.

HEARING OFFICER BANKS:  --

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

269

Prospect was the only appropriate placement in Washington DC for an LD kid.  I didn't understand that.

       MS. HARRIS-LINDSEY:  Okay.  I knew it -- that's why.  But that's factual.  That's -- I mean -- understand.

       HEARING OFFICER BANKS:  I understand but it didn't come in through sworn testimony.

       MS. HARRIS-LINDSEY:  Okay.

       HEARING OFFICER BANKS:  But that's exactly the kind of testimony I was looking for from him.

       MS. HARRIS-LINDSEY:  Okay.  Well, that's a good way to end the meeting.  Okay.  We talked about, I think -- so I don't really think I need to address -- I'm not going to address Rock Creek, because Rock Creek said what they said, that -- I'm going to hold them to that.  But I think they indicated they had six students currently,

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

270

J████ would be the seventh and that
they're hiring. I don't know what that means
that they're hiring.  I mean that could be
today, tomorrow, next month, three months
down the road, so where they stand now is
six students currently.  J██████ would be
the seventh.  In Prospect, they have nine
students.  J█████ would be the tenth.

Both -- I think Rock Creek went
down their credentials or (inaudible)
identified who all is on their staff, but
Prospect is also considered a therapeutic
center, so the -- having the staff on site,
if that makes it therapeutic, then both
schools are consistent.  And under the
priority of placement, DCPS has to go in-
house before they got out-house, outside the
program.

So to the extent, as the case was
presented, DC -- one, I don't believe the
parent met their burden, one, that the

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433      WASHINGTON, D.C.  20005-3701      (202) 234-4433

271

student requires an FBA.  That was -- Ms.
Millis never testified to it nor I don't
believe she ever laid any credit-- provided
any credentials that would even indicate
that she would be -- that the students needs
one, but at the most -- most importantly,
the student, that's the -- that was -- that
would have been the responsibility, at the
time, of Friendship Edison.

    With respect to placement, it's
really going to be, I guess, a legal --
there's a legal -- the process that Mr.
Murray followed, I think, is consistent with
the law.  Parent was not refused
participation, and there is some question, I
think leave it to the Hearing Officer, as to
why two months, more than two months passed
before there was an attempt to visit
Prospect Learning Center, probably at one of
the most inopportune times, before a
holiday.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          (202) 234-4433

272

HEARING OFFICER BANKS:  Where is she now?

MR. TYRKA:  Friendship.

HEARING OFFICER BANKS:  Still at Friendship?

MR. TYRKA: She stayed put.

HEARING OFFICER BANKS:  (Inaudible.)

MR. TYRKA:  Or --

MS. HARRIS-LINDSEY:  I don't know if that's --

MR. TYRKA:  I don't know if we had to do it formally.  I believe we did. Yes, we did a stay put --

MS. HARRIS-LINDSEY:  I don't know if a stay put really affects them.  Well, they do --

MR. TYRKA:  (Inaudible.)

MS. HARRIS-LINDSEY:  -- they get funding, so that's right.

HEARING OFFICER BANKS:  Okay.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    (202) 234-4433

273

Thank you very much.

MR. TYRKA:  If I may as a rebuttal, the FBA is in the notes as, I think, I said in my opening.

HEARING OFFICER BANKS:  Have that.

MR. TYRKA:  (Inaudible) -- and also, Ms. Plowden did say that the hiring was already in progress.  It was not particular to J██████.

HEARING OFFICER BANKS:  I got that.

MR. TYRKA:  I thought you didn't. Thank you.

(Whereupon, the foregoing matter was concluded.)

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C.  20005-3701    (202) 234-4433

274